ALAN v WAYNE COUNTY

Opinion of the Court

1. Taxation—Counties—Stadium—Millage—Debt Limitations.

The Michigan Supreme Court cannot, under law, hold that a county can tax without millage or debt limitations and without a vote of the people, based on a legal theory that justifies a county building a stadium whether or not there are any paying customers to use and pay for it.

References for Points in Headnotes

[1] 56 Am Jur 2d, Municipal Corporations, Counties and Other Political Subdivisions §§ 202, 543, 592–599, 614–619.

[1, 3, 20, 21, 73–75, 79, 95, 117] Auditorium or stadium as public purpose for which public funds may be expended or taxing power exercised, 173 ALR 415.

[2] 56 Am Jur 2d, Municipal Corporations, Counties and Other Political Subdivisions § 193.

[3] 43 Am Jur, Public Securities and Obligations §§ 21, 23, 52–60, 285.

[3–10, 12–19, 22, 23, 38–45, 50–53, 57, 60, 61, 70, 72–76, 79–81, 94–98, 100, 103, 107, 111, 114–117] 43 Am Jur, Public Securities and Obligations §§ 280–282, 285.

[11] 56 Am Jur 2d, Municipal Corporations, Counties and Other Political Subdivisions § 195.

[27, 30–32, 34, 35, 37, 62, 63, 71, 77, 78, 83, 99, 104, 108, 112] (No references)

[17, 18, 24–26] 50 Am Jur, Statutes §§ 210–216.

[12, 16, 18, 22, 113–116] 50 Am Jur, Statutes §§ 165, 179, 184.

[28, 29, 68] 50 Am Jur, Statutes §§ 133–135.

[33] 16 Am Jur 2d, Constitutional Law § 56.

[36] 16 Am Jur 2d, Constitutional Law §§ 62, 63.

[43–48, 51–53, 56–59, 100–103] 56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions § 619 et seq.

[49, 65] 43 Am Jur, Public Securities and Obligations §§ 168, 169.

[52] 43 Am Jur, Public Securities and Obligations § 77.

[54] 56 Am Jur 2d, Municipal Corporations, Counties and Other Political Subdivisions § 195.

[55, 56] 16 Am Jur 2d, Constitutional Law § 62.

[58, 59] 56 Am Jur 2d, Municipal Corporations, Counties and Other Political Subdivisions § 598.

[64] 56 Am Jur 2d, Municipal Corporations, Counties and Other Political Subdivisions § 625.

2. COUNTIES—POWERS—CONSTITUTIONAL LAW—STATUTES—BUILDING AUTHORITIES—BONDS.

A county has only such powers as have been granted to it by the Constitution or state Legislature and one such power granted by law is that of incorporating building authorities as provided in a statute; another power is that of issuing bonds (Const 1963, art 7, §§ 1, 8; art 9, § 13; MCLA 123.951 *et seq.).*

3. STATUTES—REVENUE BOND ACT—STADIUM.

The Revenue Bond Act provides for the issuance of bonds for public improvements including stadiums (MCLA 141.101 *et seq.).*

4. STATUTES—REVENUE BOND ACT.

The only kind of bond the Revenue Bond Act authorizes is one which is paid off by "revenues" which are derived from the "operation" of the proposed public improvement (MCLA 141.101 *et seq.).*

5. COUNTIES—STADIUM—BONDS—BUILDING AUTHORITY ACT.

Proposed stadium bond issue, which is based on a "Fixed Rental" paid by the county rather than the revenues paid to the county, is not authorized by the building authority act for the proposed stadium bond issue (MCLA 123.951 *et seq.).*

6. STATUTES—LEGISLATURE—BUILDING AUTHORITY ACT—BONDS—STADIUM.

The Legislature opened up the building authority act to permit a building authority either to "use" the public improvement itself or to sublease the public improvement to ultimate actual "users

[66] 56 Am Jur 2d, Municipal Corporations, Counties and Other Political Subdivisions §§ 598, 614.
[67] 56 Am Jur 2d, Municipal Corporations, Counties and Other Political Subdivisions §§ 594–596.
[69] 56 Am Jur 2d, Municipal Corporations, Counties and Other Political Subdivisions § 664.
[73–75, 79, 95] 56 Am Jur 2d, Municipal Corporations, Counties and Other Political Subdivisions §§ 202, 203, 543.
[80, 81, 86–92, 94, 105, 106] 43 Am Jur, Public Securities and Obligations §§ 77–87.
[82] 43 Am Jur, Public Securities and Obligations § 98.
[84, 85, 88–90, 92, 93] 16 Am Jur 2d, Constitutional Law § 542 *et seq.*
[109] 51 Am Jur, Taxation §§ 1218, 1226, 1235.
[110] 50 Am Jur, Statutes § 190.
[118, 119] 56 Am Jur 2d, Municipal Corporations, Counties and Other Political Subdivisions §§ 556, 590.

of" and still preserve the public purpose of the public improvement, such as a stadium, but the Legislature maintained and held inviolate the true self-liquidating revenue character of the bonds (MCLA 123.951 *et seq.*).

7. COUNTIES—STADIUM—BONDS—REVENUE BOND ACT.

Stadium bonds are not authorized by the Revenue Bond Act where the stadium bonds are backed by the full faith and credit of a county because, that act provides for only one type of full faith and credit bonds and stadium bonds do not fall within that type (MCLA 141.101 *et seq.*).

8. TAXATION—HOTEL/MOTEL TAX—COUNTIES—STADIUM.

All the hotel/motel tax act does is authorize a county having a population of 1,500,000 or more to levy a tax *after* the sale of stadium bonds (MCLA 141.851 *et seq.*).

9. COUNTIES—STADIUM—BONDS.

A county was not authorized to add its full faith and credit to a stadium bond issue payable solely from net revenues derived from the operation of the public improvement, since the project had not received more than 25% financing from Federal or state grants.

10. COUNTIES—BUILDING AUTHORITY ACT—STATUTES—STADIUM—BONDS.

A section of the building authority act, which provides that "the authority may issue self-liquidating revenue bonds in accordance with and subject to the provisions of Act No. 94 of the Public Acts of 1933", does not authorize stadium bonds because the stadium bonds are not "self-liquidating revenue bonds" and the stadium bonds are not "in accordance with and subject to the provisions of Act 94" (MCLA 123.961, 141.101 *et seq.*).

11. STATUTES—CONSTRUCTION.

A well established rule of statutory construction provides that where powers are specifically conferred they cannot be extended by inference, but the inference is that it was intended that no other or greater power was given than that specified.

12. STATUTES—BUILDING AUTHORITY ACT—REVENUE BOND ACT—BONDS.

The title of the building authority act does not include the concept of bonds other than revenue bonds, or bonds provided for in the Revenue Bond Act (MCLA 123.951 *et seq.*, 141.101 *et seq.*).

13. COUNTIES—STADIUM—BONDS—BUILDING AUTHORITY ACT.

Section of the building authority act providing in part that "such bonds shall be payable solely from the revenues of such property, which revenues shall be deemed to include payments made under any lease or contract for the use of such property" does not authorize proposed stadium bonds of a county where the stadium bonds are not payable solely from the revenues derived from the operation of the public improvement (MCLA 123.961).

14. CONSTITUTIONAL LAW—STATUTES—BUILDING AUTHORITY ACT— TAXATION—BONDS.

Provision in a section of the building authority act, which states that "where and to the extent that the bonds are payable from revenues derived from payments to be made pursuant to any lease or other contract obligations, the bonds shall be deemed to be issued in anticipation of contract obligations and such obligations shall be deemed to be contract obligations in anticipation of which bonds are issued, within the meaning of section 6 of article 9 of the constitution"; that section of that article of the constitution refers to "taxes imposed for the payment of principal and interest on bonds"; it imposes no taxes and in no way authorizes the issuance of bonds (Const 1963, art 9, § 6; MCLA 123.961).

15. STATUTES—BUILDING AUTHORITY ACT—SCHOOLS AND SCHOOL DIS- TRICTS—COUNTIES—STADIUM—BONDS—CONSTITUTIONAL LAW.

Sentence providing "where and to the extent that bonds are payable from revenues derived from payments to be made pursuant to any lease or other contract obligations, the bonds shall be deemed to be issued in anticipation of contract obliga- tions and such obligations shall be deemed to be contract obligations in anticipation of which bonds are issued, within the meaning of section 6 of article 9 of the constitution", was incorporated into the building authority act with the intent that school (governmental) use of a building would be consid- ered a self-liquidating revenue use outside the 15-mill limita- tion; the sentence was to import the actual occupier/user rather than being specially added for a non-user conduit such as a county in the stadium bond structure (Const 1963, art 9, § 6; MCLA 123.961).

16. STATUTES—BUILDING AUTHORITY ACT—CONSTITUTIONAL LAW— TAXATION—BONDS.

If anything in a section of the building authority act is construa- ble as empowering an appointed authority to issue bonds other

than self-liquidating revenue bonds, such as bonds secured in whole or in part by property taxation, that construction must fall before the title of the act as it stands (Const 1963, art 4, § 24; MCLA 123.951 *et seq.*).

17. STATUTES—CONSTITUTIONAL LAW—BUILDING AUTHORITY ACT—BONDS.

Sentence in a section of the building authority act offended the Michigan Constitution if it purported to substitute full faith and credit for the normal revenue from the property as the source of payment for the authorized bonds unless it "reenacted and published at length" any part of the Revenue Bond Act as well as the building authority act amended, which in fact it did not; this is because the building authority act incorporates a section of the Revenue Bond Act by reference and therefore, under a decision of the Michigan Supreme Court, anything in the building authority act or any act to amend that act purports "to dispense with something required by that Act, and to make some changes", offends a section of an article of the Constitution (Const 1963, art 4, § 25; MCLA 123.951, 141.101 *et seq.*).

18. STATUTES—AMENDMENTS—TITLE OF ACT—BUILDING AUTHORITY ACT—CONSTITUTIONAL LAW—STADIUM—BONDS—TAXATION—COUNTIES.

A section of the building authority act cannot be read to authorize either tax support of the "Fixed Rental" to be paid by a county to a building authority or tax bonds without offending the Michigan Constitution provision requiring unity of title and text or the constitutional provision requiring appropriate methods of amendment; consequently, county stadium bonds, which are tax bonds are not valid (Const 1963, art 4, §§ 24, 25; MCLA 123.961).

19. TAXATION—STATUTES—BUILDING AUTHORITY ACT—REVENUE BOND ACT—COUNTIES—STADIUM—BONDS.

The operative part of the building authority act as far as authorizing a bond issue is concerned, authorize only self-liquidating revenue bonds pursuant to the Revenue Bond Act and the arguments and inferences that tax bonds may be issued under either of those acts are without valid foundation; neither act authorizes stadium bonds which are tax bonds (MCLA 123.951 *et seq.*, 141.101 *et seq.*).

20. COUNTIES—STADIUM—BONDS—BUILDING AUTHORITY ACT—REVENUE BOND ACT.

A county is pledging its full faith and credit not only to pay the

rent of a stadium but also to pay the bonds for the stadium, neither of which the building authority act and the Revenue Bond Act permit, where the county's full faith and credit is pledged for the payment of the county's rent to the building authority and the building authority is not separate from the government and autonomous but acting as an alter ego (MCLA 123.951 *et seq.,* 141.101 *et seq.).*

21. STATUTES—AMENDMENTS—BUILDING AUTHORITY ACT—REVENUE BOND ACT.

The building authority act does not amend or alter the Revenue Bond Act (MCLA 123.951 *et seq.,* 141.101 *et seq.).*

22. STATUTES—BUILDING AUTHORITY ACT—TITLE—CONSTITUTIONAL LAW—BONDS—COUNTIES—STADIUM.

The building authority act embraces an object not expressed in its title, if it authorizes stadium bonds supported by the full faith and credit of a county, and is to that extent an unlawful authorization of such bonds (Const 1963, art 4, § 24; MCLA 123.951 *et seq.).*

See headnote 115.

23. TAXATION—STATUTES—BUILDING AUTHORITY ACT—REVENUE BOND ACT.

The building authority act does not create a tax bond "exception" to the Revenue Bond Act because there is no expressed legislative intent to create such an exception (MCLA 123.951 *et seq.,* 141.101 *et seq.).*

24. STATUTES—REFERENCE—SCOPE OF ACT.

A reference merely to a section of another statute can no more broaden it or enlarge its scope than could its literal reenactment in the new statute in the place it was designed to fill; in neither case, without some change in the phraseology of the act referred to, can its provisions be materially enlarged, while it may very materially limit the effect of the act of which it has thus become a part.

25. STATUTES—AMENDMENTS—CONSTITUTIONAL LAW.

The Legislature, when it intends to amend a previous act, must do so in conformance with the plain and unequivocal requirements of a section of an article of the Michigan Constitution (Const 1963, art 4, § 25).

26. STATUTES—AMENDMENTS—CONSTITUTIONAL LAW.

An act, if it is to be referred to or incorporated by reference, will be treated as incorporated without any changes unless the

sections intended to be altered or amended are reenacted and published at length as required by a section of an article of the Michigan Constitution (Const 1963, art 4, § 25).

27. CONSTITUTIONAL LAW—CONSTRUCTION.

The Michigan Supreme Court cannot approve a construction that allows the purpose and spirit of the constitution to be evaded by seizing on particular words and following them "precisely" to the detriment of the plain meaning of the full text.

28. STATUTES—AMENDMENTS—CONSTITUTIONAL LAW.

Any bill enacted into law must be published by virtue of a section of an article of the Michigan Constitution but that section of the constitution does not require the existing statute which was physically amended to be reenacted and republished in full; however, by virtue of another section of that article of the constitution the specific section amended in terms by the new bill must be reenacted and published just as any other law must be published (Const 1963, art 4, §§ 25, 35).

29. CONSTITUTIONAL LAW.

The Michigan Constitution is not satisfied with halfway measures and does not prefer dissimulation to straightforwardness.

30. STATUTES—AMENDMENTS—PUBLICATION—CONSTITUTIONAL LAW.

Statute C cannot be amended, under a section of an article of the Michigan Constitution, even by putting in statute B specific words to amend statute C, unless both statutes B and C are republished (Const 1963, art 4, § 25).

31. STATUTES.

It should not be impossible to tell what the law is.

32. STATUTES—AMENDMENTS BY IMPLICATION.

The Legislature, where it really intends to amend previous statutes so that their operation is narrower or broader than stated or previously construed to be, then this intent as expressed *is not amendment by implication* and cannot be rendered amendment by "implication" by the device of failing to point out the specific section intended to be altered or amended.

33. CONSTITUTIONAL LAW.

Constitutional duties and requirements may not be avoided on the ground that it might be a lot of work to comply with the constitution.

34. STATUTES—INTERPRETATION—AMENDMENTS—PUBLICATION—CONSTITUTIONAL LAW.

In the absence of specific legislative intent to amend or alter other statutes the Michigan Supreme Court will treat them as in existence and interpret them as they are written unaffected by subsequent statutes; if it is intended to amend or alter those other statutes then it should be stated specifically and those statutes must be amended or altered directly and republished as contemplated by a section of an article of the Michigan Constitution (Const 1963, art 4, § 25).

35. STATUTES—AMENDMENTS—CONSTITUTIONAL LAW—LEGISLATURE.

If a bill under consideration is intended, directly or indirectly, to revise, alter, or amend the operation of previous statutes, then the constitution, unless and until appropriately amended, requires that the Legislature do in fact what it intends to do by operation (Const 1963, art 4, § 25).

36. CONSTITUTIONAL LAW—INTERPRETATION.

The constitution must be given a reasonable interpretation.

37. STATUTES—BUILDING AUTHORITY ACT—REVENUE BOND ACT.

The reference in the building authority act to the Revenue Bond Act has the legal effect of incorporating that act in all of its terms without amendment or alteration into a section of the building authority act (MCLA 123.951 *et seq.,* 141.101 *et seq.*).

38. STATUTES—BUILDING AUTHORITY ACT—BONDS—TERM BONDS—SERIAL BONDS—REVENUE BOND ACT.

The proviso in a section of the building authority act which says that the bonds may be term bonds is of no effect and the bonds may only be the serial bonds authorized in a section of the Revenue Bond Act (MCLA 123.961, 141.107).

39. STATUTES—REVENUE—REVENUE BOND ACT—BUILDING AUTHORITY ACT.

The definitions of "revenue" in the Revenue Bond Act are not and cannot be excepted by any statement in a section of the building authority act no matter how specific these provisos might be phrased; in order to change the definition of "revenue" in the Revenue Bond Act direct amendments would be required at least to two sections of that act (MCLA 123.961, 141.103, 141.107).

40. STATUTES—TITLE—BUILDING AUTHORITY ACT—REVENUE BOND ACT—TAXATION—CONTRACTS.

The purported authorization in a section of the building authority

act of unlimited taxes to support the contract obligation in anticipation of which bonds are issued under the Revenue Bond Act can be of no effect without direct amendments to at least two sections of the Revenue Bond Act, as well as the title to the building authority act (MCLA 123.951 *et seq.,* 141.107, 141.113).

41. STATUTES—REFERENCES—BUILDING AUTHORITY ACT—REVENUE BOND ACT.

The reference in a section of the building authority act to the limits of the authority for purposes of voting in a section of the Revenue Bond Act does not amend, alter or revise anything in that section of the Revenue Bond Act, because it merely restates in other words what is stated in that section of the Revenue Bond Act (MCLA 123.961, 141.133).

42. CONSTITUTIONAL LAW—STATUTES—STADIUM—BONDS—NON-REVENUE BONDS.

Stadium bonds are illegal because the Stadium Authority had no statutory or constitutional power under the circumstances to issue non-revenue bonds.

43. COUNTIES—STADIUM—BONDS—REVENUE BONDS—TAX BONDS—DEBT LIMITATIONS—TAXATION.

Stadium bonds, that are not self-liquidating revenue bonds but are in fact unlimited tax bonds and general, direct obligations of a county, are tax bonds and are subject to debt limitations as are all other similar tax bonds.

44. CONSTITUTIONAL LAW—DEBT LIMITATIONS—BONDS—REVENUE BOND ACT.

The Michigan Supreme Court in effect created a constitutional definition of a "self-liquidating revenue bond" under the Revenue Bond Act and constitutional debt limits; bonds issued under that act do escape inclusion as "debt" not simply because they have been issued under that act but rather because of the character of the bonds required by that act (MCLA 141.101 *et seq.).*

45. CONSTITUTIONAL LAW—REVENUE BONDS—TAXATION—DEBT LIMITATIONS.

As a constitutional definition, "self-liquidating revenue bonds" do not obligate the general taxing power and hence do not create a debt subject to debt limitations.

46. COUNTIES—RENT—CONSTITUTIONAL LAW—DEBTS.

Rent payments for a building used by a county must be reasona-

ble and even if the county does not get title at the end of the lease, it may not incur an *unconditional* "rental" obligation without obligating its full faith and credit and hence incurring "debt" in the constitutional sense.

47. COUNTIES—CONTRACTS—LEASES—CONSTITUTIONAL LAW—STATUTES —DEBT LIMITATIONS.

Contracts or leases by a county, in which the county pledges to levy sufficient taxes and collect sufficient revenues from other sources to make the payments, are within the constitutional and applicable statutory debt limits.

48. TAXATION—BUILDING AUTHORITY ACT—CONSTITUTIONAL LAW.

A section of the building authority act and a section of an article of the Michigan Constitution do not authorize the levy of taxes under that act much less taxes "without limitation as to rate or amount" (Const 1963, art 9, § 6; MCLA 123.961).

49. COUNTIES—TAXATION—BUILDING AUTHORITY—BONDHOLDERS.

Court of Appeals decision that a county is authorized to levy annually such *ad valorem* taxes as may be necessary to meet its obligations to a building authority under the contractual arrangements of the parties is overruled but the rights of bona fide bondholders remain inviolate.

50. COUNTIES—LANDLORD AND TENANT—RENT—STADIUM.

Payments by a county to a stadium authority cannot be rent for the stadium where the county is not a user of the stadium under a section of the building authority act (MCLA 123.961).

51. COUNTIES—DEBTS—STADIUM—MUNICIPAL FINANCE COMMISSION— REVENUE BOND ACT.

Approval of the Municipal Finance Commission, which was premised upon a stadium bond obligation not being a debt of a county when it was a debt, is without legal effect and the bonds are illegal since approval is required as a condition precedent to their issuance by a section of the Revenue Bond Act (MCLA 141.127).

52. COUNTIES—STADIUM—CONTRACTS—BONDS—STATUTES.

One-tenth of one mill of the assessed valuation of Wayne County is far below 371 million dollars and the "raising" of this amount for building purposes of the county requires, under statutes, a vote of the people which has not been had so the contract and, therefore, the bond security for a stadium is void (MCLA 46.7, 141.71).

53. Counties—Stadium—Lease—Purchase—Bonds—Revenue Bond Act—Building Authority Act—Statutes—Constitutional Law.

If a lease of a stadium by a stadium authority to a county really is a purchase then the bonds issued to finance that stadium are illegal (a) since the county has presently borrowed or "raised" more than one-tenth of one mill for a building purchase without a vote of the people in violation of statutes and (b) since the bonds are not revenue bonds under the Revenue Bond Act and the building authority act, since the bonds are not secured by "revenue" derived from the operation of the property and (c) since the bonds do not conform either to a section of the Revenue Bond Act or to the statement on their face that they do not create debt within any statute or constitutional provision (MCLA 46.7, 123.951, 141.71, 141.101 *et seq.).*

54. Municipal Corporations—Powers.

Powers of municipalities involving the imposition of public burdens should be strictly construed.

55. Constitutional Law—Construction—Life—Liberty—Property.

Provisions of the Michigan Constitution for the protection of life, liberty and property are to be largely and liberally construed in favor of the citizen.

56. Constitutional Law—Any Indebtedness—Secondary Obligation—Counties—Bonds.

The constitutional phrase "any indebtedness" also requires a broad construction so as to include the so-called "secondary obligation" of counties when they back up the bonds of other units of government with a pledge of full faith and credit.

57. Counties—Credit—Revenue Bonds—Statutes—Constitutional Law—Debt Limitations.

A county's pledge of credit behind "revenue bonds" is within the constitutional debt limitation to the extent pledged; anything to the contrary in statutes or previous case law is of no effect (Const 1963, art 7, § 11).

58. Constitutional Law—Indebtedness—Statutes—Legislature.

The Legislature has no power to determine by statute the meaning of "indebtedness" for constitutional purposes (Const 1963, art 7, § 11).

59. Constitutional Law—Governmental Units—Obligations—Bonds—Municipal Finance Commission—Municipal Corporations—Contracts—Debts.

Governmental units who may incur "obligations" and the Munici-

pal Finance Commission who must approve some of these obligations *(i.e.* those which involve certain kinds of bonds) are forewarned that the Michigan Supreme Court will not bend and twist the constitution in response to emergencies or pleaded necessity; "debt" will not be construed to mean something just below whatever the aggregate total of obligations a particular distressed municipality has; the Court will construe debt to mean what the people intended it to mean regardless of its effect on municipal contracts, debts, liabilities, bonds, *etc.*

60. COUNTIES—REVENUE BONDS—RENT—DEBTS—BONDS.

A true revenue bond or "true rent" creates no indebtedness in judging the creation of debt in connection with a public bond issue.

61. COUNTIES—REVENUE BONDS—PUBLIC IMPROVEMENTS.

A true revenue bond is one that is payable solely from the revenues derived from the operation or use of the public improvement in question.

62. MUNICIPAL CORPORATIONS—COUNTIES—RENT—PUBLIC IMPROVE-MENT.

A municipality must, for a true rent situation, be the actual user of the public improvement except where it acts merely as a conduit and the actual users, such as a professional baseball team, pay the rent and a true rent payment must be reasonable in that it must bear a direct relation to the economic or market value to the county of its actual use of the public improvement; a true rent payment may include operating costs if they are a normal part of such a rental and the total payment of rent and/or including operating costs is reasonable.

63. MUNICIPAL CORPORATIONS—RENT—CONTRACTS—DEBTS.

A municipality in connection with its contract to pay "rent" may make no unconditional covenant to pay despite such contingencies as would make the facility unavailable for use by the renter without creating a debt whether or not title passes and the municipality may not pledge its full faith and credit to support its rent without creating a debt.

64. COUNTIES—SECONDARY DEBT—BONDS—DEBTS—CONSTITUTIONAL LAW.

Secondary debt involves a county's full faith and credit to support bonds of other units of government in certain contingencies and is a debt within a section of an article of the Michigan Constitution (Const 1963, art 7, § 11).

65. Bonds—Bona Fide Purchasers—Supreme Court.

The rights of bona fide purchasers of bonds to be paid according to the tenor of the obligations cannot be impaired by a subsequent holding of the Michigan Supreme Court.

66. Constitutional Law—Debts—Legislature.

The meaning of debt in the Michigan Constitution cannot be altered by legislative action (Const 1963, art 7, §§ 2, 11).

67. Counties—Unchartered Counties—Debt Limitations.

The Legislature has the authority to establish or alter debt limitations for unchartered counties within the ten percent limit of a section of an article of the Michigan Constitution (Const 1963, art 7, § 11).

68. Counties—Unchartered Counties—Statutes—Amendments—Publication—Building Authority Act—Constitutional Law.

Provision in a section of the building authority act that "any rental obligation or consideration applicable to the incorporating unit or units under such contract, shall not be considered as indebtedness of the incorporating unit or units within the meaning of any statutory or charter debt limitation of such incorporating unit or units" is void and of no effect as to unchartered counties because the Legislature failed to observe the Michigan Constitutional republication requirements on amendments (Const 1963, art 4, § 25; MCLA 123.958).

69. Taxation—Revenue Bonds—Rent—Constitutional Limitations.

Payments by a municipality of rents for buildings financed by revenue bonds are part of the municipality's normal operating expenses and must come from normal revenues, including *ad valorem* taxes, and the *ad valorem* taxes from which rents are paid are subject to the limitations imposed by the state constitution (Const 1963, art 9, § 6).

70. Taxation—Revenue Bonds—Constitutional Limitations.

Revenue bonds issued by a local building authority as authorized by statute, except those which qualify to have the municipality pledge its full faith and credit, are subject to the limitations imposed on taxation by the state constitution (Const 1963, art 9, § 6; MCLA 123.951 *et seq.;* MCLA 141.101 *et seq.).*

71. Taxation—Tax Bonds—Constitutional Limitations.

Tax bonds issued for the payment of any of the categories indicated in the second paragraph of Constitution 1963, art 9,

§ 6 are free of the limitations in the first paragraph of that section, but are subject to the ten percent limitation of Constitution 1963, art 7, § 11 (Const 1963, art 7, § 11; art 9, § 6).

72. STATUTES—CONSTRUCTION—REVENUE BONDS—TAX BONDS.

That part of the statute which authorizes the issuance of bonds by local building authorities, if it purports to remove revenue bonds from the millage limitations imposed by the state constitution, is invalid, and if it purports to free tax bonds of the limitations is ineffective because neither the local building authority act nor the Revenue Bond Act of 1933 authorizes tax bonds (Const 1963, art 9, § 6; MCLA 123.961).

73. CONSTITUTIONAL LAW—STADIUM—MUNICIPAL CORPORATIONS—PUBLIC PURPOSE.

The building of a stadium is not prevented from being a "public purpose" under the constitution by the fact that it will be used and is intended to be used primarily by private profit-making sports organizations.

74. MUNICIPAL CORPORATIONS—REVENUE BONDS—STADIUM—ABSOLUTE NECESSITY.

A showing of "absolute necessity" is not required to justify the building of a stadium by a local building authority where the stadium is to be financed by revenue bonds and to be paid for by private users who must pay sufficient revenues to provide for the retirement of principal and interest on the bonds (MCLA 123.961).

75. MUNICIPAL CORPORATIONS—LOCAL BUILDING AUTHORITY—STADIUM—INCREASED BUSINESS ACTIVITY—STATUTES.

The statute authorizing a local building authority to acquire a stadium and lease it for sports, recreational, and other activities "thus to increase business activity and employment" does not make increased business activity a condition which must be met by proof to justify acquisition of the stadium (MCLA 123.958).

76. COUNTIES—STATES—REVENUE BONDS—PLEDGE OF CREDIT.

No pledge of credit is given by the state or its subdivision county in true revenue bond financing of a stadium, and the bondholders must look to the actual users of the stadium to pay off the bonded indebtedness, not to the county whose building authority issued the bonds; thus true revenue bond financing does not violate the constitutional prohibition on granting the credit of the state (Const 1963, art 9, § 18).

77. CONSTITUTIONAL LAW—STATES—COUNTIES—PLEDGE OF CREDIT.

Neither the state nor its subdivision county may give anything away without consideration, whether for a public or private purpose, but when the state acquires or transfers something of value in return for value it does not offend the constitutional prohibition on granting the credit of the state (Const 1963, art 9, § 18).

78. CONSTITUTIONAL LAW—STATES—PLEDGE OF CREDIT—FAIR VALUE.

The determination of whether the state has received fair value for what it has given and thus has not violated the constitutional prohibition on granting the credit of the state is for officers of the Legislative and Executive branches to make in the exercise of a proper judgment and will be respected by the courts unless there has been a clear abuse of discretion (Const 1963, art 9, § 18).

79. TAXATION—TAX BONDS—STADIUM—LEASE—RENT—FAIR VALUE.

The rental to be paid by a major user, such as a major-league baseball team, of a municipal stadium financed by valid tax bonds rather than revenue bonds, would be the fair market value of the facilities to the team rather than the revenue-bond standard of liquidating a proportionate share of the bonded indebtedness.

80. STATUTES—NOTICE—REVENUE BONDS—REVENUE BOND ACT—PETITION BY ELECTORS.

There is no absolute constitutional right to vote on revenue bonds but under a section of the Revenue Bond Act a vote must be held if, within 30 days of the publication of a "Notice of Intent to Issue Bonds", a petition is filed signed by 10% of the electors of the borrower (MCLA 104.133).

81. STATUTES—NOTICE—REVENUE BOND ACT.

The legal purpose of the Notice of Intent, as required by a section of the Revenue Bond Act, is to provide information so as a taxpayer can decide whether to seek a vote (MCLA 141.133).

82. CONSTITUTIONAL LAW—EQUAL PROTECTION—SCHOOL ELECTIONS—REVENUE BONDS.

Even though there is no Federal constitutional right to vote in certain school elections, once the right is given, lines cannot be drawn inconsistent with equal protection; the same rule applies to voting on revenue bond issues.

83. CONSTITUTIONAL LAW—DUE PROCESS.

A citizen, merely because he has no constitutional right to

something, cannot be forced to take that something burdened with whatever classification and unfair procedures the Legislature attaches; once a right is given, be it a job, the right to vote, a telephone, the right to hold property, the right to bid on government contracts or whatever, that right cannot be restricted by means not consonant with due process.

84. CONSTITUTIONAL LAW—EQUAL PROTECTION—DUE PROCESS.

Every denial of equal protection is a fortiori, a denial of due process.

85. CONSTITUTIONAL LAW—DUE PROCESS—STATES.

A state may not grant a "privilege" and burden it with procedures violative of due process.

86. NOTICE—COUNTIES—STADIUM.

The Notice of Intent for a bond issue for a stadium was defective in both its method of reaching taxpayers and its substance because the right to petition cannot be created and cut off by fine print in the back of a newspaper and because it failed to inform the reader of its purpose and was misleading.

87. NOTICE.

The method of notice chosen must give reasonable assurance of actually giving notice in light of other available means; the kind of notice required depends upon the circumstances of the case and the availability of other means in both a theoretical and economic sense.

88. CONSTITUTIONAL LAW—DUE PROCESS—CUSTOMARY PROCESS.

Customary process is not necessarily due process.

89. COUNTIES—CONSTITUTIONAL LAW—DUE PROCESS—BONDS—TAXATION—NOTICE.

To comport with due process any notice respecting petition rights on bonds supported by any pledge of tax power of a county must state to whom the notice is issued and for what purpose; it must tell the electors and taxpayers of a county that it is issued for their benefit; it must contain enough information so that it can be told from its face in plain and understandable language that the notice concerns some particular right or obligation respecting the subject matter of the notice; the notice must explain the nature of the right (or obligation) and what is required to exercise it and the consequence of not exercising it; regarding the subject matter of the notice there must be enough information so that a meaningfully informed decision respecting the right can reasonably be made from

information supplied in plain language on the face of the notice.

90. CONSTITUTIONAL LAW—STATUTES—PUBLIC OFFICIALS—BONDS— TAXATION—TRUSTS—FIDUCIARY STANDARD.

   The government and its public officials occupy a position of trust and a fiduciary standard should be applied to them where they are acting under a constitutional and statutory duty to give notice to the public of what the government proposes, and especially where it concerns rights of electors respecting important undertakings of government such as the issuance of bonds secured by taxing powers.

91. NOTICE—MUNICIPAL FINANCE COMMISSION—BONDS.

   The Municipal Finance Commission has an obligation to insure that the notices of a bond issue as well as the bonds themselves comply with the law.

92. SECURITIES REGULATION—PUBLIC SECURITIES—SECURITIES EXCHANGE COMMISSION—FRAUD—DECEIT—PUBLIC POLICY—PUBLIC OFFICIALS.

   Misleading statements in connection with the issuance of public securities, even to one who is neither a "purchaser" nor a "seller" but who has a right to prevent the securities from being issued, are within the condemnation of a rule of the Securities Exchange Commission which prohibits "any person, directly or indirectly to engage in any act * * * which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security" and it is contrary to the public policy of Michigan to permit the officials of our public corporations issuing bonds to act in ways which, under other circumstances, would be actionable if officials of private corporations issued bonds by securing shareholder approval through misleading notices (SEC Rule 10b-5).

93. CONSTITUTIONAL LAW—DUE PROCESS.

   Misleading process is not due process.

94. COUNTIES—STADIUM—BONDS—REVENUE BOND ACT.

   Stadium bonds are invalid since there has been no valid notice given under a section of the Revenue Bond Act (MCLA 141.133).

95. COUNTIES—STADIUM—PUBLIC PURPOSE—BUILDING AUTHORITY ACT —REVENUE BOND ACT.

   The acquisition, operation and subleasing of a county stadium for

the use of professional sports organizations may be a legitimate public purpose and it would appear possible to do so under a legally structured revenue bond issue under the building authority act and the Revenue Bond Act, alone or in combination, under appropriate circumstances as well as by new legislation (MCLA 123.951 *et seq.,* 141.101 *et seq.).*

96. COUNTIES—STADIUM—BONDS—TAX BONDS—REVENUE BONDS—TAX-
ATION—BUILDING AUTHORITY ACT—REVENUE BOND ACT.

Stadium bonds were structured to. be general tax bonds, secured by the full faith and credit of a county to tax without limit, rather than revenue bonds authorized by the building authority act and the Revenue Bond Act, which must be secured exclusively by the revenues derived from the operation of the public improvement; therefore, the bonds are illegal because they do not comply with the requirements of those acts and they do not qualify under the 25% Federal financing or state grant exception in the Revenue Bond Act (MCLA 123.951 *et seq.,* 141.101 *et seq.).*

97. COUNTIES—BONDS—STADIUM—REVENUE BOND ACT—TAXATION.

An incorporating authority, when it pledges its general tax power to pay the rental obligation to a building authority, the "alter ego" doctrine comes into play and the county and the authority are considered as the same entity and since the county and authority are therefore considered as the same entity, the county's pledge of unlimited tax power runs directly to the bondholder; such a pledge is not permitted under the Revenue Bond Act and so Wayne County stadium bonds are illegal (MCLA 141.101 *et seq.).*

98. CONSTITUTIONAL LAW—STATUTES—AMENDMENTS—PUBLICATION—
BUILDING AUTHORITY ACT.

The part of a section of the building authority act, which provides that "where and to the extent that the bonds are payable from revenues derived from payments to be made pursuant to any lease or other contract obligations, the bonds shall be deemed issued in anticipation of contract obligations and such obligations shall be deemed to be contract obligations in anticipation of which bonds are issued, within the meaning of section 6 of article 9 of the constitution", is null and of no effect because the sections of the Revenue Bond Act to be amended were not reenacted and republished as required by a section of an article of the Michigan Constitution (Const 1963, art 4, § 25; MCLA 123.961, 141.101 *et seq.).*

99. TAXATION—CONSTITUTIONAL LAW—STATUTES—BUILDING AUTHOR-
ITY ACT—SCOPE OF TITLE.

If a section of the building authority act intends to permit
taxation without limitation to pay fixed rentals, then that
section exceeds the scope of the title to the building authority
act in violation of a section of an article of the Michigan
Constitution and also imposes a tax without distinctly stating it
in violation of another section of that article of the Constitu-
tion (Const 1963, art 4, §§ 24, 32; MCLA 123.961).

100. COUNTIES—CONSTITUTIONAL LAW—BONDS—STADIUM—TAXATION
—REVENUE BOND ACT.

Stadium bonds of a county do create an indebtedness within a
section of an article of the Michigan Constitution because the
county has created a present unconditional obligation to pay
the total debt service secured by their pledge to tax without
limit and, in addition, the county has created indebtedness on
the bonds in two other ways: (1) the county has directly agreed
to give bondholders the power to enforce a lease contract one
covenant of which is the pledge of unlimited tax support, and
(2) the county's pledge of general taxing power to support the
rent places the county in the shoes of the building authority so
their obligations to the authority are also their obligations to
the bondholders; the bonds are therefore illegal because they do
create an indebtedness within the meaning of that constitu-
tional provision contrary to the statement on their face and the
requirements of a section of the Revenue Bond Act (Const 1963,
art 7, § 11; MCLA 141.113).

101. COUNTIES—STADIUM—BONDS—MUNICIPAL FINANCE COMMISSION—
REVENUE BOND ACT.

The approval of the Municipal Finance Commission required
under a section of the Revenue Bond Act is without legal effect
since it was premised upon stadium bonds not being debt
(MCLA 141.127).

102. COUNTIES—UNCHARTERED COUNTIES—BUILDING AUTHORITY ACT—
STATUTES—AMENDMENTS—REPEALS—PUBLICATION—CONSTITUTIONAL
LAW.

Insofar as a part of a section of the building authority act would
except the unconditional rental obligations of an unchartered
county from the limitations and conditions of another statute,
it is unconstitutional because there was not compliance with
the reenactment and republication requirements of a section of
an article of the constitution, which would require amendment

or repeal of the other statute in order to escape its limitations and voting requirements (Const 1963, art 4, § 25; MCLA 46.7, 123.958).

103. COUNTIES—UNCHARTERED COUNTIES—BUILDING AUTHORITY ACT—REVENUE BONDS—TAXATION—MILLAGE—CONSTITUTIONAL LAW.

Under the building authority act a "revenue bond" of an unchartered county may not have its taxing power pledged to pay "rental" payments beyond the operating millage allowed under the condition in a paragraph in a section of an article of the Michigan Constitution and no tax bond of any county, however structured, may be free from constitutional debt limitations; stadium bonds as tax or revenue bonds, which purport to do both, are illegal (Const 1963, art 9, § 6; MCLA 123.951 *et seq.).*

104. COUNTIES—STATES—CONSTITUTIONAL LAW—CONTRACTS—SERVICES —GRANT OF CREDIT.

Under a section of an article of the Michigan Constitution, the state or a county may contract for services without an unlawful grant of credit if it receives full and fair value in return (Const 1963, art 9, § 18).

105. CONSTITUTIONAL LAW—NOTICE—BONDS—DUE PROCESS.

The people are entitled to due process in the issuance of the notice of a bond issue, when the Legislature has provided for notice.

106. CONSTITUTIONAL LAW—DUE PROCESS—NOTICE—STADIUM—BONDS.

Notice of a stadium bond issue was a denial of due process because it was published in fine print in the classified part of a newspaper and this is not reasonably calculated to actually reach the greatest number of taxpayers; the notice was also a denial of due process because it was inherently deceptive and misleading and misleading process is not due process.

107. COUNTIES—STADIUM—BONDS—CONSTITUTIONAL LAW—BUILDING AUTHORITY ACT—REVENUE BOND ACT.

Stadium bonds relate to a public purpose within the Constitution; however, a county cannot support stadium bonds with its full faith and credit under the building authority act and the Revenue Bond Act (MCLA 123.951 *et seq.,* 141.101 *et seq.).*

108. STATUTES—BUILDING AUTHORITY ACT—REVENUE BOND ACT—STADIUM—BONDS.

There are adequate standards in Michigan law to issue stadium bonds under the building authority act and the Revenue Bond Act (MCLA 123.951 *et seq.,* 141.101 *et seq.).*

109. EQUITY—INJUNCTION—SUPREME COURT—TAXATION.

The equitable doors of Michigan's one court of justice are wide open for direct actions by taxpayers for injunctive protection against more levies "without limitation as to rate or amount" whenever they are able to plead and prove a case of confiscation or irreparable injury.

OPINION CONCURRING SPECIALLY

BLACK, J.

110. CONSTITUTIONAL LAW—STATUTES—TITLE—ONE OBJECT LIMITATION—TAXATION.

*The constitutional provision that no law shall embrace more than one object, which shall be expressed in its title, where the inquiry concerns taxes, has always been interrelated in meaning and purpose with another constitutional provision that every law which imposes, continues, or revives a tax shall distinctly state the tax (Const 1963, art 4, §§ 20, 32).*

111. COUNTIES—BONDS—BUILDING AUTHORITY ACT—REVENUE BONDS —GENERAL OBLIGATION BONDS.

*Bonds to be issued by a stadium authority, incorporated under the building authority act, which were to be paid as they become due from receipts of use of the stadium, an excise tax on charges made for accommodations by hotels and motels in the county, and state revenues derived from thoroughbred and harness racing and, only if funds available from all these sources are insufficient, from county general funds including such funds as may be raised by ad valorem taxes for this purpose are in actual fact a combination of revenue bonds and general obligation bonds (MCLA 123.951 et seq.).*

112. COUNTIES—BONDS—GENERAL OBLIGATION BONDS—BUILDING AUTHORITY ACT.

*In the building authority act there is no power to issue and sell bonds which are general obligation bonds, dually secured, in that they are designed for retirement (a) by variously committed, or "returned", or "granted", or promised "net revenues primarily pledged", and (b) by a specific pledge of the faith and credit of a county with that pledge backed by obligatory countywide property taxation—"without limitation as to rate or amount"—whenever such revenues turn up short (MCLA 123.951 et seq.).*

113. STATUTES—BUILDING AUTHORITY ACT—TITLE—BONDS—REVENUE BONDS.

> *The amended title of the building authority act gives notice only of intent to provide "for the issuance of revenue bonds by such authorities" and, the title, is in that respect* restrictive *and* preclusive *(MCLA 123.951).*

114. STATUTES—TITLE—BUILDING AUTHORITY ACT—BONDS—REVENUE BONDS.

> *The title of the building authority act and the title of the Revenue Bond Act until its amendment in 1969 has always restricted the issuance of bonds, by any and every authority appointed thereunder, to what are legally identifiable and commonly known as revenue bonds and a 1970-amended section of the building authority act still restricts the financing power of the appointed authority to that of issuance of "self-liquidating revenue bonds", such bonds only, as theretofore and presently authorized by the Revenue Bond Act (MCLA 123.951 et seq., 141.101 et seq.).*

See headnote 16.

115. COUNTIES—BONDS—STATUTES—TITLE—TAXATION.

> *The title and body of the Revenue Bond Act were amended radically, in 1969, so as to authorize for the first time in the life of the statute a financing choice, available to the "public corporation", between: (a) the issuance and sale of self-liquidating revenue bonds as before or, (b) the issuance and sale of bonds supported in part by "net revenues primarily pledged to such payment", and in part by property taxation pursuant to a new section of the act (1969 PA 87).*

116. COUNTIES—BONDS—BUILDING AUTHORITY ACT—TAXATION—STATUTES—TITLE—CONSTITUTIONAL LAW—FRAUD—ONE OBJECT LIMITATION.

> *Amendment of the building authority act so that bonds issued and sold by a stadium authority would have the same taxational support as that provided in a section of the Revenue Bond Act, although the title of the building authority act was left pertinently intact, thus continuing the representation to legislators and public that all bonds issued by "such authorities" would be "revenue bonds" is constitutionally banned fraud because the act is broader than its title (Const 1963, art 4, § 24; MCLA 123.951 et seq., 141.101 et seq.).*

See headnotes 2–9 and 81–95.

117. STATUTES—STADIUM—PUBLIC PURPOSES.

*Stadiums are specifically declared by statute to be proper public purposes (MCLA 123.958).*

118. COUNTIES—BASEBALL—STADIUM—MONOPOLY.

*A county has no more right to issue a baseball franchise in a domed stadium than it has to grant a monopoly to any user of a public facility; neither can a public facility be "reserved" for a single user without the payment of the same consideration as any other user would be required to pay for the possession of the premises during a considerable period of time.*

119. COUNTIES—BASEBALL—STADIUM—LANDLORD AND TENANT—BONDS.

*A sublease of a stadium from a county to a baseball club neither adds to nor detracts from the legal posture of a proposed bond issue for the stadium and a circuit court opinion holding the bond issue invalid should be reversed and remanded.*

Certified questions from Wayne, Blair Moody, Jr., J. Submitted June 8, 1972. (No. 10 June Term 1972, Docket No. 54,136.) Decided June 16, 1972. Opinions filed August 30, 1972.

Complaint by Marc Alan, William Roskelly, Mayor of Belleville, and the City of Belleville against Wayne County and Wayne County Stadium Authority for a declaration that construction and incurring indebtedness to construct a proposed stadium is in violation of law and for an injunction restraining defendants from selling or delivering Wayne County Stadium Authority bonds and from constructing a proposed stadium. Request by Governor William G. Milliken that certain questions in the case be certified to the Supreme Court as permitted by GCR 1963, 797. Request granted, questions certified by the trial judge to the Supreme Court and injunction granted. Affirmed.

*Ronald J. Prebenda,* for plaintiffs Alan and Roskelly.

*Cozadd, Shangle & Smith,* for plaintiffs Mayor of Belleville and City of Belleville.

*William L. Cahalan,* Prosecuting Attorney, *W. Leo Cahalan,* Assistant Prosecuting Attorney, *Aloysius J. Suchy,* Corporation Counsel, and *Lawrence O. Hinkle,* Assistant Corporation Counsel, for defendant Wayne County.

*Dickinson, Wright, McKean & Cudlip* (by *Fred W. Freeman)* and *Miller, Canfield, Paddock & Stone* (by *Gilbert E. Gove),* for defendant Wayne County Stadium Authority.

*Amicus Curiae:* Michigan Education Association (by *Foster, Lindemer, Swift & Collins).*

WILLIAMS, J. Defendants sought approval for their stadium bonds which could eventually cost the county $371,000,000 on the legal theory:

That Wayne County not the Tigers will be the actual user of the new stadium;[1]

That Wayne County can go ahead and build the new stadium even though neither the Tigers nor any one else will ever play there;[2]

That Wayne County has to pay rent for the stadium for 50 years even though there was a

---

[1] Defendants' brief, p 23:

"When correctly analyzed * * * it is clear that the County, not persons attending or promoting events, is the 'user' of the Stadium * * * ."

[2] Defendants' supplemental brief, p 25:

"The fact is, that even if the Tiger Agreement is invalid *or even non-existent,* it would not reduce or eliminate the obligation of the County * * * ." (Emphasis by Defendants.)

"failure to complete the stadium" or the "destruction of any part or *all* of the stadium";[3]

That tax bonds are called revenue bonds;[4]

That Wayne County can issue tax bonds without a vote of the people;[5]

That there is no limit as to the millage Wayne County can raise "to provide the funds necessary to pay said annual rental in anticipation of which these bonds are issued" nor is there any limit to the amount of debt Wayne County can incur in taxing to raise such funds.[6]

This Court finds these propositions to be untenable in regard to revenue bonds under Acts 31 and 94. We have been referred to no court in this country which has approved "revenue bonds" on similar facts under similar law on the basis of such a theory. In fact, defendants' own expert, who helped put together many other stadiums around the country, testified the financing plan here is unique in the entire country.[7] This Court is asked to hold that the county can tax without millage or debt limitations and without a vote of the people, based on a legal theory that justifies Wayne County building a stadium whether or not there

---

[3] Lease, § 13; trial exhibit 2A, pp 18–20 quoted below at p 337.

[4] On oral argument the following exchange occurred:

"*The Court:* Well you're telling me then that a revenue bond is really a full faith and credit bond.

\* \* \*

"*Defendants' Counsel:* \* \* \* this is an example of a type of revenue bond which is not truly a revenue bond \* \* \* ."

Also see description on face of bond set forth *infra*, p 235; approving opinion of bond counsel, trial exhibit 10; and see fn 26 and accompanying text.

[5] Section 33 of Act 94; MCLA 141.133; MSA 5.2763 does not require submission to voters for "revenue" bonds, although it does provide for a petition. MCLA 46.7; MSA 5.327 does require a vote in order to "raise" more than 1/10 of 1 mill for building purposes.

[6] Defendants' brief, pp 33–35, quoted below at pp 261–262.

[7] Transcript of trial proceedings, p 184.

are any paying customers to use and pay for it. This we cannot do under law.

This is another chapter in the efforts of civic and governmental leaders in pursuit of a worthy goal to avoid constitutional and statutory taxpayer protections in the form of spending and debt limitations in order to undertake new projects. The law was pushed not to, but beyond the breaking point. The Municipal Finance Commission as the agency of government created to examine the ability of local government to carry its financial load, for the security of the bond buyer and for the rights of the taxpayer, confused by a novel and ambiguous problem, momentarily stood up to the challenge, then gave way to the rush for what they thought desirable ends at any cost.

The confusion in this bond structure is evident throughout this case. The Stadium Authority advertised the stadium bonds to the taxpayers and public of Michigan as revenue bonds but advertised them to the bond buyers as bonds backed by the obligation of Wayne County to tax without limit.[8]

Even the bonds themselves on the one hand read:

"Each Bond of said series is a self-liquidating revenue Bond, is not a general obligation of said Authority or of said County, and does not constitute an indebtedness of said Authority or of said County * * * ."[9]

But on the other hand read:

"[T]he obligation to pay said annual rental is a general obligation of the said County of Wayne which is authorized and obligated by law to levy an ad valorem

[8] See Part X below, pp 330–355 in which the precise nature of the disclosure practices in this case are discussed in detail.

[9] Bond ordinance #2, bond form (trial exhibit 10).

tax on all taxable property within the said County, without limitation as to rate or amount, to provide the funds necessary to pay said annual rental in anticipation of which these Bonds are issued."[10]

The schizophrenic structure of this bond issue was so confusing, not only to the public but to lawyers and judges in this case, that the plaintiffs argued the case, and the trial judge based his first decision on the theory that since the bonds were revenue bonds the Tigers contract should but didn't bear its fair share of the costs of amortizing and operating the stadium,[11] but the defendants said, "Gentlemen, sorry, but you just don't understand, these bonds can be perfectly good without the Tigers or any other stadium user paying a red cent, because the county wants to use the stadium all by itself and has agreed unconditionally to pay the fixed rental which pays the $371,000,000 principal and interest[12] to liquidate the bonds."

This effort to treat tax bonds as revenue bonds has raised a number of serious and important technical issues. Some of these issues involve areas

---

[10] *Id.*

[11] The trial court, after a searching analysis of the complicated financial structure of the Tiger Contract concluded:

"Even using the most optimistic of evaluations as reflected in the Defendants' financial progressions for the proposed stadium, it is most apparent that the Club for its contracted use of the stadium is not carrying anywhere near its fair share of retiring the principal and interest on the bonds, not to speak of covering the operating expenses. The aggregate consideration received by the Club substantially outweighs what it gives in return. The difference must be made up by the taxpayer.

"Under such circumstances, taking into consideration the totality of the Baseball League Agreement, such contract transcends into an invalid lending of credit of the County in aid of a private corporation in violation of Article IX, Section 18 of the Michigan Constitution." (trial court opinion, p 37.)

[12] The principal amount is $126,000,000; interest is $245,000,000. The initial debt service would be paid by bond proceeds, leaving a net debt service of approximately $246,000,000.

relatively untouched even by previous penetrating judicial review. The principal issues involved are:

1. Do Acts 31[13] and 94[14] singly or jointly authorize stadium bonds as revenue bonds or otherwise where the non-user county covenants to permit bondholders to enforce directly the county's full faith and credit tax obligation to the Authority to pay a "rental" equivalent to the principal and interest on the bonds and where the revenue and revenue producing capacity of the one actual and other potential users are claimed to be of no legal consequence? (Parts II, pp 244–246, III, pp 246–253, IV, pp 253–268.)

2. What is the impact of Const 1963, art 4, § 25 requiring sections of acts altered or amended to be reenacted and republished at length on portions of Act 31 that may alter or amend Act 94 or other acts? (Part V, pp 268–288.)

3. Do constitutional and statutory debt limitations affect the just described stadium bonds or true revenue bonds in any way? (Part VI, pp 288–314.)

4. Do constitutional and statutory millage limitations affect the just described stadium bonds or true revenue bonds in any way? (Part VII, pp 314–317.)

5. Does the stadium bond issue relate to a "public purpose?" (Part VIII, 317–323.)

6. Would the stadium bond issue violate Const 1963, art 9, § 18 "[t]he credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution," if the Tigers, as alleged,

[13] 1948 PA (1st Ex Sess) 31; MCLA 123.951 *et seq.:* MSA 5.301(1) *et seq.,* known as the building authority act (hereinafter usually referred to as Act 31).

[14] 1933 PA 94; MCLA 141.101 *et seq.;* MSA 5.2731 *et seq.,* known as the Revenue Bond Act (hereinafter usually referred to as Act 94).

paid less than they should have for their sublease? (Part IX, pp 323–330.)

7. Were the notices given constitutionally sufficient? (Part X, pp 330–355.)

8. Other issues. (Part XI, p 356.)

## I.

### *FACTS.*

Wayne County on August 20, 1970, established a Stadium Authority under Act 31 to construct a stadium. On September 23, 1971, the county approved a lease[15] of the proposed stadium from the Authority to the county. In that lease the county made three significant covenants. First, the county obligated its full faith and credit to pay a "Fixed Rental" to the Stadium Authority for the stadium equivalent to the debt service of $371,000,000 on a bond issue which the Authority was to issue.[16] Second, the county covenanted that the bondholders should have the power to enforce the covenants in the Lease, including the county's covenant of its full faith and credit to pay the fixed rental equivalent to the debt service.[17] Third, the county unconditionally covenanted to pay that fixed rental whether the stadium was completed, destroyed, or whatever.[18]

The county thereupon delegated the operation of the stadium to the Stadium Authority with the duty to sublease.[19] After instituting, but before

---

[15] Purportedly pursuant to Act 31, § 8; MCLA 123.958; MSA 5.301(8).

[16] Wayne County—Wayne County Stadium Authority Lease (hereinafter "Lease"), § 4(b); Trial Exhibit 2A, p 8–9.

[17] Lease, § 14; trial exhibit 2A, pp 20–21.

[18] See footnote 3.

[19] The basis for the lease and sublease arrangements is provided by § 8 of Act 31; MCLA 123.958; MSA 5.301(8). The relationship between

closing bond negotiations, the Stadium Authority for itself and the county arranged a sublease with the Tigers for the use of the stadium.[20] The county and the Stadium Authority approved this lease March 2, 1972. The proceeds from the Tiger lease were to be payable to the Stadium Authority.[21]

On March 28, 1972 the Wayne County Stadium Authority Lease, the bond ordinance issued pursuant thereto, the Tiger sublease, data supporting the financial feasibility of the stadium because of Tiger baseball games, other events, concessions, *etc.,* were acted on by the Municipal Finance Commission which after hearing its staff and others voted approval for the stadium bond issue under Acts 31 and 94.[22]

In opening that meeting, the Chairman of the Municipal Finance Commission called on the staff for comment. James F. Marling, Director, Municipal Finance Division, replied:

"I am not ready to recommend approval of this item. * * * I think the two problems deal primarily with the potential revenues from the baseball and the potential revenues from the other events as outlined in my

the county and the Stadium Authority as its operating agent is covered by Lease, § 5; Trial Exhibit 2A, p 11, and Operating Agreement; Trial Exhibit 2E.

[20] The "Tiger Contract;" trial exhibit 2F.

[21] Lease, § 5; Operating Agreement, §§ 1(2) and 3; Bond Ordinance §§ 701(1), 702, 703, 704 (and amendments), 705 (and amendments), 706 (and amendments). The "funds" are established as required by Act 94, §§ 22–26; MCLA 141.122–141.126; MSA 5.2752–5.2756. This highlights further the curious dualism of these bonds since these funds required by Act 94 are to ensure that revenues of *actual* users pledged to pay the bonds will be properly applied.

[22] Approval of the Municipal Finance Commission is required by § 27 of Act 94; MCLA 141.127; MSA 5.2757. The application was first filed in October of 1971. After amendment to the Lease and Bond Ordinance (discussed in Part X, below) the application was amended and filed on March 6, 1972. The approval of the Municipal Finance Commission is, of course, not to be deemed as approval of the bond issue. See § 28 of Act 94; MCLA 141.128; MSA 5.2758.

memorandum. I see nothing that changes that. *It is a drain on the County's general fund, the drain is very real.* "(Emphasis added.)[23]

Subsequently, an Assistant Attorney General assigned to the project made the following comments among others:

"The effort of the staff has been to develop a basis upon which the commission may approve this project if it sees fit to do so despite the formative legal problems which center around the potential drain upon the Wayne County general fund which at the moment is in a deficit position according to our files and people who spoke on it last week.* * * With respect to the more serious legal objection this I think relates to the potential drain on county general funds and the duty of the MFC to make sure that debt service on this issue as it is approved will not unduly burden the underlying community. We have obtained from bond councel their *consent to take out of the form of the bond the reference contained therein of which in our opinion would have made the bonds in effect general obligation bonds* of the County and as included in the order and notice of the sale that we have recommended to the commission, if it sees fit to approve, *we have built in reference to the language which would preserve the revenue nature of the project.* Finally, we recommend inclusion in the order of the language requiring the county which is the principal of the authority under the River Rouge case, the authority being agent in issuing these bonds, a requirement that the county rehabilitate its general fund; that it make periodic reports to the MFC during the life of the bond regarding the condition of the general fund—that it make reports to the MFC concerning the payment of rental to the authority, such showing to include a disclosure of the source of the funds; and finally, that before levying any special ad valorem tax for this project which would be a drain on county general funds over and above the millage limitation the county report its inten-

---

[23] Minutes of a Regular Meeting of the Municipal Finance Commission held March 28, 1972, in the office of the Attorney General, pp 1–1A.

tion to do so to the MFC and obtain an order from the commission determining the necessity thereof. Now with respect to this provision, *I want to be very clear that in the event somewhere down the line of the maturity schedule if all our sales and the debt service could only be met by levying a tax upon the county,* article I, section 10 of the federal constitution would require that the bondholder would have the debt service. *In the hands of the bondholder these bonds will be unlimited tax bonds.* The thrust of the requirement which we propose in the order goes to the control of the debt service procedures and habits of the county in coming up with the money for the rent to the authority. This we can and should control. This I think is a brief presentation of the staff position which is and has been designed to make available to the commission a method of approving the bonds while protecting the taxpayer." (Emphasis added.)[24]

In that order approving the bond issue, the Commission required that before any taxes are levied for the payment of the fixed rental, the county secure permission therefor from the Commission.[25] However, the Attorney General, referring to this requirement subsequently on March 29, 1972, said:

"The language does not affect the security of the bondholder, in whose hands the bonds are unlimited tax bonds * * * ."[26]

---

[24] *Id,* pp 6–7.

[25] Order of Approval, dated March 28, 1972, p 2; trial exhibit 10.

[26] Letter from Frank J. Kelley, Attorney General, to Miller, Canfield, Paddock and Stone dated March 29, 1972; trial exhibit 10. The Comptroller of Currency also rendered his opinion which was required to enable National Bank of Detroit to deal in the Bonds under 12 USC 24, ¶ 7:

"It is our conclusion that the $126,000,000 *Wayne County Stadium Authority Bonds are general obligations of a state or political subdivision* thereof under ¶ 7 of U.S.C. 24 and accordingly are eligible for purchase, dealing in, underwriting and unlimited holding by National Bank." Letter to National Bank of Detroit, April 12, 1972; trial exhibit 10 (emphasis added).

The Director of the Municipal Finance Commission was concerned that the baseball and other revenues would be insufficient to meet the financing costs. The discussion by the Attorney General's staff revealed an internal ambivalence about the bonds because changes were recommended to "preserve the revenue nature of the project" but at the same time there was concern about the level of the county's general fund, the possibility that any special *ad valorem* tax levy for this bond project might exceed the millage limitation and the clincher that "in the hands of the bondholder these bonds will be unlimited tax bonds."

In due course after the Municipal Finance Commission approval of the project, the bonds were advertised on March 30, 1972[27] and Halsey Stuart won the underwriting bid with delivery for June 19, 1972.

Plaintiffs on April 18, 1972 brought suit under the Public Securities Validation Act[28] to test the validity of these public securities and to pray for the issuance of an injunction restraining the delivery of the bonds and construction of the stadium. At show cause on April 28, 1972, the trial judge refused to issue an injunction but did order the defendants not to deliver the bonds to the low bidder without seven days notice to the court and plaintiffs.

On May 18, 1972, Governor Milliken in an Executive Message to this Court noted that at a pretrial hearing on May 12, 1972, before the Honorable Blair Moody, Jr., the trial judge in this case, "the parties indicated that the pleadings currently

[27] "Official Notice of Sale" was published on March 30, 1972, in the Daily Bond Buyer. See Trial Exhibit 10 for proof of publication and see discussion below, Part X.

[28] MCLA 600.2942; MSA 27A.2942.

on file are satisfactory; consequently, the matter is at issue." The Governor submitted three questions for certification relating first to whether the bond issue which obligates the county's full faith and credit to discharge its lease obligation comprises a "public purpose" and second, whether there is a public grant of credit for a private purpose and third whether constitutionally there are adequate statutory standards.[29]

This Court responded to the Governor's request on May 24, 1972 by assuming appellate jurisdiction,[30] and ordering the trial judge to "[m]ake his

[29] Executive Message of William G. Milliken, Governor, dated May 18, 1972; Joint Appendix 128–132. The questions, as phrased by the Governor, are as follows:

"1. Does the acquisition by a building authority created by a Michigan county of a multi-purpose stadium, which is financed by the authority's sale of bonds, is rented to the county under a lease which makes the county's annual rental obligation (which is in an amount not less than the debt service requirements of the bonds) a general obligation and is intended for use, pursuant to a contract duly authorized by the county, by a major league professional baseball team as the site of all its home games, and for use by a variety of other athletic teams and performers, and as the site of conventions, trade shows, musical events and other activities, comply with, and comprise a benefit and a legitimate public purpose of the county as determined by, Act No. 31 Public Acts of 1948, as amended, and constitutionally obligate the county to discharge its obligation under said lease through such ad valorem tax levies as may be necessary?

"2. Do the foregoing transactions constitute a grant by the County of its credit to or in aid of a private corporation in violation of the United States Constitution or the Michigan Constitution of 1963?

"3. Does Act No. 31, Public Acts of 1948, as amended, violate the United States Constitution or the Michigan Constitution of 1963, insofar as said Act relates to stadiums, by reason of insufficient standards to protect the public interest and to assure public use thereof?"

[30] Order of Michigan Supreme Court pursuant to GCR 797, dated May 24, 1972; Joint Appendix, p 133. Our order did not limit appeal to only those questions phrased by the Governor, but rather based the appeal on whatever findings and conclusions the trial judge might make:

"Upon due consideration thereof, the Court hereby assumes appellate jurisdiction of said case.

"It is hereby Ordered that the said trial judge make his findings of fact and conclusions of law and file the same with this Court by June 1, 1972."

findings of fact and conclusions of law and file the same with this Court by June 1, 1972." We also ordered briefs by May 31, supplemental briefs by June 7 and oral argument on June 8.

The Honorable Blair Moody, Jr. duly filed his findings and opinion on June 1, holding the bond issue invalid because the Tiger contract did not carry its proportionate share of the bonded indebtedness and to the extent it failed to be proportional the county was lending its credit to a private person. He issued a permanent injunction against delivery of the proposed stadium bonds. On June 7 he filed "Supplementary conclusions" holding the bond issue illegal because Acts 31 and 94 require revenue bonds, whereas the stadium bonds "are not presently 'self-liquidating' bonds."

This Court issued a unanimous memorandum order on June 16, 1972 affirming the trial court with opinion or opinions to follow.[31]

## II.

## DO THE WAYNE COUNTY STADIUM AUTHORITY BONDS QUALIFY UNDER ACTS 31 AND 94, SINGLY OR JOINTLY?

---

[31] Memorandum Order in re Executive Message of Governor *i.e.* Certification of Questions Pertaining to Wayne Stadium Authority, dated June 16, 1972. Part of the text of that Order follows:

"Because of the many complex legal and constitutional issues raised and the importance of their resolution and lucid description and exposition to the bench, bar and the taxpayers of Michigan, the opinion or opinions of the Court detailing our reasons for the decision will require time beyond June 19, 1972 for the proper marshalling and elucidation of the basic research already done. As a consequence the following order is entered with opinion or opinions to follow.

"Upon due consideration it is hereby ordered that the judgment reached by the trial court enjoining the delivery of these bonds under the present circumstances be, and the same is hereby AFFIRMED.

* * *

"BLACK, J. I concur in affirmance of the circuit court's judgment, with advices to the parties that yet unprepared opinions will follow."

It is elementary that a county has only such powers as have been granted to it by the Constitution or the state Legislature. Const 1963, art 7, § 1; art 7, § 8.[32] One such power granted by law is that of incorporating building authorities as provided in Act 31. Another power is that of issuing bonds which in particular needs to be spelled out. Const 1963, art 9, § 13.[33] As a consequence, it is essential to examine Acts 31 and 94 under which the Stadium Authority (incorporated by the county) in this case attempted to issue the bonds to see whether the Stadium Authority can issue the type of bond here in question.

This Court has already held that some kinds of public improvement bonds issued by an authority are authorized by § 11 of Act 31, *Rude v Muskegon County Building Authority,* 338 Mich 363 (1953); *Walinske v Detroit-Wayne Joint Building Authority,* 325 Mich 562 (1940).[34] Act 94 from its inception in 1933 has included "stadiums" among the defined "public improvements" in § 3(b).[35] Act 31 was amended specifically for this project in 1970 to include "stadiums."[36] So the real issue is not

---

[32] Const 1963, art 7, § 1 reads:

"Each organized county shall be a body corporate with powers and immunities provided by law."

Const 1963, art 7, § 8 reads:

"Boards of supervisors shall have legislative, administrative and such other powers and duties as provided by law."

[33] Const 1963, art 9, § 13 reads:

"Public bodies corporate shall have power to borrow money and to issue their securities evidencing debt, subject to this constitution and law."

[34] *Rude* and *Walinske* are discussed at length below in Part VI, pp 293–299.

[35] MCLA 141.103(b); MSA 5.2733(b).

[36] Act 31, title and §§ 1, 2, 8, 11; MCLA 123.951, 123.952, 123.958, 123.961; MSA 5.301(1), 5.301(2), 5.301(8), 5.301(11). Why the county chose to amend the building authority act rather than to amend other available acts to accomplish the same result may have its answer in

whether the Stadium Authority can issue stadium bonds, but what *kind* of stadium bonds it is authorized to issue.

## III.

## 1933 PA 94 (REVENUE BOND ACT) NO SUPPORT FOR STADIUM BONDS.

Section 7 of Act 94[37] provides for the issuance of bonds for public improvements including stadiums. Pertinent here is the description and limitation of the type of bond that can be issued that is found in the first sentence of § 7(2) which follows:

"(2) The principal of and interest upon such bonds shall be payable, except as hereinafter provided, solely from the net revenues *derived from the operation* of the public improvement * * * ." (Emphasis added.)

The words *"derived from the operation"* are the critical ones. The only kind of bond Act 94 authorizes is one which is paid off by "revenues" which are derived from the "operation" of the proposed public improvement which in this case is the proposed stadium.[38]

---

the fact that other acts require the stadium to be truly self-liquidating *(e.g.* the industrial development act, 1963 PA 62; MCLA 125.1251 *et seq.;* MSA 5.3533[21] *et seq.)* and this particular stadium structure is not truly self-liquidating. The amendments could also have been made to the joint public building act, 1923 PA 150; MCLA 123.921 *et seq.;* MSA 5.2351 *et seq.* This act has its hurdles also, however, because it requires an affirmative vote of a majority of the electors.

[37] MCLA 141.107; MSA 5.2737.

[38] The words "derived from the operation" in § 7(2) of Act 94 should be read along with the definitions in § 3(e), (f), and (g) of Act 94; MCLA 141.103(e), (f), and (g); MSA 5.2733(e), (f), and (g):

"(e) The term 'rates' shall be construed to mean the charges, fees, rentals and rates which may be fixed and imposed for the services, facilities and commodities furnished by any public improvement.

"(f) The term 'revenues' shall be construed to mean all the income derived from the rates charged for the services, facilities and commodities furnished by any public improvement.

"(g) The term 'net revenues' shall be construed to mean the reve-

Since by § 5 of the Wayne County-Wayne County Stadium Authority Lease, "[t]he County * * * shall operate * * * the Stadium * * * " or "enter into an operating agreement or sublease with the Authority or others for the operation * * * of the Stadium,"[39] any revenues derived from the operation of the stadium are revenues paid *to* the county or the Authority, and not so-called "revenue" paid *by* the county.

In other words, the statutorily approved revenues come from those who actually use the stadium for sports or other events—the revenues paid by the Tigers, for example.

That this is a correct interpretation of the source of the *revenues derived from the operation* of the stadium is further borne out by the definition of "Stadium Revenues" in the Operating Agreement between the County and the Stadium Authority, § 1(p) of the Operating Agreement reads in part as follows:[40]

"The term 'Stadium Revenues' means all income, receipts and revenues derived from the operation or ownership of the Stadium or from the facilities of the Stadium of any nature whatsoever, including, but not limited to, rental payments, user fees and charges, concession fees, parking fees and any payments received by the Authority or the County pursuant to a contract or sublease entered into by the Authority in accordance with Paragraph 2 of the Operating Agreement, and shall also include Supplemental Receipts."

The conclusion to be drawn from this is that Act

nues of any public improvement remaining after deducting the reasonable expenses of administration, operation and maintenance of such public improvement."

[39] See trial exhibit 2A, p 11.

[40] See trial exhibit 2E, p 5.

94 authorizes a county to issue bonds the source of payment for which must be "solely from [the] net revenues derived from the operation of the public improvement" which translated to the stadium bond issue refers to the "stadium revenues" derived from the Tigers or similar users.[41] Since the proposed stadium bond issue is based on the "Fixed Rental" paid by the county rather than the revenues paid to the county, the proposed stadium bond issue is not authorized by Act 94.

## *Defendants Argue County "Is the 'user' of the stadium"*

Defendants, in attempting to meet plaintiffs' argument that the Authority provides "free use or free service" to the county and that the county is not guilty of itself granting "free use or free services," tried to make the point that the county "is the 'user' of the stadium, in the Act 94 sense." Defendants' brief states:

"Section 8 of Act 31, provides, in the first two sentences as follows:

" 'Sec. 8. The authority and any incorporating unit or units shall have power to enter into a contract or contracts whereby the authority will acquire property contemplated by the terms of this act and lease the same to the incorporating unit or units for a period not to exceed 50 years. The consideration specified in such contract for such use shall be subject to increase by the authority if necessary in order to provide funds to meet its obligations.'

"Since the Authority is the issuer of the revenue bonds, and since the Authority has power only to acquire the Stadium and lease it to the County, the only revenues the Authority can anticipate to pay its

---

[41] This conclusion is merely a restating of what we have held in cases under Act 94 to date. See *e.g., Young v Ann Arbor,* 267 Mich 241 (1934) and cases discussed in Part VI below, pp 292 and following.

revenue Bonds are the rentals under the Lease. Thus, the Lease is the basic document from which springs the power of the Authority to issue its revenue Bonds.

"When correctly analyzed, as above stated, it is clear that the County, not persons attending or promoting events, is the 'user' of the Stadium, in the Act 94 sense, and for this use the County pays the rentals specified in the lease (Fixed Rental—more than $9,000,000 per year) all expenses of operation and maintenance (about $4,000,000 per year). No free use or free service is provided the County by the Authority and the rates for services are the lease rental required to be paid by the County pursuant to the Lease which have been fixed precedent to the issuance of the Bonds." (Defendants' brief, p 23–24.)

Defendants' argument is faulty for three reasons. First, his "use" reference is out of context, particularly in view of the full text of § 8. Second, the Legislature by amending Act 31 in 1970 specifically distinguished between where the county is and is not (as here) a "user". Third, the reasons in our own analysis show who is the true "user".

First, defendants in quoting only the first two sentences of § 8 of Act 31 failed to tell the whole story. There is more "use" in § 8 than defendants permitted to be seen. Quoted hereafter is the pertinent part of § 8 with that portion quoted by defendants in brackets:[42]

["Sec. 8. The authority and any incorporating unit or units shall have power to enter into a contract or contracts whereby the authority will acquire property contemplated by the terms of this act and lease the same to the incorporating unit or units for a period not to exceed 50 years. The consideration specified in such contract *for such use* shall be subject to increase by the authority if necessary in order to provide funds to meet its obligations] * * * With the consent of the authority * * * any incorporating unit * * * may sublease the property * * * or may contract *for the use of the*

[42] MCLA 123.958; MSA 5.301(8).

*property* \* \* \* by any 1 or more persons, firms or corporations \* \* \* . Where any stadium \* \* \* is \* \* \* leased \* \* \* *for the use thereof* by \* \* \* any owner of a franchise in any professional sports \* \* \* constitutes a benefit to and a legitimate public purpose of such incorporating unit \* \* \* ." (Emphasis added.)

From the italicized portions of § 8 it is immediately apparent that "use" appears three times not just the one time quoted in defendants' brief.

The first appearance—"[t]he consideration specified in such contract for *such use"*—does indeed refer, as defendants say it does, to the Lease between the Authority and the county. But what it specifically refers to is the consideration in that Lease and that it may be raised. Section 8 is not a section authorizing bonding and this particular employment of the word "use" does not constitute it a definition of "use" in the bonding part of § 11 of Act 31.[43]

"Consideration \* \* \* for *such use"* might be "payments made under any lease or contract for the *use of* such property" or it might not be. It would be if the county actually used the public improvement as an office building or courthouse as in *Walinske.* It would not be if the county set up an authority with a lease back and a lease to a factory as in the *Gaylord* case,[44] where the "payments made under any lease or contract for the use of such property" would be from the private corporation not the county.

In any event the specific meaning of the term

---

[43] Section 11 of Act 31 does not say that bonds may be secured by revenues payable under a lease for the *use for* a legitimate public purpose, but rather it says bonds shall be payable exclusively from the revenues of the property which revenues will include payments made "under any lease or other contract for the *use of* such property." (Emphasis added.)

[44] *City of Gaylord v Gaylord City Clerk,* 378 Mich 273 (1966).

"use" above must be considered in connection with the two other appearances below of the word "use".

The second appearance of *"use"* refers to a sublease and an actual use by "persons, firms or corporations" like the *Gaylord* case. This would be a § 11 *"use of* such property."

The third appearance of *"use"* perfectly describes the Tiger contract and would be a revenue bond use. If these were the revenues looked to in this case, which they are not, the stadium bonds would be valid self-liquidating bonds under § 11.

To summarize, defendants' reference to the word "use" in the first two sentences of § 8 is at best ambiguous and not at all persuasive, particularly when viewed in conjunction with the other two appearances of the word "use", where the meaning refers clearly to the ultimate user and not to the county.

Second, as a matter of fact, 1970 amendments of Act 31[45] to include stadiums recognized that whereas prior to such amendments the public improvement was "for the use of any county," thereafter the public improvement might be for the "use" of some ultimate user such as the Tigers and for the "benefit" of the county.

Italics show such amendments in the named sections:

Title: "for the use *or benefit* of any county"

"for the use *or benefit* of any city"

Section 1: "for the use *for any legitimate public purpose* of the county"

Section 2: same as § 1 except for cities, *etc.,*.

It is important to notice that while the Legislature amended the title and § 1 and § 2 to preserve

---

[45] 1970 PA 47, effective July 2nd.

the public purpose of a stadium even if the county itself was not a *"user of"* it, the Legislature did not amend the self-liquidating revenue bond *"use of"* requirement in § 11. In other words, while the Legislature opened up Act 31 to permit the Authority either to "use" the public improvement itself or to sublease the public improvement to ultimate actual "users of" and still preserve the public purpose of the public improvement (here stadium) the Legislature maintained and held inviolate the true self-liquidating revenue character of the § 11 bonds.

The county is, under Act 31, §§ 1 and 8, a "user for" a public purpose but it is not, in this case, a "user of" the stadium in Act 31, § 11.

There is a further reason why the stadium bonds are not authorized by Act 94. The stadium bonds are backed by the full faith and credit of the county. Act 94 provides for only one type of full faith and credit bonds and the stadium bonds do not fall within that type.

Section 7(2) does have an exception to the pure revenue bond just considered. That exception appears in the second paragraph of § 7(2) and reads in parts as follows:

"As additional security for the payment of such bonds used to finance the local share of projects which receive more than 25% of financing from federal or state grants, a public corporation * * * may include * * * a pledge of its full faith and credit for the payment of principal and interest on such bonds."

No claim has been made by defendants that the stadium bonds qualify under this exception. And for good reason. This project on the record has received no Federal or state "grant". Nor do we have judicial notice of any. It has not been argued

that the hotel/motel tax act (1971 PA 232; MCLA 141.851 *et seq.;* MSA 5.3194 [361] *et seq.)* is a "grant". All it does is authorize the county to levy a tax *after* the sale of the stadium bonds. Nor has it been argued that 1972 amendment to the racing act (1972 PA 5; MCLA 431.42–431.44; MSA 18.966[12]–18.966[14] provides a grant. It provides for an annual share of racing funds, which is not a grant, but at the most an expectancy dependant upon the continued existence of the act for the lease term of 50 years and of the horse track or tracks during that time and their developing sufficient revenues to pay off this and other transfers.

As our statement of the facts indicated, in the stadium bond issue the county made "a pledge of its full faith and credit for the payment of principal and interest on such bonds." Since the project had not received "more than 25% of financing from federal or state grants," the county was not authorized to add its full faith and credit to "bonds payable * * * solely from such net revenues derived from the operation of the public improvement."

On the principle of *expressio unius est exclusio alterius,* this is another reason why the stadium bonds do not qualify under Act 94. *Sebewaing Industries, Inc v Village of Sebewaing,* 337 Mich 530, 545 (1953).

IV.

1948 PA (1ST EX SESS) 31 (BUILDING AUTHORITY ACT) ALONE OR WITH 1933 PA 94 NO SUPPORT FOR STADIUM BONDS.

Section 11, Act 31 provides:

[a] "[T]he authority may issue self-liquidating revenue

bonds in accordance with and subject to the provisions of Act No. 94 of the Public Acts of 1933 * * *

[b] "except that the bonds may be either serial bonds or term bonds or any combination thereof, as shall be determined by the authority.

[c] "Such bonds shall be payable solely from the revenues of such property, which revenues shall be deemed to include payments made under any lease or contract for the use of such property.

[d] "Where and to the extent that the bonds are payable from revenues derived from payments to be made pursuant to any lease or other contract obligations, the bonds shall be deemed to be issued in anticipation of contract obligations and such obligations shall be deemed to be contract obligations in anticipation of which bonds are issued, within the meaning of section 6 of article 9 of the constitution." (Bracketed a, b, c, d added for convenience herein.)

[a] "Self-liquidating revenue bonds * * * Act No 94"

That part of § 11 included in [a] above provides "the authority may issue self-liquidating revenue bonds in accordance with and subject to the provisions of Act No. 94 of the Public Acts of 1933". Part [a] of § 11 does not authorize the stadium bonds for two reasons. First, the stadium bonds, as we have seen, are not "self-liquidating revenue bonds". Second, the stadium bonds, we have just held, are not "in accordance with and subject to the provisions of Act 94."

Nothing in [a] therefore authorizes the stadium bonds.

[b] "[E]xcept that the bonds may be either serial * * * or term * * * ." Defendants' claim this authorizes a different bond from Act 94.

On argument defendants try to reason that § 11 evidences an intent to create a different kind of bond by this "exception" to § 7(2) of Act 94 and in

support they point out differences between § 11 and certain sections of Act 94. We will deal fully below with the question of whether "exceptions" can be lawfully created in this manner but for now, assuming they could, we believe defendants argue a *non sequitur.*

First, defendants point to sentence [b] above and point out that it allows "either serial or term bonds or any combination thereof," while Act 94, § 7(2) allows only "serial" bonds. In addition to what we have said above that everything in sentence [a] points to a conclusion that no "exception" is created and assuming this method of creating an exception is lawful, the very sentence defendants point to cuts against their argument.

Sentences [a] and [b] say the bonds shall be issued "in accordance with and subject to the provision of Act 94 * * * except that the bonds may be either serial or term bonds." Here, it is true, an intent and attempt to create an "exception" is evident. There is, however, no further statement in sentence [b] to the effect that:

"If revenue bonds are issued under [Act 94] they shall be payable solely from revenues pledged for their payment as provided in *this* act"

nor any statement that:

"the charges and rates for service * * * under section [8] of *this* act shall be sufficient to satisfy the provision of [Act 94]"

nor is there any statement that:

"the term 'revenues of the project' * * * means revenue derived from contract with municipalities * * * ."

The above quoted "exceptions" are from the

joint sewage authority act, 1955 PA 233, §§ 4(f), 12, and 12(b)(2);[46] MCLA 124.284(f), 124.292, 124.292(b)(2). Here the legislative intent to create an exception to Act 94's § 7(2) definition of "revenue derived from the operation" is clearly expressed. If the Legislature intended by sentence [b] above of Act 31's § 11 to create such an "exception" the method to describe this intent was available in 1955 PA 233 and a multitude of similar expressions in others acts.[47]

The failure of the Legislature to incorporate

---

[46] MCLA 124.284(f), 124.292, 124.292(b)(2); MSA 5.2769(54)(f), 5.2769(62), 5.2769(62b)(2).

[47] Compare for example airports, 1957 PA 206, § 8; MCLA 259.628; MSA 10.318. An airport board may issue "self-liquidating bonds of the authority in accordance with Act 94 * * * ." No liability on the municipality except a maximum possible *voted 1 mill levy which "shall be considered to be part of the revenues of the airport authority as that term is defined in section 3, subsection (f) of Act 94 * * * ."* (Emphasis added.) See also on airports MCLA 259.131, 259.131(a); MSA 10.231, 10.231(1).

And see county public improvements, MCLA 46.177; MSA 5.2767(7).

County DPW act, MCLA 123.741; MSA 5.570(11).

County & regional parks & recreation commissions, MCLA 46.367; MSA 5.570(117).

Huron-Clinton Metropolitan Authority, MCLA 119.58; MSA 5.2148(8).

Port district improvements, MCLA 120.16, 120.24; MSA 5.2166, 5.2174.

Joint water supply, MCLA 123.155; MSA 5.2532(5).

Joint sewage disposal revenue bond, MCLA 123.235; MSA 5.2769(5).

Rubbish disposal & dog pound bonds, MCLA 123.309; MSA 5.2725(9).

Joint water & sewage bonds, MCLA 123.342; MSA 5.2769(32).

Garbage Disposal Act, MCLA 123.365; MSA 5.2726(5).

Market Authority Act, MCLA 123.676(2); MSA 5.2770(106)(2).

Joint public building, MCLA 123.925; MSA 5.2355.

Municipal water supply & sewage disposal systems, MCLA 124.259; MSA 5.2533(9).

Mass transportation system authority, MCLA 124.357; MSA 5.3475(7).

Shopping areas redevelopment, MCLA 125.982; MSA 5.3533(2).

These are only some of the more important statutes making reference to Act 94. There are many more acts which overlap each other and Act 94 by reference and cross-reference. The resulting maze is considered in Part V of this opinion below.

these specific usages of other acts only provides further evidence that no new type bond exception to Act 94 was intended beyond adding term or combination bonds to serial bonds. Also, this latter *specific* exception in Act 31 to the bond type provided in Act 94 read against the absence of any specific exception for "revenue" calls into play once again the principles quoted in *Sebewaing Industries:*

> .<sup>"</sup> ' "It is well established rule of statutory construction that *where powers are specifically conferred they cannot be extended by inference,* but the inference is that it was intended that no other or greater power was given than that specified." ' " 337 Mich 530, 546. (Emphasis added.)

If part [b], or [d] later considered, were authority in whole or in conjunction with other language for the issuance of full faith and credit bonds under Act 31 that subject should appear in the title of Act 31. However, the only bond section of the title of Act 31 reads: "to provide for the issuance of revenue bonds by such authorities". Obviously the title of Act 31 does not include the concept of bonds other than revenue bonds, or bonds provided for in Act 94.

It is to be noted that when Act 94 was amended to permit an exception to revenue bonds and allow the pledging of full faith and credit where there is more than a 25% Federal or state grant, the title to the Act was appropriately amended as follows:

> "[T]o provide for a pledge by public corporations of their full faith and credit for payment of the bonds * * * ."

The net result of all these interpretative factors is that defendants' argument that Act 31 contem-

plated any other than the revenue bond described
in § 11[a] and in Act 94 § 7(2) is invalid.

[c] "Such bonds * * * payable * * * under lease or
contract for the use of such property". Defendants'
contention "lease" refers § 8 "lease".

That part of § 11 included in [c] above empha-
sizes two things: First, *"[s]uch bonds* shall be paya-
ble solely from the revenues of such property".
(Emphasis added.) Second, "[w]hich revenues shall
be deemed to include payments made under any
lease or contract *for the use of such property."*
(Emphasis added.)

There are two critical points. First, the words
"such bonds" in the first phrase. "Such bonds"
obviously refers to the bonds in the previous sen-
tence. "Such bonds," therefore, are the kind that
may be issued under Act 94, which are "payable
* * * solely from [the] net revenues derived from
the operation of the public improvement". This
then fills out the meaning of the "revenues of such
property", particularly since there is no definition
of "revenues" in Act 31, the definition of revenues
in Act 94 having already been incorporated by
reference in § 11[a]. Since the stadium bonds are
not "payable * * * solely from [the] revenues de-
rived from the operation" of the public improve-
ment but by the county as a "Fixed Rental" the
first clause in part [c] does not authorize the
proposed stadium bonds.

The second clause in part [c] "which revenues
shall be deemed to include payments made under
any lease or contract for the *use of such property"*
likewise does not authorize the proposed stadium
bonds for similar reasons. "Use of such property"
certainly as between the county and the Tigers
refers to the Tigers. The county is at best a con-

duit. Our interpretation certainly is reinforced by a remark made in defendants' supplemental brief. There they chided the trial judge for enjoining the issuance of the stadium bonds on the basis of his finding the Tiger contract invalid "because he is holding that the County and the Authority have power to acquire the stadium as a public purpose and public facility, but they lose this power if they permit a use of the stadium *in the only way it can be used.*" (Emphasis added.)[48]

This is not an attempt to use the defendants' words against them but to borrow a good articulation of the most cogent reason that could be advanced. In any event such an interpretation is the only reasonable way to read both clauses of sentence [c] together; and sentence [a] and sentence [c] together to make sense. The net result is that we conclude sentence [c] does not authorize the proposed stadium bonds. (See also our discussion of "user" under Act 94 above, Part III, pp 248–252.)

Defendants' counsel on oral argument concedes there is not specific authority in § 11 sentence [c] to change the definitions of Act 94 and § 7(2) but asks us to "infer" it from the other parts of § 11 such as the sentence [b] bond exception. This we cannot do without ignoring rational principles of statutory construction.

He then argues that since the Authority can only lease to the county under § 8, the lease or contract referred to in sentence [c] must of necessity be the one—and only the one—with the county.

This argument, like defendants' other arguments, does more than ask us to construe § 11 as a whole. Defendants ask us to look everywhere but the plain language of sentence [a] and [c] and in effect let the tail wag the dog. What defendants

---

[48] Defendants' supplemental brief, p 25.

ignore about § 8 is that the powers therein may be exercised whether or not bonds are issued pursuant to the enabling power of § 11 so the "leases" in § 8 are not automatically the leases in § 11.[49]

In addition, the Authority, under § 8, has the power and *duty* to review any county subleases and withhold consent if necessary. The only purpose for such a provision is to insure that the revenues paid by sublessees (when the county is not the actual user) will provide a sufficient "pledge" for bonds to be issued under § 11.

If, as defendants' counsel argues, the subleases are completely irrelevant from the Authority's standpoint, why the requirement that the Authority must consent to sublease? The answer is simply that the consent is a security device for the Authority and bondholders. The Authority must police the adequacy of subleases or it could not, as issuer, honestly tell bondholders that the revenue pledges from subleases will be sufficient to pay debt service.[50]

[d] Defendants' claim § 11[d] (quoted below) plus Const 1963, art 9 § 6 permits county to tax without reference to 15 mill and infers the stadium bonds are tax supported.

Since the claim that § 11[d] in conjunction with

---

[49] Section 9 of Act 31 provides that the Authority may exercise the powers by acquiring property by purchase, construction, lease, gift, devise or condemnation. The issuance of bonds under § 11 is only one of the contemplated ways for a county to "acquire" the property in question.

[50] Defendants also point to the portion of § 11 of Act 31 which says that before bonds are issued the property must be leased by the Authority for a period greater than 50 years. Defendants then say that since the Authority can only lease to the county under § 8 of Act 31 that the leases referred to in § 11[c] can only mean those between the Authority and county and not those between the Authority as agent and the Tigers or other actual users. Once again, defendants ask the Court to reason backwards and beg the question which we cannot and will not do.

Const 1963, art 9, § 6 is a key pillar to defendants'
justification of the tax supported "Fixed Rental"
base of the stadium bonds, let us consider § 11[d]
first through their brief. Defendants articulate
their case as follows (excerpts from defendants'
brief pp 33–35):

"The legislative body of the County of Wayne (its
Board of Commissioners) has determined that the acqui-
sition and construction of the Stadium is a desirable
public purpose of the County and as a result thereof
has entered into the lease obligation in accordance with
Section 8 of the Act. This obligation must be paid just
as the rental obligation of the County under the lease
of the County with the Detroit-Wayne Joint Building
Authority must be paid for the City-County Building
and the Frank Murphy Hall of Justice. As stated in
case *Betz v. Berrien County Building Authority,* 12
Mich. App. 304 (1968):

" 'Const 1963, art 9, § 6 provides in the first portion of
the second paragraph after a statement of the general
15-mill limitation):

" ' "The foregoing limitations shall not apply to taxes
imposed for the payment of principal and interest on
bonds or other evidences of indebtedness or for the
payment of assessments or contract obligations in antic-
ipation of which bonds are issued, which taxes may be
imposed without limitation as to rate or amount."

" 'The language is applicable to the situation here.
*The county is, thus, authorized to levy annually such ad
valorem taxes as may be necessary to meet its obliga-
tions to the Authority under the contractual arrange-
ments of the parties.'* (Emphasis supplied.) [Defendants'
emphasis.]

\*   \*   \*

"Section 11 of the Act, in characterizing the nature of
the obligation of the County to pay the rental to the
Authority, states in part as follows:

" 'Where and to the extent that the bonds are paya-
ble from revenues derived from payments to be made
pursuant to any lease or any *[sic]* [other] contract

obligations, the bonds shall be deemed to be issued in anticipation of contract obligations and such obligations shall be deemed to be contract obligations in anticipation of which bonds are issued, within the meaning of section 6 of article 9 of the constitution.' [§ 11[d].]

"The Stadium Bonds are payable from revenues derived from payments to be made by the County pursuant to the Lease and, accordingly, the Bonds of the Authority are deemed to be issued in anticipation of contractual obligations. *The reference to Article IX, Section 6, of the Michigan Constitution of 1963, is a clear legislative declaration that under the circumstances herein described the County has authority, if it is necessary to exercise it, to levy ad valorem taxes on all taxable property in the County in addition to the tax rate limitation imposed by the first paragraph of Article IX, Section 6, of the Michigan Constitution.* In this connection see *Butcher v. Grosse Ile Township, et al.,* 387 Mich 42 (1972). *The purpose of the above described language which was added to Section 11 of Act 31 was to confirm the decision in the Betz case that the County is authorized, if necessary, to levy ad valorem taxes to pay the rental just as it could for other County obligations represented by bonds or in anticipation of which bonds are authorized to be issued."* (Emphasis added.)

Defendants' position certainly has the color and verisimilitude of the real thing and merits our careful consideration. Defendants' argument must be considered from two points of view. First, it is obvious that defendants contend that *Betz* reads § 11[d] quoted in their brief above along with Const 1963, art 9 § 6 for the rule "that the county is authorized, if necessary, to levy *ad valorem* taxes to pay the rental * * * ." Up to that point defendants contend that *Betz* authorizes Wayne County in this case to levy necessary taxes to pay the "Fixed Rental". Second, defendants contend, it appears, that *Betz* stands for the rule that § 11[d]

with art 9, § 6 authorizes not only taxes to pay the "Fixed Rental" but to issue tax bonds. The sentence from the brief above in which we stopped short from completion reads more fully "that the County is authorized, if necessary, to levy *ad valorem* taxes to pay the rental [—] just as it could for other County obligations represented by bonds or in anticipation of which bonds are authorized to be issued." "Taxes * * * for * * * bonds" certainly sounds as though defendants contend § 11[d] with art 9, § 6 authorize tax bonds.

Let us look at the tax bond part first. Does § 11[d] authorize tax bonds?

There is nothing in § 11[d] which even remotely suggests authorizing a bond issue. The words "shall issue" or "may issue" do not appear. The only time the verb "to issue" is used in sentence [d] is to say that certain described "bonds shall be deemed to be issued * * * within the meaning of section 6 of article 9 of the constitution," or outside the 15-mill limitation. Section 6, art 9 refers to "taxes imposed for the payment of principal and interest on bonds" and says the 15-mill limitation does not apply to them. *It imposes no taxes. It in no way authorizes the issuance of bonds.*

Sentence [d] above was added prior to the 1970 "stadium" amendments. It was added by 1968 PA 96 in what might be called the "school package". In other words sentence [d] was incorporated with the intent that the school (governmental) use of a building would be considered a self-liquidating revenue use outside the 15-mill limitation.[51] In other words, sentence [d] was to import the actual occupier/user rather than being specially added for a non-user conduit such as Wayne County in

---

[51] But see Part VII, pp 314–317 for rule that government user revenues come within 15-mill limitation.

the stadium bond structure. This is the purpose of sentence [d].

Sentence [d] begins "[w]here and to the extent *the bonds* are payable from *revenues* derived from *payments* to be made pursuant to *any lease or other contract* * * * ." (Emphasis added.)

Following as it does two sentences one authorizing and the other describing bonds, *i.e.* true "revenue bonds," "the bonds" logically refers to the bonds just discussed in the previous two sentences and says they do not come within the 15-mill limitation. This analysis makes particular sense because the immediately preceding sentence contains practically the same reference to " * * * bonds * * * payable solely from the revenues * * * which *revenues* shall be deemed to include *payments* made under *any lease or* contract * * * ." (Emphasis added.)

Let us now look to see whether § 11[d] authorizes a tax.

As in the case of authorizing bond issuance there is nary a word about authorizing taxes in § 11[d]. In defendants' Brief quoted above, defendants state:

> "*The reference to Article IX, Section 6, of the Michigan Constitution of 1963, is a clear legislative declaration that under the circumstances herein described the County has authority, if it is necessary to exercise it, to levy ad valorem taxes on all taxable property in the County in addition to the tax rate limitation imposed by the first paragraph of Article IX, Section 6, of the Michigan Constitution.*"

Furthermore, defendants quote *Betz* to the same effect as follows:

> "*The county is, thus, authorized to levy annually such ad valorem taxes as may be necessary to meet its*

*obligations to the Authority under the contractual arrangements of the parties."* 12 Mich App 304, 312.

Assuming § 11[d] intends to do what defendants and *Betz*[52] claim it does, and as it gives appearance of doing, there are two reasons why it does not.

First as my Brother Justice BLACK thundered in Olympian prose in his opinion concurring specially hereto (p 374):

"If anything in this welter of words is construable as empowering an appointed authority to issue bonds other than 'self-liquidating revenue bonds', such as bonds secured in whole or in part by property taxation, that construction must fall before the title of the Act as it stands; § 24 being supremely controlling."

Second, as Justice COOLEY said in *Detroit Building & Savings Association v Mok,* 30 Mich 511 (1875) (discussed below):

"Alterations made in the statutes by mere reference, and amendments by the striking out or insertion of words, without reproducing the statute in its amended form, were well calculated to deceive and mislead, not only the legislature as to the effect of the law proposed, but also the people as to the law they were to obey, and were perhaps sometimes presented in this obscure form from a doubt on the part of those desiring or proposing them of their being accepted if the exact change to be made were clearly understood."

The Act inserting § 11[d] in Act 31 offended Const 1963, art 4, § 25 if it purported to substitute full faith and credit for the normal revenue from the property as the source of payment for the authorized bonds, unless it "re-enacted and published at

---

[52] *Betz v Berrien County Building Authority,* 12 Mich App 304, 312 (1968). We subsequently hold that a county cannot levy taxes on bonds issued under Act 31 and Act 94 which were the purported authority for tax bonds in *Betz* and this case. See Part VI, pp 300–304.

length" any part of Act 94 as well as Act 31 amended, which in fact it did not. See Part V, *infra,* pp 271–275 and 281. This is because Act 31 incorporates the revenue bond § 7(2) of Act 94 by reference (see § 11[a] p 253 *et seq. supra)* and therefore under *Mok, supra* anything in Act 31 or any act to amend Act 31 that purports "to dispense with something required by that Act, and to make some changes" offends Const 1963, art 4, § 25.

In short, without offending Const 1963, art 4, § 24 requiring unity of title and text or Const 1963, art 4, § 25 requiring appropriate methods of amendment, it is not possible to read § 11[d] to authorize either tax support of the "Fixed Rental" or tax bonds. Consequently, the stadium bonds, which are tax bonds are not valid and we are unable to accept defendants' able and vigorous contentions.

In conclusion it is clear that parts [a], [b], [c], and [d] of § 11, the operative parts of Act 31 as far as authorizing a bond issue are concerned, authorize only self-liquidating revenue bonds pursuant to Act 94 and that all of defendants' arguments and inferences that tax bonds may be issued under Act 31 or Act 94 are without valid foundation. Therefore neither Act 31 nor Act 94 authorizes the stadium bonds which are tax bonds.

Even if we could interpret § 11 Act 31 to authorize the county to pledge its full faith and credit to pay rent, we could not hold that the county by pledging its full faith and credit to pay the rent was only doing that and not also pledging its full faith and credit to pay the bonds, thereby making them tax bonds and invalid under Acts 31 and 94.

Defendants' theory, of course, is that the contract between the county and the Authority to pay

the rent and the contract between the Authority and bondholders are absolutely separate and distinct. Furthermore, they can quote *Rude* (338 Mich 363, 366) that there is no alter ego relationship between the county and the Authority which would "pierce the corporate veil," as it were.

The fact of the matter is that the bondholder does look directly to the county to pay off his bonds. On oral argument Bond Counsel said "[t]he record shows [the bonds] wouldn't have been sold at all without the good faith of the County behind them * * * ."

*"Chief Justice:* There's a practical matter of looking through [the Authority] to the good faith and credit.

*"Bond Counsel:* That's right * * * The Tiger Agreement wasn't what sold these bonds nor the possibility of any other use of the stadium."

Furthermore, we note that in *Dearborn v Michigan Turnpike Authority,* 344 Mich 37, 58 (1955) we held there was no alter ego where, as in *Rude:*

"[T]he *full faith and credit of the government is not pledged* and * * * the *activities of the authority are not tax supported,* the authority is separate from the government and autonomous." (Emphasis added.)

See also *Herman v Mobile Homes Corp,* 317 Mich 233, 243 (1947), and an "agency" case, *Smith, Hinchman & Grylls Associates, Inc v River Rouge Building Authority,* 374 Mich 514, 519–523 (1965).

Here the county's full faith and credit is pledged and we hold "the Authority is [not] separate from the government and autonomous" but is acting as an alter ego. This means the county is pledging its full faith and credit not only to pay the rent but also to pay the bonds, neither of which Acts 31 and 94 permit.

Of course, in the stadium bond case the county has directly covenanted to give the bondholder the power to enforce the Lease contract (Lease, § 14, Trial Exhibit 2A, pp 20–21), which is another reason why the county's full faith and credit pledge ran directly to the bondholder and was not insulated by the interposition of the Authority.

V.

## AMENDMENT BY IMPLICATION. MAY ACT 31 AMEND ACT 94 AS DEFENSE COUNSEL SUGGESTS?

We have held by internal statutory interpretation that Act 31 does not amend or alter Act 94 and here we shall consider the constitutional reasons why it cannot do so in the way defense counsel urges, even if Act 31 intended to do so, *viz,* to permit the levy of taxes to pay off revenue bonds or the creation of tax bonds.

We begin with certain sections of Act 94 which on their face preclude its amendment by the operation of other statutes:[53]

"Sec. 11. *The bonds authorized hereunder shall not be subject to any* limitations or *provisions contained in the laws of the state of* Michigan, pertaining to public corporations or in the charters of public corporations, as now in force or hereafter amended, *other than as provided for in this act."* (Emphasis added.)

"Sec. 2. * * * The powers conferred by this act shall *not be affected* or limited *by any other statute* or by any charter, *except as otherwise herein provided."* (Emphasis added.)

As we have already held, Act 94 does not "provide herein" for the "exception" urged upon us by

---

[53] MCLA 141.111; MSA 5.2741; MCLA 141.102; MSA 5.2732.

defense counsel. They ask us to amend it by implication. There are constitutional reasons why we cannot do this, however, as the following provisions will indicate: Const 1963, art 4, §§ 24 and 25:

"Sec. 24. No law shall embrace more than one object, which shall be expressed in its title."

"Sec. 25. No law shall be revised, altered or amended by reference to its title only. The section or sections of the act altered or amended shall be re-enacted and published at length."

In brief comments above we have heretofore noted that if Act 31 authorizes the bonds here under consideration, then Act 31 embraces an object not expressed in its title and is to that extent an unlawful authorization of such bonds. We concur with and adopt as our view the views on this subject stated by Justice BLACK, concurring specially.

We also concur with and adopt the views of Justice BLACK regarding the failure of Act 31 to distinctly state the tax as required by Const 1963, art 4, § 32.

We come now to the question of Part V.

May § 11 of Act 31 lawfully amend or alter the provisions of Act 94, the Revenue Bond Act, by creating "exceptions" to it without reenacting and publishing the section or sections amended?

The question here affects not only Act 31 but many other acts in our current labyrinth of municipal finance law which amend or purport to amend the Revenue Bond Act by changing or altering its definitions and/or application.[54]

Our job here is to determine the meaning and application of Const 1963, art 4, § 25:

---

[54] Some of these statutes are referred to in footnote 47, above.

"No law shall be revised, altered or amended by reference to its title only. The section or sections of the act altered or amended shall be re-enacted and published at length."

We have held above that Act 31 does not create the tax bond "exception" to Act 94 as defendants urge because there is no expressed legislative intent to create such exception.

Our ensuing discussion will deal with that part of § 11 which does purport to specifically create an exception (*i.e.* regarding serial or term bonds) and we also assume for purposes of decision what would be the case had the Legislature specifically attempted to create exceptions to Act 94 (with respect to "tax bonds") in the manner done in other statutes, for example the joint sewage authority act referred to in Part IV above, pp 255–256.

This is not a case of so-called "amendment by implication" such as the cases which were considered and held valid in *People v Mahaney,* 13 Mich 481, 496 (1865) (transfer of powers from one statute to another is not an "amendment" requiring republication); *Underwood v McDuffee,* 15 Mich 361, 366 (1867) (overall revision of statute and system of references adding new sections with the reference number of an old one is permissible where new section is not foreign to subject indicated by title of law in which inserted); *People v Wands,* 23 Mich 384, 388–389 (1871) (an amending act which properly amends two sections of law may have the effect of amending by implication other parts of the same body of law); *Swartwout v Mich Airline R Co,* 24 Mich 388, 399 (1872) (following *Wands* in holding that a new statute which adds a new section to a body of law may amend by implication other sections of the same body of law); and a continuing line of cases not cited here.

The cases cited above and others like them deal with kinds of "amendment by implication" held not subject to Const 1963, art 4, § 25 and its predecessors. Insofar as these previously mentioned lines of cases are distinguishable in their facts from the case presently at bar, those cases will still be the law to the extent not inconsistent with the principles enunciated in this opinion, which stem from the case of *Mok v The Detroit Building & Savings Association No. 4,* 30 Mich 511 (1875). In *Mok* there were three statutes which provided the grist of decision.

First, an act of 1853 authorized the formation of corporations for mining, smelting or manufacturing iron and "for other manufacturing purposes".

Second, an act of 1855 authorized the formation of corporations for "building and leasing houses and other tenements". The act of 1855 provided that corporations under that act could be formed under the provisions of the act of 1853 and these building and leasing corporations thus formed should have and possess all the rights and be subject to all the liabilities provided in the act of 1853 and any amendments thereto.

Third, an act of 1869 provided for the incorporation of building and savings association "under the provisions" of the act of 1855.

The Court noted that it was confusing to be sent by the act of 1869 to the act of 1855 only to be told to go in turn to the act of 1853, when it would have been much less confusing and questionable if there had been a direct reference to the act of 1853. This, however, was not the ground upon which this Court struck down the legislative labyrinth in question.

Assuming that the act of 1869 referred parties lawfully to the act of 1853 for the requirements in

organization, the Court held that it could not at the same time make changes or exceptions in the act referred to without reenacting the sections changed or modified. Describing the purported amendment of the act of 1853 the *Mok* Court said:

"But while the act of 1869 referred parties in this circuitous manner to that of 1853 for the requirements *in organization, it undertook at the same time to dispense with some things required by that act, and to make some changes.* It provided that the articles of association need not state the amount of capital stock actually paid in; that it should be contributed in initiation fees and in weekly or monthly sums as should be provided by by-laws * * * etc." *Mok,* 521–522. (Emphasis added.)

"Amendments of statutes by implication, we have held, are not forbidden by it [art 4, § 25]: *People v Mahaney,* 13 Mich., 481 [1865]; *Underwood v McDuffee,* 15 Mich., 361 [1867]. But this is not a case of that nature * * * ." *Id,* 522.

*"The act of 1853 has been, for the purposes of building and savings associations, incorporated in and made a part of the act of 1869, but with several changes and modifications, and these not made by the re-enactment of the changed or modified, but only by indicating the extent of the changes, leaving the parties concerned to fit the new act to the old as best they may." Id,* 523. (Emphasis added.)

*"What has been attempted here is, to duplicate an act, but at the same time to accommodate it by indirect amendments to a new class of cases, in disregard of the constitutional provision which requires each act of legislation to be complete in itself, and forbids the enactment of fragments which are incapable of having effect or of being understood until fitted in to other acts after by construction or otherwise places have been made for them.* No such legislation can be sustained. Persons claiming such extraordinary powers and privileges as

some which are claimed here, should be able to claim
them under legislation which is clear and unequivocal,
and which leaves no doubt of the purpose of the legisla-
ture to grant them." *Id,* 529 (Emphasis added.)

Const 1963, art 4, § 25 was also art 4, § 25 of the
Constitution of 1850. In writing the *Mok* case
Justice Cooley began by quoting the provision and
explaining the reasons for its existence:

"No one questions the great importance and value of
provision, nor that the evil it was meant to remedy was
one perpetually recurring, and often serious. Altera-
tions *made in the statutes by mere reference, and
amendments by the striking out or insertion of words,
without reproducing the statute in its amended form,
were well calculated to deceive and mislead, not only
the legislature as to the effect of the law proposed, but
also the people as to the law they were to obey, and
were perhaps sometimes presented in this obscure form
from a doubt on the part of those desiring or proposing
them of their being accepted if the exact change to be
made were clearly understood.* Harmony and consist-
ency in the statute law, and such a clear and consecu-
tive expression of the legislative will on any given
subject as was desirable, it had been found impractica-
ble to secure without some provision of this nature; and
as the section requires nothing in legislation that is not
perfectly simple and easily followed, and nothing that a
due regard to clearness, certainty and simplicity in the
law would not favor, * * * ." *Mok,* 515–517. (Emphasis
added.)

See also *Clay v Penoyer Creek Improvement Co,*
34 Mich 204, 208–210 (1876), a case similar to *Mok*
where the Court had under consideration a statute
providing for the appointment of commissioners by
reference to another act. Parties claimed that by
virtue of the referring act the appointment of
commissioners could be had in a way different
from the act referred to. Of this the Court said:

"While we do not question the right or power of the legislature to thus refer to the provisions of another statute, and render them applicable and binding as though incorporated and re-enacted in the act under consideration, *yet such a method of incorporating certain sections of previous statutes in subsequent acts, must be confined to cases* where the sections so referred to are germane to the latter act; *where it will not be necessary that parties should either omit from or add important words or provisions to the sections referred to in order to render them applicable.* When such changes become necessary, it is leaving to each party acting under the statute the power to change it to suit his convenience, and thus to legislate for himself. And when he has done so *there is no certainty at all that the legislature, had its attention been specially called thereto, would have made like changes, or if it had, that the act would have become a law by receiving the approval of the governor." Id,* 208-209. (Emphasis added.)

And in conclusion the Court summed up the rule of *Mok* which is still the law of this state:

"*The sections referred to must be treated as though they had been re-enacted at length in this act, and without any changes having been made therein.* Had this been done, then the inquiry of the commissioners would have been limited as we have just stated. *A reference merely to a section of another statute, in this manner, can no more broaden it or enlarge its scope than could its literal reenactment in the new statute in the place it was designed to fill.* In neither case, without some change in the phraseology, [of the act referred to] can its provisions be materially enlarged, while it may very materially limit the effect of the act of which it has thus become a part. —*Mok v Detroit Building, etc., Co.,* 30 Mich., 511; *United States v Bassett,* 2 Story, 403 [CA1, 1843]." *Id,* 210-211. (Emphasis added.)

An analogous case is *In re Petition of Auditor General,* 275 Mich 462, 467-468 (1936). This case

did not involve the incorporation by reference of another statute, but the amendment of a previous statute (regarding publication lists of delinquent taxes on land) in the same statute in which a new method for providing notice was enacted.

The Legislature had purported to repeal the section but actually only amended it and, whether or not the act exceeded the scope of its title, this Court held the amended section should have been reenacted:

"The so-called repeal of section 66 (section 3458) actually is an amendment of this section for a large portion of it remains unaffected, and provides for the publication in the instant case. *This section, as amended, should have been reenacted and published at length in the amended form so as to conform with the constitutional mandate, hereinbefore quoted. People v. Stimer,* 248 Mich. 272 (67 A.L.R. 552) [1929]. *The confusion that has arisen through failure to reenact the amended section can be readily seen when in Mason's 1935 Supplement to Compiled Laws of 1929, § 3458 is referred to as repealed although as a matter of fact it was only amended." Id,* 468. (Emphasis added.)

This case, which like *Mok* has never been overruled, holds that when the Legislature intends to amend a previous act, it must do so in conformance with the plain and unequivocal requirements of now Const 1963, art 4, § 25.

We are aware of cases such as *People v Stimer,* 248 Mich 272 (1929). In that case there was an act on the books that created the Department of Animal Industry and the duties of its commissioner. Other sections dealt with criminal penalties for failing to allow the commissioner to examine diseased animals. A later act abolished the Department of Animal Industry, created the State Department of Agriculture and provided that the

Department of Agriculture would exercise the powers "now vested by law in the Department of Animal Industry." In answer to the suggestion that the former act was amended without repassing and republishing it, the Court said:

"Except to the extent that it was expressly done by a provision in the act of 1921, we do not understand that there was any attempt or intention thereby to revise, alter, or amend the provisions of the act of 1919. By the express terms of the 1921 enactment, the department of animal industry was abolished; and the powers and duties of that department were transferred to the State department of agriculture. The portion of Act No. 181, Pub. Acts 1919, which prescribes these powers and duties was not 'revised, altered, or amended.' It still stands as a part of the statutory law of the State, and therefore there was no occasion for the re-enactment or republication of that portion of the statute." *Id,* 278.

\*   \*   \*

"In so far as the act under consideration revises, alters or amends Act No. 181, Pub. Acts 1919, it does so in express language, published at length; and in so far as the change or alteration is by implication merely, it does not offend the constitutional provision." *Id,* 280.

In support, the *Stimer* Court (pp 278–280) relied on language of Justice COOLEY in *People v Mahaney,* 13 Mich 481 (1865). We quote part of the *Mahaney* language relied on as follows:

"It is next objected that the law is invalid because in conflict with section twenty-five of article four of the constitution, which provides that 'no law shall be revised, altered or amended by reference to its title only; but the act revised, and the section or sections of the act altered or amended, shall be re-enacted and published at length.'

"The act before us does not assume in terms, to revise, alter or amend any prior act, or section of an

act, but by various transfers of duties it has an amendatory effect by implication, and by its last section it repeals all inconsistent acts. * * *

"This constitutional provision must receive a reasonable construction, with a view to give its effect. *The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the changes made in the laws. An amendatory act which purported only to insert certain words, or to substitute one phrase for another in an act or section which was only referred to but not republished, was well calculated to mislead the careless as to its effect, and was, perhaps, sometimes drawn in that form for that express purpose. Endless confusion was thus introduced into the law, and the constitution wisely prohibited such legislation. But an act complete in itself is not within the mischief designed to be remedied by this provision,* and cannot be held to be prohibited by it without violating its plain intent." *Mahaney,* 496–497. (Emphasis added.)

Leaving aside for the moment the continuing validity of cases such as *Stimer,* it is plain that these words we have emphasized above apply to precisely the fact situation in the stadium bond case. If an act is to be referred to or incorporated by reference then it will be treated as incorporated without any changes unless the sections intended to be altered or amended are reenacted and published at length as required by Const 1963, art 4, § 25.

Although *Stimer* clearly recognized the principles we have been stating, *Stimer* seems to be another case where hard facts (public health and safety) make bad law. On the facts as well as the law, we find ourselves in agreement with Justice POTTER, dissenting. He held the later act in viola-

tion of the constitutional provision requiring re-
enactment and republication and concluded:

"(b) Act No. 13 * * * amends not only Act No. 181
* * * as we have seen, but a great number of other
acts. *Any one, upon consulting Act No. 13 * * * which
does not refer to the acts amended by title or number,
must search through the previous enactments of the
legislature in order to ascertain the powers and duties*
of the State department of agriculture created by Act
No. 13 * * * .

"(c) Act No. 13 * * * *clearly amends Act No. 181
* * * by abolishing the enforcing officers provided in
Act No. 181 * * * and their subordinates, and transfer-
ring their powers and duties to new enforcing officers
created by Act No. 13 * * * * or provided to be created
by the commissioner of agriculture.

"(d) *It is entirely immaterial whether Act No. 13
* * * purports to amend Act No. 181 * * * . It in fact
does alter and amend it,* and therefore it must comply
with constitutional provision of republication.

"(e) *Defendant, to ascertain the rights and duties of
the agents and employees* of the department of agricul-
ture and of himself, *must extricate such knowledge
from the repugnant provisions of conflicting statutes,
new and old, and from their overlapping, inconsistent,
and obscure provisions, obtain that clear knowledge of
his rights and duties which the people by the Constitu-
tion sought to make available by his reading the last
statute upon the subject."* (Emphasis added.)

Justice POTTER then deals with the permissibil-
ity of so-called amendment by implication of other
statutes, when these other statutes are not specifi-
cally mentioned either by number, title or other-
wise. Among the pertinent authorities collected is
the following:

" *'The character of an act, whether amendatory or
complete in itself, is to be determined not by its title,
alone, nor by the question whether it professes to be an
amendment of existing laws, but by comparison of its*

*provisions with prior laws left in force,* and if it is complete on the subject with which it deals it will not be subject to the constitutional objection, *but if it attempts to amend the old law by intermingling new and different provisions with the old ones or by adding new provisions, the law on that subject must be regarded as amendatory of the old law and the law amended must be inserted at length in the new act.'* Nelson v Hoffman, 314 Ill. 616 (145 N.E. 688, 690) [1924]; *People v Knopf,* 183 . Ill. 410 (56 N.E. 155) [1900]." *Stimer,* 293. (Emphasis added by this writer.)

Another line of cases created an aberration of the doctrine of amendment by implication by the practice of hair spliting the meaning of the constitution so that only the specific act *directly* amended need be published while others that were affected need not be published. An example is the often cited case of *Burton v Koch,* 184 Mich 250 (1915).

In that case an amendment was added to one set of laws which was unquestionably intended to change or create a proviso regarding qualifications for voters in another set of laws. The Court approved this result by a process of reasoning that allows the Legislature to amend, repeal, revise or alter any statutes on the books without reenacting and republishing them so long as they publish the *single* statute which is intended to affect all the others. What this Court said in *Burton* was:

"We ought not to confuse the effect of the amendment with the constitutional duties of the legislature to indicate an amendment in a particular way. * * * The *section amended* was re-enacted and republished at length as the Constitution provides. The constitution has been precisely obeyed and the effect of the amendment is, and was intended to be * * * to provide uniform qualifications for voters in all school districts of the State." *Id,* 255. (Emphasis by the *Burton* Court.)

Whether or not the result in the case is good law under some other theory we cannot approve a construction that allows the purpose and spirit of the constitution to be evaded by seizing on particular words and following them "precisely" to the detriment of the plain meaning of the full text.

In the *Burton* case the statute involved was a bill physically amending an existing statute. This existing statute as physically amended was intended to amend and alter other statutes. By virtue of Const 1963, art 4, § 35 any bill enacted into law must be published. But that section of the constitution does not require the existing statute which was physically amended to be reenacted and republished in full. By virtue of Const 1963, art 4, § 25, however, the specific section amended in terms by the new bill must be reenacted and published just as any other law must be published. The *Burton* Court held that this publication of the section specifically amended *in its words* was a "precise" following of the constitution and no other statute need be reenacted and republished even if the plain intention of the statute specifically amended *by words* is to revise, alter, amend or abrogate one or hundreds of parts of existing statutes.

The absurdity of this rule becomes more apparent in its logical extention. Suppose (instead of introducing bill A which amended statute B *in its words,* and statute B in turn was intended to amend numerous others as in *Burton)* the Legislature introduced a bill which did *not amend any statute in its words* but merely was to stand by itself but it is intended and its only purpose is that it should revise, alter and amend hundreds of statutory provisions.

Under the logic and rule of the *Burton* case

none of the other sections need be reenacted regardless of how much and in what way they are affected, because no statute has been amended in its specific words. In other words, under the rule of *Burton* and similar cases nothing need be reenacted and republished so long as you don't march directly up to it and strike out words or add other words.

*Mok* stands for the rule that you *cannot* amend statute C even by putting in statute B specific words to amend statute C, unless you republish statute C as well as statute B under Const 1963, art 4, § 25.

*Burton,* on the other hand, stands for the rule that you *can* amend statute C by putting in statute B words for the purpose of amending statute C so long as you make no specific reference to C, merely by republishing statute B under Const 1963, art 4, § 25, but without republishing statute C.

*Mok* says the constitution requires you to do the whole job right. *Burton* says it is good enough to do the job half right. Furthermore, *Burton* says you can avoid the second half of the job of republication if you hide your purpose whereas *Mok* requires the second half of the job of republication even though you disclose your purpose.

This Court is convinced the constitution is not satisfied with halfway measures and does not prefer dissimulation to straightforwardness. We adopt the rule of *Mok* and overrule *Burton.*

It is argued, however, that it would be unreasonable to require the Legislature to reenact and republish statutes which they intend to amend and that the constitution should not be read to require the doing of what it plainly states on its face.

What must be underscored, it is said, is other language in *People v Mahaney:*

" 'If, whenever a new statute is passed, it is necessary that all prior statutes, modified by it by implication should be re-enacted and published at length as modified, then a large portion of the whole code of laws of the State would require to be re-published at every session, and parts of it several times over, until, from mere immensity of material, it would be impossible to tell what the law was.' " *Stimer,* 279, quoting *Mahaney,* 497.

Several answers are appropriate to this objection. First, we do not have such a case before us now. Second, this objection, even if valid, should not be extended to the point where it produces just the result it seeks to avoid—it should not be impossible to tell what the law is. Third, where the Legislature really intends to amend previous statutes so that their operation is narrower or broader than stated or previously construed to be, then this intent as expressed *is not amendment by implication* and cannot be rendered amendment by "implication" by the device of failing to point out the specific section intended to be altered or amended.

Fourth, and of most importance, is that *constitutional duties and requirements may not be avoided on the ground that it might be a lot of work to comply with the constitution.* This objection is treated forthrightly by Justice POTTER in his dissenting opinion in *People v Stimer* at p 295:

"The people contend that if defendant's contention is well taken, the legislature has been proceeding upon a theory which, if overturned, will seriously affect the governmental activities of the State, * * * . So far as this question is entitled to consideration:

"The legislature must comply with the constitutional provision so long as it remains in force.

*"If the people of the State are not desirous of having the legislature comply with the constitutional provision above quoted, then such provision may be abolished by an amendment to the Constitution; * * * ."* (Emphasis is present writer's.)

There are presently further reasons why the objection that it will be hard work to comply with the constitution is not well taken. At the time the so-much relied on language of *Mahaney* was written, we were barely into the age of the typewriter and practical printing methods.[55]

We need not recount the remarkable advances in printing and copying technology available and in current use that permit rapid, inexpensive and efficient high volume reproduction.

---

[55] The earliest form of printing press was the simple screw hand press. In the 1800's the flatbed cylinder press was introduced along with the platen press and the rotary press. These allowed for more efficient and speedy printing but did not solve the problem of finding a quick and efficient method to complete the arduous task of setting type. If, every time a statute was amended affecting a number of other laws, it was necessary to republish all of those laws, the "burden" would be very real in the days of *Mahaney,* because the job of setting type required a person to find the "letters" and put the words together and then to distribute the set-up type to the printing wheel. The first machine for setting type mechanically was not even patented until 1822 in England by Dr. William Kurt. The first machine patent for distributing the type to the printing press after use was taken out by Gouden (England, 1840) and by Rosenberg in America in 1842. The first *practical* machine for composition and distribution was not even patented until 15 years after the *Mahaney* case by Joseph Thorne in 1880. The forerunner of modern typesetters was the monotype, invented by Tolbert Lanston in 1885, 20 years after *Mahaney.* In addition to the burden of republication for the benefit of the *public,* there was the problem of publication of the statute in its amended form so that the *legislature* would know what they were doing. It may have seemed quite a burden to require enormous typesetting and printing costs to be incurred for a statute or hundreds of statutes which might never be passed but which were introduced for one reason or another as the rightful prerogative of legislators. At the time there was no alternative (such as Xerox) to typesetting and the first practical typewriters were not even invented until two years after *Mahaney* in 1867 by three Milwaukee men, Christopher Latham Sholes, Carlos Glidden, and Samuel Soulé.

The Michigan Legislature of today, moreover, *does* have its own sophisticated bill drafting and research services that are mandated by Const 1963, art 4, § 15:

"There shall be a bi-partisan legislative council consisting of legislators appointed in the manner prescribed by law. The legislature shall appropriate funds for the council's operations and provide for its staff which shall maintain bill drafting, research and other services for the members of the legislature. The council shall periodically examine and recommend to the legislature revision of the various laws of the state."

This section of the constitution is implemented by MCLA 4.311; MSA 2.138(1). One of the services provided by the legislative research bureau under the mandate of constitution and statutes is a full-text computer research and retrieval system containing all the laws of the State of Michigan.

Through the gracious assistance of this bureau and legislative analyst Edward J. Gaffney, Jr., we were able by simple computer requests to quickly retrieve every statute making reference in any way to Act 94.[56] By the same method it is possible to retrieve every statute making reference to a word or particular combination of words in Acts 31 and 94 used in any conceivable context.[57]

In short, it is a simple and speedy task to

---

[56] See footnote 47, above, for some of the statutes extracted from this computer search.

[57] If a lawyer or legislator *today* wants to find every statute making reference to Act 94, he *still* cannot do so by the use of a Shepard's statute citator. At one point the statute section of the citator gave references to all other statutes making reference to any other statute but that service has been discontinued as the practice of cross-referencing mushroomed and the citations became too long for economical reproduction by the publishers of Shepard's. Even if it would have solved the problem in the days of *Mahaney,* the Shepard citator did not come into existence until 18 years after *Mahaney* and the predecessor "sticker" services did not cover statutes.

determine which of all statutes in existence may be affected in any direct or substantial way by a bill currently under consideration—in fact it takes much less time and effort to do this job than it takes a reader to wade through this opinion.

If the search reveals statutes which appear to be affected and are not intended to be so, then this should be made clear by simply inserting appropriate language into the bill under consideration specifically excluding its operation upon the other statutes revealed in the search. But whether or not this is done we hold that in the absence of specific legislative intent to amend or alter other statutes we will treat them as in existence and interpret them as they are written unaffected by subsequent statutes. If, on the other hand, it *is* intended to amend or alter those other statutes revealed in this search, then it should be stated specifically and those statutes must be amended or altered directly and republished as contemplated by Const 1963, art 4, § 25.

There is nothing complicated, burdensome, unreasonable or obscure about what we say here today. If a bill under consideration is intended whether directly or indirectly to *revise, alter, or amend* the operation of previous statutes, then the constitution, unless and until appropriately amended, requires that the Legislature do in fact what it intends to do by operation.

What we say in no way affects those limited kinds of cases where because of a special fact situation a court is faced with two accidently absolutely conflicting statutes requiring a determination that one or the other applies (and thus an amendment or repeal of the other by implication follows in the fact circumstances). These kinds of cases do not result from any deliberate misleading

by the Legislature or failure to make all reasonable efforts to make clear in the statutes what is intended, but rather, as we said in *Mok,* 517 "[i]t is probable that if the requirement has at any time been disregarded by the legislature, the default has proceeded from inadvertence merely."

In sum, we agree with Justice COOLEY in *Mahaney* that the constitution must be given a reasonable interpretation and we do no more than that. Whereas the *Mahaney* Court felt compelled to shy from the plain words of the constitution in light of then available tools, we construe the provision to mean what it says in light of the tools available today and required to be used under the injunction of Const 1963, art 4, § 15.

It may not be answered here that the people when adopting the Constitution of 1963 did so with the existing law stemming from *Mahaney* in mind. It is true that in some instances existing case law on a particular subject was brought to the attention of the delegates and it was pointed out to them that a particular transaction that might seem to be covered would probably not be covered because of case law exempting certain fact situations from the operation of the predecessor provision of the constitution. This, for example, was the case with respect to the discussion of Const 1963, art 3, § 6 relating to "internal improvements". It was pointed out to the delegates that judicial definition had excepted truly self-supporting or "self-liquidating" projects from the operation of the predecessor, Const 1908, art 10, § 14. The delegates passed the provision anyway and froze the exception into § 6 of the present constitution. See the discussion by Justice ADAMS in *City of Gaylord v Gaylord City Clerk,* 378 Mich 273, 289–291 (1966).

In contrast, with respect to the requirement of reenactment and publication of Const 1963, art 4, § 25 there was no mention of previous case law nor was there any debate or discussion by the delegates of what situations the provisions should not cover. See 2 Official Record, Constitutional Convention 1961, p 2416.[58]

For the reasons stated above, what we hold here with respect to Act 31 is as follows:

1) The reference to Act 94 has the legal effect of incorporating that act in all of its terms without amendment or alteration into § 11 of Act 31.

2) The proviso in § 11 of Act 31 which says that the bonds may be term bonds is of no effect and the bonds may only be the serial bonds authorized in § 7(1) of Act 94.

3) The definitions of "revenue" in Act 94 are not and cannot be excepted by any statements in § 11 of Act 31 no matter how specific these provisos might be phrased. In order to change the definition of "revenue" in Act 94 direct amendments would be required at least to §§ 3 and 7 of Act 94.

4) The purported authorization in § 11 of Act 31 of unlimited taxes to support the contract obligation in anticipation of which bonds are issued

---

[58] The only comment in the entire convention record on the application of this section is as follows:

"MR. KUHN: Mr. Chairman and members of the committee, on this particular proposal, we kept it intact as to what the practice is in Michigan today. You will note on line 8 we struck out the words 'the act revised.' That would mean that if the legislature were to pass any statute today which would affect a statute in being, that you would have to republish the whole statute. This is not the process in Michigan today. It is not the sensible thing to do. Therefore, these words were deleted by our committee. In practice, what is done if you amend a statute today in a particular section or sections, you reprint those sections in full, which is the correct thing to do, in our judgment. Therefore, we ask that this be adopted." 2 Official Record, Constitutional Convention 1961, p 2416.

under Act 94 can be of no effect without direct amendments to at least §§ 7(2) and 13 of Act 94, as well as the title to Act 31.

5) The reference in § 11 of Act 31 to the limits of the authority for purposes of voting in § 33 of Act 94 does not amend, alter or revise anything in § 33 of Act 94, because it merely restates in other words what is stated in § 33 of Act 94.

6) We do not decide here whether 1969 PA 342, as amended by 1971 PA 40,[59] (which provides for a 8% interest rate at which "any public corporation may issue bonds" until July of 1973 notwithstanding any other provision of law) is a permissible method of amending, temporarily, § 12 of Act 94 which provides for a maximum 6% net interest cost.

## VI.

## ARE REVENUE BONDS SUBJECT TO DEBT LIMITATIONS?

In the foregoing part of this opinion we have held that the stadium bonds are illegal because the Stadium Authority had no statutory or constitutional power under the circumstances to issue bonds of that type, *i.e.* non-revenue bonds. In doing so we were not compelled to consider the implication of certain statements made in the stadium bonds and in the arguments relative to debt and millage limitations. We do so now as an important part of the decision of this case.

Also in this part of the opinion, we will consider the implication of constitutional and statutory

---

[59] MCLA 141.151 *et seq.;* MSA 5.2572(1) *et seq.*

The bonds here were sold at a net interest cost greater than the 6% allowed by § 12 of Act 94 and approval had been given for resale of bonds up to the maximum 8% allowed by MCLA 141.151 *et seq.*

debt and millage limitations on revenue bonds for the use of the profession and especially for the Municipal Finance Commission which the Legislature has created as the watch dog of the state's credit. We will divide our consideration of the matter into two separate sections, Part VI, relating to the constitutional "debt" issue, Part VII to the constitutional "millage" issue. Statutory debt limitations will be considered here in Part VI.

A. *Constitutional Debt Limitation*

According to defendants, the status of the stadium bonds is as follows:

"Official Statement of Wayne County Stadium Authority:"

"The bonds are not general obligations of the Authority or the County and do not constitute indebtedness of the Authority or the County within any constitutional provision or statutory limitation."[60]

"Official Notice of Sale" Approved by Municipal Finance Commission:"

"Each bond is a self-liquidating revenue bond, is not a general obligation of said Authority or of said County, and does not constitute an indebtedness of said Authority or of said County, within any constitutional provisions or statutory limitation."[61]

We have held above that the stadium bonds, are, contrary to the above statement, not self-liquidating revenue bonds but are in fact unlimited tax bonds and general, *direct* obligations of Wayne County. The above quoted statements are therefore false as to premise if not as to the indebtedness conclusions. But since the stadium bonds are

---

[60] See trial exhibit 10.
[61] See trial exhibit 10.

tax bonds, the stadium bonds are subject to debt limitations as are all other similar tax bonds.

We shall set forth pertinent constitutional and statutory debt limitation provisions (1, *infra)* and consider what the relationship of true "revenue" bonds is to these provisions under case law (2, *infra).* Then we shall apply these principles to the revenue bond structure viewed alternatively as a lease of property (as defendants ask us to view it) and as a sale (3, *infra).* Finally, we will attempt to develop certain benchmarks to determine "debt" under the constitutional debt limitation provisions for true revenue bonds. (4, *infra.)*

## 1. CONSTITUTIONAL AND STATUTORY PROVISIONS:

a. Const 1963, art 7, § 11:

"Sec. 11. No county shall incur any indebtedness which shall increase its total debt beyond 10 percent of its assessed valuation."

b. Act 31, § 8; MCLA 123.958; MSA 5.301(8) states in part:

"Any rental obligation or consideration applicable to the incorporating unit or units under such contract, shall not be considered as indebtedness of the incorporating unit or units within the meaning of any statutory or charter debt limitation of such incorporating unit or units."

c. Act 94 § 7(2); MCLA 141.107(2); MSA 5.2737(2) states in part:

"No bond or coupon issued pursuant to this act shall be a general obligation or constitute an indebtedness of the borrower unless its full faith and credit are so pledged. Whether or not a public corporation pledges its full faith and credit for the payment of bonds issued

pursuant to this act, the amount of the bonds shall not be included in computing the net bonded indebtedness of the public corporation for the purposes of debt limitations imposed by any statutory or charter provisions."

d. Act 94 § 13; MCLA 141.113; MSA 5.2743 states in part:

"There shall be plainly stated on the face of each such bond * * * that it is a self-liquidating bond and is not a general obligation of the borrower, unless the full faith and credit of the issuer are pledged and also plainly stated on the face of each bond; that it does not constitute an indebtedness of the borrower within any constitutional or statutory limitation * * * there shall also be plainly stated on the face of each interest coupon substantially as follows: This coupon is not a general obligation of the borrower * * * ."

e. MCLA 46.7; MSA 5.327 relating to the powers of county states as follows:

"The board of supervisors of any county may in any 1 year levy a tax of 1/10 of 1 mill on the assessed valuation of said county for the construction or repair of public buildings or bridges, *or may borrow an equal sum for such purposes; * * * but no greater sum shall be raised for such purposes in any county in any 1 year, unless submitted to the electors* of the county and approved by a majority of those voting thereon: * * * ." (Emphasis added.)

f. MCLA 141.71; MSA 5.2301 has exactly this same language as MCLA 46.7 except it adds "for purchase of real estate sites for".[62]

---

[62] Other statutes of possible application here are the bonding and spending limit provisions of MCLA 141.61 and MCLA 141.61a; MSA 5.2251 and 5.2251(1).

In *Bond v Cowan,* 272 Mich 296 (1935) we held that the absence of a specific requirement for a vote under MCLA 141.61 did not abrogate the requirement of a vote under MCLA 46.7. MCLA 141.61a operates with MCLA 46.7 to provide a limit of 1-1/10th mill of monies to be spent for building purposes regardless of where the monies come from

## 2. THE CASES—YOUNG AND ITS PROGENY; WALINSKE; RUDE; DOYLE; BETZ

a. *Young v Ann Arbor,* 267 Mich 241 (1934).

*Young,* involving a contract for a sewage disposal plant was the first case under the Revenue Bond Act (Act 94) and was a test of its validity. It was claimed that the "statement" on the face of the bonds required by § 13 of Act 94, *supra,* violated the debt restrictions of constitution and statute. This Court first spoke to the reasons why "special assessments" are not constitutional debt, quoting Dillon, Municipal Corporations (5th ed), § 198 as follows:

" 'Under such a contract no judgment *in personam* against the city for non-payment of the cost is justified, no charge can be enforced against its general assets, nor can a resort be had to general taxation for the purpose of satisfying the claim. When the rights of the contractor are so limited, there is *no debt within the debt-limit provision of the Constitution.' "* (Emphasis added.) 267 Mich 241, 251.

This Court then said that the same reasoning was applicable to "self-liquidating revenue bonds," quoting from *Winston v Spokane,* 12 Wash 524; 41 P 888 (1895) in part as follows:

" 'The general credit of the city is in no manner pledged except for the performance of its duty in the creation of such special fund.' "

In conclusion, this Court in effect created a constitutional definition of a "self-liquidating revenue bond" under Act 94 and constitutional debt limits. Bonds issued under Act 94 do escape inclu-

unless there has been a vote of the people authorizing a greater expenditure of tax funds over and above the 1/10th of 1 mill limitation in MCLA 46.7. See *Oakland County Taxpayers League v Oakland County Supervisors,* 355 Mich 305, 320–325 (1959).

sion as "debt" not simply because they have been issued under Act 94, but rather because of the character of the bonds required by Act 94:

"Such bonds are not payable by the city. *It does not assume and agree to pay them.* It *can levy no tax* upon the people for their payment. They are exactly what they purport to be, self-liquidating revenue bonds, and the *purchaser thereof can have recourse for their payment only to the revenues to be derived from the operation* of the sewage disposal plant. These revenues must be disbursed in accordance with the statute." 267 Mich 241, 253–254. (Emphasis added.)

And in addition the Court noted:

"[T]he bonds which it issues are not secured by the property of the sewage disposal plant; *there can be no foreclosure under these bonds; the lien* granted by the statute *is solely upon the revenues to be derived from its operation."* 265 Mich 241, 254. (Emphasis added.)

A continuing line of cases since *Young* reaffirm the principle that as a *constitutional definition,* "self-liquidating revenue bonds" do not obligate the general taxing power and hence do not create a debt subject to debt limitations. See *Gilbert v Traverse City,* 267 Mich 257, 260–261 (1934); *Attorney General ex rel Eaves v State Bridge Commission,* 277 Mich 373, 383 (1936); *Michigan Gas & Electric Co v Dowagiac,* 278 Mich 522, 526ff (1936); *In re Brewster Street Housing Site,* 291 Mich 313, 341–342 (1939); *State Highway Commissioner v Detroit City Controller,* 331 Mich 337, 348–349 (1951); *Cleveland v Detroit,* 324 Mich 526, 538–539 (1949); and see *City of Gaylord v Gaylord City Clerk,* 378 Mich 273, 290, 292, 302 (1966) and cases cited there.

b. *Walinske v Detroit-Wayne Joint Building Authority,* 325 Mich 562 (1949).

Defendant claims, however, that this stadium transaction is just like those considered in *Walinske, Rude* and *Betz* all of which involved construction of a municipal building for use by the municipality or municipalities, with the bonds being retired by municipally paid rent, and therefore outside debt limits.

As the analysis below will show, these cases create no exception to the constitutional definition that "self-liquidating revenue bonds" do not obligate the general taxing power and, are therefore outside debt limitations.

In support of the contention that the county's obligation here is not "debt" are the following quotations from *Walinske:*

"[A] contract for future services to be paid for as rendered, is not an incurring of indebtedness * * * ." *Id,* 577.

"Inasmuch as the bonds proposed to be issued by the authority are not faith and credit obligations of its incorporators, they need not be voted on by the electorate, nor are they subject to the debt limitations of the municipalities." *Id,* 581–582.

*Walinske* is not all that useful to the stadium bonds as bond counsel cracks it up to be, however, as the case is limited by the following crucial differences between that transaction and this stadium transaction.

(1). *Ultimate Ownership of Building Not Before Court in Walinske*

Of great significance in *Walinske* is the fact that the *lease was not before this Court* so consideration of the cases supporting plaintiffs' contention that this was a "sale" could be avoided and this Court in *Walinske* took great pains to repeatedly point this out:

"The eventual disposition of the building is not now before us." *Id,* 573.

"Plaintiff further relies on a series of cases holding that when a city contracts or leases a building at an annual rental sufficient to pay the cost of the building over the period of the lease, and providing that at the end of the term of the lease the building shall be conveyed to the city, it is in fact a contract to purchase the building by instalments and so subject to the debt limitations of the city for the full amount of the payments to be made under the lease. *We cannot pass on the lease in the instant case as it has not been executed and is not now before us \* \* \* . There is no showing that the lease when executed will be subject to the objections of the above cases* cited by plaintiff." *Id,* 578. (Emphasis added.)

The cases relied on by this Court and quoted in *Walinske* make plain that *there would be a sale if title were to pass* and the rents were geared to the bond debt retirement:

" 'But a contract which, though denominated and purporting to be a lease with option to purchase, is in fact a contract of purchase by payments in instalments, is treated as a contract of purchase rather than as a lease; and, according to the great weight of authority, the fact that the so-called rentals are sufficient, if paid throughout the term of the lease, to cover the entire purchase price, and to enable the municipality to acquire the property without further payment, renders the contract one of purchase rather than lease, and gives rise to an indebtedness, within the meaning of a constitutional or statutory debt limitation.' " *Id,* 579–580 quoting 71 ALR 1326.

\* \* \*

" 'When the case was first here the difference between such leases and the one under consideration was that at the end of a definite period, upon compliance with the contract, the property leased was to be deeded to the Commonwealth. This the court held was a sale not a lease. We now have a very different situation. The

instrument before us is a straight lease for a recurring necessity. The land leased is not deeded to the Commonwealth; it is still held by the authority, an independent public corporation.'" *Id,* 580 quoting *Kelley v Earle,* 320 Pa 449; 182 A 501 (1936).

In addition to the fact that the lease was not before this Court in *Walinske* and is before us now, there is another reason why the eventual disposition of the building is before us whether or not the lease is executed.

At the time of *Walinske* and up until June 6th, 1968, § 13 of Act 31 provided that the building *"may"* be conveyed to the incorporating unit after the retirement of bonds. Under 1968 PA 96, Act 31, § 13 was amended, substituting *"shall"* for *"may".* Ownership of the building by the incorporator is now mandatory.

This amendment was no doubt in response to the holding of *Betz v Berrien County Building Authority,* 12 Mich App 304 (1968) which was never appealed to this Court. The reasoning of this case will be considered below.

(2). *Walinske Under Millage Limit*

There is an interesting facet of *Walinske* which may account for that Court's willingness to explicitly ignore the nature of the transaction and the disposition of the building thus avoiding the restrictive bond and debt limits of Const 1908, art 8, § 10.

What we are referring to is that the lease payments in *Walinske* would be made *within present operating millage.* The city and county were not undertaking any new obligation and of most importance is that under the 1908 Constitution the county could *not pledge to levy any taxes beyond the 15 mill limit* without special action. The *Wal-*

*inske* Court assumed the county *must pay for the rentals as they do other services within their operating millage:*

"Plaintiff further contends that the annual payments under the proposed lease *may exceed the millage limitations* prescribed by the Constitution and the charter. We have already reviewed the amount the city and county will be called upon to pay as compared with what they are expending at the present time for similar services. *This is primarily an administrative question to be met by the city and county in the normal course of providing for expenses of operating. The danger of it exceeding the millage limitations is so remote that it requires no further consideration."* (Emphasis added.) *Id,* 583.

Whatever criticism may be had of the willingness of the *Walinske* Court to avoid harsh constitutional restrictions by reliance upon fiction, it must be recognized that the constitutional environment influencing that Court was vastly different than our present document.

Today there is no *constitutional* 1/10 of 1 mill limit, although there remain statutes to the same effect, MCLA 46.7; MCLA 141.71, *supra.*

Today there are the exceptions to the 15 mill limit of now art 9, § 6 that we construed in *Butcher v Grosse Ile Twp,* 387 Mich 42 (1972), aspects of which will be considered below.

c. *Rude v Muskegon County Building Authority,* 338 Mich 363 (1953).

In *Rude* we also noted that the lease and eventual disposition of the building were not before us. *Id,* 367. In *Rude* we focused on what "reasonable" rental was and rejected an argument that the authority may bind the county to "pay the indebtedness about to be incurred of $200,000 *regardless of the value to the county of the rental use* to be

provided in the building or buildings proposed to be acquired or built." *Id,* 367. (Emphasis added.)

What this Court said in *Rude* relative to the right and power under § 8 of Act 31 to increase the rental payment further emphasizes that the rent has to be reasonable. We said, such right and power:

"[D]o not mean that the authority can under any circumstances increase the rent beyond what would be reasonable, but can raise its rent charges up to a reasonable amount if below what is reasonable and if necessary to meet its obligations and may continue the lease if necessary to meet its debts." *Id,* 369.

And later the Court spoke of the possible terms of the as yet unexecuted contract and said:

"If Muskegon county should bind itself to pay in a contract or lease more than a reasonable rental, *in a total amount* of $200,000, this would amount to a plain evasion of [the 1908 Const, art 8, § 10 provision for vote if more than 1/10 of 1 mill is raised for building purposes] because the county *in the year in which the county signed such a lease would make itself liable for that total amount on the county's faith and credit,* and by that means *raise* $200,000 in that year." *Id,* 370. (Emphasis added except the word "raise" wherein emphasis in original.)

What we there said was that the *county may not unconditionally pledge to pay the total amount* regardless of the reasonableness of the rent because then on the one hand the county has created an obligation independent of the value of the county's use of the building, and on the other hand such a pledge would not be "reasonable rental" but would be an unconditional assumption of the whole contract and a "debt".

In summary, this case means that (1) rent pay-

ments must be reasonable and (2) even if the
county does not get title at the end of the lease,
that it may not incur an *unconditional* "rental"
obligation without obligating its full faith and
credit and hence incurring "debt" in the constitu-
tional sense.

d. *State v Doyle & Associates, Inc,* 374 Mich 222
(1965).

In this case the county dealt directly with a
builder who constructed a building for sick and
aged people and "leased" it to the county for its
use and the county agreed to pay a monthly
specified sum "and, as well, pay all other operating
expenses and costs which normally are payable by
the owner of a building, and at the end of 10
years, title to the building and equipment would
be in the county free and clear of any encum-
brances." *Id,* 224.

Of this transaction Justice SOURIS said for a
unanimous Court at p 226:

"We cannot read the documents executed by the
county and Doyle as other than an agreement for the
construction and equipping of a medical facility by
Doyle and its purchase by deferred payments by the
county. By such agreement *the county has incurred a
debt in the total amount of the monthly sums it has
agreed to pay Doyle over a 10-year period plus other
expenses it has assumed to pay,* such as taxes and
assessments, charges for utilities, and insurance premi-
ums."

Describing the so-called "rent," Justice SOURIS
said:

*"Labeling the monthly payments required to be made
by the county as 'rentals' does not affect their essential
nature as purchase payments." Id,* 226–227.

Thus, in the only case where this Court had the

eventual disposition of the building before it, we said:

"That the county undertook to incur an indebtedness cannot be questioned seriously. It agreed to make monthly payments and to pay other charges and expenses for a 10-year period certain *during which time it forswore termination of the agreement.* It *pledged it would budget sufficient funds each* year for the monthly payments required to be made and, indeed, it *pledged to levy sufficient taxes* and to collect sufficient revenues from other sources to make such payments. In short, *it assumed an indebtedness to Doyle* repayable in installments over a 10-year term." *Id,* 227–228. (Emphasis added.)

In this case on appeal defense counsel says that *Doyle* was decided under Const 1908, art 8, § 10,[63] and that this Court found this transaction would not violate the 1963 Constitution.

This is only true in that Constitution 1963, art 7, § 11 provides now for a liberal 10% debt limit for all purposes rather than a 1/10 of 1 mill limit for building purposes. The *rule* of the case still applies, however, and such contracts or leases are within the constitutional and applicable statutory debt limits quoted above.

e. *Betz v Berrien County Building Authority,* 12 Mich App 304 (1968).

This is another case, like *Walinske,* where the

---

[63] Const 1908, art 8, § 10 reads as follows:

"The board of supervisors of any county may in any one year levy a tax of one-tenth of one mill on the assessed valuation of said county for the construction or repair of public buildings or bridges, or may borrow an equal sum for such purposes * * * but no greater sum shall be raised for such purposes in any county in any one year, unless submitted to the electors of the county and approved by a majority of those voting thereon."

MCLA 46.7 and 141.71 are substantially identical to this former constitutional provision.

county would be the actual user of the office and court building under the lease from the authority.

In *Betz,* the plaintiffs claimed that the issuance of additional bonds and the consequent raising of the county's "rental" obligation made the transaction a disguised purchase and that the aggregate amount of rentals were a present debt in excess of the statutory limits for Berrien County.

The Court of Appeals dismissed these contentions without recognizing the limitations of *Walinske, Rude* and *Doyle.* That Court never really analyzed the cases but rather stated:

> "Had the county attempted to build this building directly, it most likely would have been illegal. See *State v Doyle & Associates* (1965), 374 Mich 222. The agreement and procedure in the case at bar must be judged in the light of the Building Authority Act. In effect the Act has been held valid." (Citing *Walinske* and *Rude.)* 12 Mich App 304, 308.

In answer to the charge that the rents the first year, the cost of which was about 20% of the cost of the entire building-shades of reasonable rent in *Rude,* were not reasonable, the *Betz* Court answered not that they *were* reasonable but that "[t]he short term will save the county a substantial sum in interest costs." *Id,* 309. This reasoning is completely inconsistant with the premise of the Court's ruling—*i.e.,* that it is a *lease* and not a purchase. Interest is paid on capital—not on a lease.

The *Betz* Court definition of reasonableness of rent in terms of payment of principal and interest alone *(Id,* 313) does not follow *Rude* and is wrong. The rents must be reasonable in a "market" sense.

That Court also ignored the plain limitations of *Walinske* and *Rude* with respect to (a) the passing

of title and (b) the assumption of obligations unrelated to the value to the county of its use of the building:

"The conveyance of the premises to the county on the expiration of the lease does not convert it to a contract of sale, for such result is anticipated and specifically authorized by the statute. Conveyance by the Authority to the county at the expiration of the lease was involved in both the *Walinske* and *Rude* cases. * * * It is a logical disposition of the building to give it to the incorporating unit after the financing is paid." *Id*, 309–310.

However "logical" it might be to convey the building to the incorporators has nothing whatever to do with answering the question of whether the transaction was a sale. The statements of the Court of Appeals in *Betz* are without support in precedent, for, as we have noted, the *Walinske, Rude* and *Doyle* cases are significantly different:

In *Walinske* there was:

(1) no passage of title—we expressly decided the case as though title wouldn't pass,

(2) no pledge of full faith and credit to *either* the bonds *or the rental obligation.* There could not have been under the 1908 Constitution and the payments had to come from within the county's part of the 15 mill tax limit. (See also on this the briefs in *Walinske.)*

In *Rude* there was:

(1) and (2) as in *Walinske* plus

(3) we said that the county could not presently and unconditionally pledge to pay the fixed rentals. If it did the payments would not be rent at all but a "debt" in the total amount of the lease rentals—*whether or not title passed.*

*Doyle* cannot be meaningfully distinguished on

the ground that in *Doyle* there is a builder-lessor
who is a private corporation and in *Betz* the
builder-lessor is a public corporation—the Author-
ity.

The *holding* in *Doyle* is that a transaction which
was in substance identical to the *Betz* transaction
was in legal effect the direct "building" or pur-
chase of the structure by the county, subject to all
provisions of law applicable to the direct purchase
or "building" of improvements by the county.

*Betz* is significantly different from *Walinske* and
*Rude* in another matter. Defendants point out on p
35 of defendants' brief:

"[T]he decision in the *Betz* case that the County is
authorized, if necessary, to levy ad valorem taxes to pay
the rental just as it could for other County obligations
represented by bonds or in anticipation of which bonds
are to be issued."

*Betz* does indeed say after referring to Const
1963, art 9, § 6:

"The language is applicable to the situation here. The
county is, thus, authorized to levy annually such *ad
valorem* taxes as may be necessary to meet its obliga-
tions to the Authority under the contractual arrange-
ments of the parties." 12 Mich App 304, 312.

If defense counsel and *Betz* are right Michigan
has a new rule permitting a full faith and credit
tax obligation to be attached to a rent obligation
in a so-called "revenue bond" and that this addi-
tion would permit levying *ad valorem* taxes with-
out limitation as to rate or amount.

We have already considered both of these quota-
tions above in Part IV, pp 260–266, in connection
with whether § 11[d] with art 9, § 6 authorized
issuing tax bonds. We concluded there was no

language in § 11[d] authorizing bonds, but that art 9, § 6 to which § 11[d] refers does indeed deal with taxes. For that reason, because of the failure of the title of Act 31 to authorize taxing, and because of the rule on amendment by implication in Const 1963, art 4, § 25, as heretofore discussed above, we hold that *Betz* is wrong and that § 11[d] and art 9, § 6 do not authorize the levy of taxes under Act 31 much less taxes "without limitation as to rate or amount."

*Betz* is overruled as it would have been reversed had it been appealed to this Court. The rights of *bona fide* bondholders, of course, remain inviolate.

## 3. PRINCIPLES APPLIED TO COUNTY "RENT" OF STADIUM VIEWED ALTERNATIVELY AS LEASE OR PURCHASE

The county's obligation in the stadium bonds is to pay whatever amounts are required to pay interest and retire the original bonds and any additional bonds.[64] This obligation is unconditional and subject to no conditions precedent. If the stadium is destroyed, never built, never rented, filled with cement—come what may—the county agrees to tax without limit to pay the "rent". (See *Lease,* § 13; Trial Exhibit 2A, pp 18–20.)

*Viewed As A Lease.*

Under *Rude,* this obligation described above is not "reasonable" rent and it is not even "rent" because it is completely *unrelated* to the value to the county of any use it may make of the building. (In fact, we have held above the payments cannot be rent at all for another reason—the county is not a user of the stadium under § 11 of Act 31.)

So viewing this transaction as a lease, as defendants' counsel asks us to, and whether or not title

---

[64] Lease §§ 4(b) and 8; trial exhibit 2A, pp 8–10 and pp 13–14.

passes, the assumption of such an unconditional "rent" obligation is "debt" within the contemplation of Const 1963, art 7, § 11 and a "raising of money" within MCLA 46.7 and 141.71, *supra,* for the entire amount of payments due regardless of any self-serving disclaimers written into Acts 31 and 94.

This obligation is in a gross amount of 371 million dollars. The assessed valuation of Wayne County is 12-1/4 billion dollars.

We do not know whether this unconditional contract debt would raise total county debt above ten per cent of assessed valuation but the approval of the Municipal Finance Commission was premised upon this obligation not being debt. That approval is consequently without legal effect and the bonds are illegal since approval is required as a condition precedent to their issuance by § 27 of Act 94; MCLA 141.127; MSA 5.2757.

We do know that 1/10 of 1 mill of the assessed valuation of Wayne County is far below 371 million dollars and the "raising" of this amount for building purposes requires, under MCLA 46.7 and MCLA 141.71 a vote of the people which has not been had so the contract (and, therefore, the bond security) is void.[65]

*Viewed As Purchase*

If this really is a purchase, however, then the bonds are illegal (a) since the county has presently borrowed or "raised" more than 1/10 of 1 mill for a building purchase without a vote of the people in violation of MCLA 46.7; 141.71 and, (b) since, as we have held above, the bonds are not revenue

---

[65] The contract amounts to an extending of money for building purposes within the meaning of MCLA 46.7 because the county is the alter ego of the Authority where it pledges its full faith and credit. See *Dearborn v Michigan Turnpike Authority,* 344 Mich 37, 56–58 (1955), and discussion above, p 267.

bonds under Act 94 and Act 31, since the bonds are not secured by "revenue" derived from the operation of the property and (c) since the bonds do not conform either to § 13 of Act 94, *supra,* or to the statement on their face that they do not create debt within any statute or constitutional provision.

## 4. SUMMARY OF CONSTITUTIONAL AND STATUTORY DEBT RULES

### A. *CONSTITUTIONAL "INDEBTEDNESS"*

The provision we are concerned with here is Const 1963, art 7, § 11:

> "No county shall incur any indebtedness which shall increase its total debt beyond 10 percent of its assessed valuation."

In construing this section we are mindful of Const 1963, art 7, § 34 which states:

> "The provisions of this constitution and law concerning counties * * * shall be liberally construed in their favor. Powers granted to counties * * * by this constitution and by law shall include those fairly implied and not prohibited by this constitution."

However, we must also pay heed to the historic rule that powers of municipalities involving the imposition of public burdens should be strictly construed, *Bogart v Lamotte Twp,* 79 Mich 294 (1890).

From that duty comes what we have called in *Lockwood v Commissioner of Revenue,* 357 Mich 517, 557 (1959) the "most pressing rule" of constitutional construction:

> "We come face to face, then, with what has been termed 'the most pressing rule for constitutional con-

struction,' namely, that 'the provisions for the protection of life, liberty and property are to be largely and liberally construed in favor of the citizen.' "[66]

The injunction of Const 1963, art 7, § 11 must be treated as we treat any other protection of the constitution for as we said in *Lockwood:*

"That this is 'merely' a tax limitation and not one on freedom of speech, or worship, is immaterial. There are no differences in degrees of protection afforded in the constitutional safeguards. With equal alacrity we halt in its tracks, once his foot crosses the line, the inquisitor, the policeman, the tax collector, the legislator or the executive. Our question is not how far he has passed over the forbidden line, how serious his encroachment, or how aggravated the arrogance. Our duty arises with the trespass itself." 357 Mich 517, 558.

And so our job is to determine what the people mean when they say "any indebtedness" in Const 1963, art 7, § 11.

Formerly this provision limited debt to 3% under Const 1908, art 8, § 12. Cases under Const 1963, art 7, § 11 and its predecessors are few and not of great assistance so we must look also to cases under analogous constitutional and statutory provisions.

In *Young v Ann Arbor,* 267 Mich 241, 248–249 (1934) we said:

"The term 'indebtedness' may be said to include obligations of every character whereby a municipality agrees, or is bound, to pay a sum of money to another. Usually one of the incidents of municipal indebtedness is that there is a legal right upon its maturity to coerce payment."

---

[66] See also Justice BLACK's comments in *Bacon v Kent-Ottawa Metropolitan Water Authority,* 354 Mich 159 (1958); *Lockwood v Commissioner of Revenue,* 357 Mich 517, 560–576 (1959); *Carman v Secretary of State,* 384 Mich 443, 451–453 (1971).

In *Young,* we said "revenue" bonds were not "debt" because the creditor as obligee would have no recourse against the municipality. This was merely an application of the "special fund" doctrine operating with respect to special assessment bonds. See quoted material above (p 292).

This *Young* definition of "indebtedness" was adopted by the Court in *Detroit Edison Co v Public Service Commission,* 359 Mich 137, 147 (1960) for purposes of determining whether a guaranty contract was an "evidence of indebtedness" requiring a fee to be paid for its issuance.

This Court said that the *Young* definition quoted above includes the contingent liability of Detroit Edison to pay loans if the primary obligor did not. This Court in ruling said that "indebtedness" should be given a "broad" interpretation under the statute in question and therefore · guaranty contracts were included.

We believe the constitutional phrase "any indebtedness" also requires a broad construction so as to include the so-called "secondary obligation" of counties when they back up the bonds of other units of government with a pledge of full faith and credit.

The convention comment to Const 1963, art 7, § 11 indicates that the inclusion of these secondary obligations as "indebtedness" was clearly in mind. That, in fact, was the main reason the county debt limit was raised from three percent to ten percent of assessed valuation. See Convention Comment to art 7, § 11; 1 Official Record, Constitutional Convention 1961, p 930, "section i comments".[67] The county's

---

[67] "Section i comments: The limitation in section 12 of the present constitution on the power of the county to incur debt is increased from 3 per cent to 10 per cent of its assessed valuation. The exception relating to counties of an assessed valuation of $5 million or less was deleted because there are no longer any such counties. The committee

pledge of credit behind "revenue bonds" is within Const 1963, art 7, § 11 to the extent pledged. Anything to the contrary in statutes or previous case law is of no effect.

Other cases have focused not so much on what debt is but what it isn't.

These cases, for the most part, were decided under statutory or charter debt limits and the questions were whether the Legislature may except certain debts from these limits under the constitutional injunction that the Legislature "shall restrict the powers of cities and villages to borrow money and contract debts." Const 1963, art 7, § 21 (Const 1908, art 8, § 20) See, *e.g., Callahan v City of Berkley,* 307 Mich 701 (1943). Other cases considered only Const 1908, art 8, § 10 and/or corresponding statutes, MCLA 46.7; MCLA 141.71 or similar charter provisions which restrict the power of counties to tax, "borrow" or "raise" any sum for building purposes in any one year beyond 1/10 of 1 mill of assessed valuation without a vote of the electorate. See *e.g., Walinske; Rude; Oakland County Taxpayers' League v Oakland County Supervisors,* 355 Mich 305 (1959).

These cases are of little or no help, however, in determining "any indebtedness" with Const 1963, art 7, § 11 because the Legislature has no power to

---

has increased the debt limit to give counties greater flexibility to meet current problems. Our counties are now extending their credit for both primary and secondary purposes. Secondary obligations are incurred by placing the full faith and credit of the county behind bonds of cities and townships to enable them to borrow at the lowest possible interest rate for the construction of water and sewage systems and other public works. The county also backs revenue bonds for airports. This secondary debt may easily exceed the 3 per cent limitation set in the present constitution. Such secondary debt is payable out of the revenues of the water works, sewage fees, airport activities, etc. The committee on finance and taxation, having concurrent jurisdiction, has no objection." 1 Official Record, Constitutional Convention 1961, p 930.

determine by statute the meaning of "indebtedness" for constitutional purposes. These cases are of limited help for a further reason—we are faced with a provision broader in application than what is suggested by the words "borrow" or "raise". Here the broad words are *"any* indebtedness".

*State v Doyle & Associates, Inc,* 374 Mich 222 (1965) was discussed above. We raise it again to point out that although this case too was directly concerned only with the 1/10 of 1 mill limit in Const 1908, art 8, § 10, the principles stated in *Doyle,* are applicable to the determination of "indebtedness" under Const 1963, art 7, § 11, and under MCLA 46.7, MCLA 141.71, *supra.*

This is not to say that *Doyle* states the only principles for determining constitutional debt but merely that any transactions like those described in *Doyle* are one of the things to be included as indebtedness.

For purposes of this case we are not and cannot be charged with defining what of all possible transactions are or are not "debts" under the constitution. It is enough here to give notice that restrictive and technical definitions of debt do not suffice in the face of the language of Const 1963, art 7, § 11—"any indebtedness".

We also give notice that the responsibility for seeking determination of what is indebtedness does not rest merely in the lap of chance that someone may contest the issuance of bonds or the incurring of some other obligation.

The governmental units who may incur "obligations" and the Municipal Finance Commission who must approve some of these obligations *(i.e.* those which involve certain kinds of bonds) are forewarned that this Court will not bend and twist the constitution in response to emergencies or pleaded

necessity. We will not construe "debt" to mean something just below whatever the aggregate total of obligations a particular distressed municipality has. We will construe debt to mean what the people intended it to mean regardless of its effect on municipal contracts, debts, liabilities, bonds *etc.*

However nicely a transaction is labeled we will look through labels to substance. The constitution was not adopted for the benefit of specialists or technicians. It was adopted by and for the people. We must all consider it in that light and act accordingly. This Court certainly intends to.

The impact of our holding upon future bond issues by communities who are at or may be over their debt limits is not before this Court. In such a future case, however, the assistance of the Municipal Finance Commission in determining the amount and nature of debt will be needed by this Court.

### DEBT BENCH MARKS—DEBT LIMITATIONS

From the foregoing analysis we summarize the following benchmarks in judging the creation of debt in connection with a public bond issue.

1. A true revenue bond or "true rent" creates no indebtedness.

2. A true revenue bond is one that is payable solely from the revenues derived from the operation or use of the public improvement in question.

3. The municipality must for a true rent situation be the actual user of the public improvement except where it acts merely as a conduit and the actual users, such as the Tigers here, pay the rent. See also *Gaylord, supra.*

4. A true rent payment must be reasonable in that it must bear a direct relation to the economic or market value to the county of its actual use of the public improvement.

5. A true rent payment may include operating costs if they are a normal part of such a rental and the total payment of rent and/or including operating costs is reasonable as above defined.

6. Whether the addition of passage of title to the public improvement at the conclusion of the "rent" payments creates a debt is something on which we express no present opinion except to say that the rent payment may under no circumstances be increased above what would otherwise be a reasonable rent without considering the factor of passage of title and still remain a valid rent.

7. The municipality in connection with its contract to pay "rent" may make no unconditional covenant to pay despite such contingencies as would make the facility unavailable for use by the renter without creating a debt whether or not title passes.

8. The municipality may not pledge its full faith and credit to support its rent without creating a debt.

9. Secondary debt involves the county's full faith and credit to support bonds of other units of government in certain contingencies and is a debt within Const 1963, art 7, § 11.

*PREVIOUS BOND ISSUES*

The impact of our holding on previous bond issues is not before this Court but whether or not they are valid under the law as stated herein, the rights of *bona fide* purchasers of such bonds to be paid according to the tenor of the obligations cannot be impaired by the holding of this opinion, *Green County v Conness,* 109 US 104; 3 S Ct 69; 27 L Ed 872 (1883); *Gentzler v Constantine Village Clerk,* 320 Mich 394 (1948); 15 McQuillin, *Municipal Corporations,* §§ 43.15, 43.16, 43.78, 43.80.

B. *STATUTORY*

MCLA 46.7 and MCLA 141.71 in identical language provide (except MCLA 141.71 also provides for purchase of real estate sites):

"The board of supervisors of any county may in any one year levy a tax of 1/10 of 1 mill on the assessed valuation of said county for the construction and repair of public buildings or bridges or may borrow an equal sum for such purposes * * * but no greater sum shall be raised for such purposes in any one year unless submitted to the electors of the county and approved by a majority of those voting thereon * * * ."

Section 8 of Act 31 provides in part:

"Any rental obligation or consideration applicable to the incorporating unit or units under such contract, shall not be considered as indebtedness of the incorporating unit or units within the meaning of any statutory or charter debt limitation of such incorporating unit or units."

As already noted Const 1963, art 7, § 11 provides:

"Sec. 11. No county shall incur any indebtedness which shall increase its total debt beyond 10 per cent of its assessed valuation."

These three provisions together raise two questions:

1. May the Legislature in Act 31 change the constitutional definition of debt?

2. May the stadium bonds which are tax bonds exceed the one tenth of one mill levy without a vote of the people?

1

It is clear that the Constitution not only in art 7, § 11 but elsewhere *(e.g.* art 7, § 2) has spoken to debt limitations. The meaning of debt in the constitution cannot be altered by legislative action.

2

On the assumption that Act 31 could have authorized the stadium bonds, which we have held it can not, the question is whether it could establish a different debt limit from that already contained in MCLA 46.7. We conclude that the Legislature has the authority to establish or alter debt limitations for unchartered counties within the 10% limit of art 7, § 11. However, the Legislature failed to observe the requirements of Const 1963, art 4, § 25 on amendments. See Part V above. Therefore the quoted part of § 8, Act 31 is void and of no effect as to unchartered counties.[68]

VII.

APPLICATION OF CONSTITUTIONAL MILLAGE LIMITS TO COUNTY'S RENT OBLIGATION.

We have made reference before to that portion of § 11 of Act 31 which states:

"Where and to the extent that the bonds are payable

[68] As to chartered counties the Legislature is under a constitutional duty to restrict their power to borrow money and contract debt. See Const 1963, art 7, § 2. The Legislature is under a similar duty with respect to cities and villages under Const 1963, art 7, § 21. As to chartered counties, cities and villages therefore any statute which provides an unlimited ability to contract "debt" would be in violation of the constitutional provision requiring the Legislature to limit the ability of these entities to contract debt.

from revenues derived from payments to be made pursuant to any lease or other contract obligations, the bonds shall be deemed to be issued in anticipation of contract obligations in anticipation of which bonds are issued, within the meaning of section 6 of article 9 of the constitution."

The relevant portion of Const 1963, art 9, § 6 states:

"The foregoing limitations [15-18-50 mills for counties, townships and school districts] shall not apply to taxes imposed * * * for the payment of * * * contract obligations in anticipation of which bonds are issued, which taxes may be imposed without limitation as to rate or amount."

We have heretofore considered § 11 and art 9, § 6 and defendants' arguments based thereon with respect to the possibility these provisions might authorize the county to issue bonds different from those elsewhere authorized in Act 31 or Act 94 and to permit pledge of the government's full faith and credit to support the "fixed rental". We held there was no such authorization. Part IV, pp 260–263.

We now consider these same provisions and defendants' arguments and the statement made in the stadium bonds from the standpoint of whether (a) revenue bonds and (b) tax bonds are subject to or excepted from the limitations of Const 1963, art 9, § 6.

A. *Revenue Bonds*

The exceptions to the first paragraph of art 9, § 6 are enumerated in the second paragraph in the language quoted above. The critical words are here repeated:

"The foregoing limitations shall not apply to *taxes*

*imposed* \* \* \* for the payment of \* \* \* contract obligations in anticipation of which bonds are issued." (Emphasis added.)

Since revenue bonds, including those issued under Acts 31 and 94 in connection with governmental rentals, are in no way tax obligation bonds, payment of rents under Act 31 and Act 94 bonds are a part of the municipality's normal operating expenses and must come from the municipality's normal revenues, whether they are Federal or state grants, excises or *ad valorem* taxes, or whatever. *Walinske, supra; Rude, supra.*

Since normal taxes for operating purposes are subject to art 9, § 6 limitations,[69] likewise any *ad valorem* taxes producing the municipality's funds from which rents are paid in revenue bond situations must be and are subject to art 9, § 6 limitations.[70]

Acts 31 and 94 authorize the issuance of revenue bonds solely, with the exception of permitting the municipalities who receive more than 25% Federal or state grant to pledge their full faith and credit to the *bonds.* Therefore all Act 31 and 94 bonds with the exception noted are subject to the limitations of art 9, § 6 for the reasons herein noted. (This pledge of full faith and credit exception, however, to be valid may be subject to statutory debt limit provisions discussed above.)[71]

B. *Tax Bonds*

Reference to the language of art 9, § 6 quoted

---

[69] See the discussion by Justice T. M. KAVANAGH in *Butcher v Grosse Ile Twp,* 387 Mich 42, 73–76 (1972).

[70] Thus, in order to be "revenue" the payments must be within the 15 (or 18) operating millage in the first paragraph of art 9, § 6. To go above that limit and still be considered "revenue" the operating millage is subject to a vote of the people provided in the first paragraph of Const 1963, art 9, § 6.

[71] Section 7(2) of Act 94 already provides that when the full faith and credit of a public corporation is pledged in the event there is a 25 per cent grant that the bonds *are* debt "to the extent pledged".

above would indicate that all tax bonds where the taxes were imposed for the payment of any of the indicated categories would be free of the limitations in the first paragraph of art 9, § 6. However, they would all be subject to the 10% limitation of art 7, § 11.

If that part of § 11 of Act 31 above quoted (elsewhere referred to as § 11[d]) purports to remove the revenue bonds issuable under Acts 31 and 94 from the millage limitations of art 9, § 6, it is invalid. If it purports to free tax bonds from such limitations, since Acts 31 and 94 do not authorize tax bonds it is of no force and effect.

## VIII.

## PUBLIC PURPOSE ISSUES.

Plaintiffs in this case expended many pages of brief and many hours of argument at trial and here on the question of whether the building of the proposed stadium is a public purpose. Their argument has three prongs: (a) this stadium is not a public purpose under the constitution; (b) that § 11 of Act 31 under the continuing rule of *Walinske* and *Rude* requires a showing of "absolute necessity" before the authority may build this stadium and lease it to the county; (c) that § 8 of Act 31 evidences a legislative intent that before a stadium can be built, there must be competent proof that it will in fact increase business activity and employment.

A. *Constitutional Public Purpose*

We held in *City of Gaylord v Gaylord City Clerk*, 378 Mich 273, 294–295 (1966) that despite the absence of specified general limits on legislative power, and because the theme of public purpose runs through the constitution, the power of the

Legislature and of government generally are limited "to such acts and such governmental powers as exhibit a public purpose." *Id,* 295.

Plaintiffs do not contend that the building of a stadium may never be a public purpose but that the authorizing statute is not adequately governed by appropriate standards and principles to protect the public interest and to assure public use thereof.

In support they rely on *Opinions of the Justices,* 356 Mass 775; 250 NE2d 547 (1969). In that case the Court held in an advisory opinion that a proposed stadium statute lacked adequate statutory guidance and provisions for reviewing compliance with guidelines the Court felt were necessary to constitute a public purpose under the Massachusetts Constitution:

"We are of opinion that a large multi-purpose stadium * * * may be for a public purpose if the expenditure of public funds, the extension of public privileges, powers and exemptions, and the use, rental and operation of the projects are adequately governed by appropriate standards and principles set out in the legislation." *Id,* 795.

The statute in question did not meet the principles since:

"No provisions in the bill seem designed to protect the public interest in having the stadium complex and arena used for all the activities mentioned in § 2, without having any one (e.g. professional athletics) fostered to the exclusion of other activities (e.g. civic, philanthropic, and educational meetings, conventions, labor meetings, amateur and school athletics, and the like) * * * ." *Id,* 797.

"There is no requirement that, in leasing the facilities, the Authority protect whatever public interest

there may be in having the facilities available to a diversity of users * * * ." *Id,* 798.

Defendants counter by saying that the determination of what constitutes a public purpose is primarily a function of the Legislature, relying on statements from one of the opinions in *Gregory Marina Inc v Detroit,* 378 Mich 364 (1966).

In *Gregory Marina* there was a claim that the restricting of boat well leases to a limited number of private users under renewable leases was not a public purpose.

In that case Chief Justice THOMAS M. KAVANAGH in an opinion concurred in by Justice BLACK, quoted and emphasized the rule in 37 Am Jur, Municipal Corporations, § 120, pp 734–735 as follows:

" *'The determination of what constitutes a public purpose is primarily a legislative function, subject to review by the courts when abused, and the determination of the legislative body of that matter should not be reversed except in instances where such determination is palpable and manifestly arbitrary and incorrect.'* " 378 Mich 364, 396 (Emphasis added in the case quoted from.)

In *Gregory Marina* Justice ADAMS dissented on grounds unrelated to the public purpose aspect of which he said:

"I agree that the determination of what constitutes a public purpose is primarily a legislative function and that there has been no abuse by the legislature of that function in its determination [here]." 378 Mich 364, 409.

Defendants then point out that § 8 of Act 31; MCLA 123.958; MSA 5.301(8) specifically declares that leases to professional sports organizations are declared to be a legitimate public purpose. This

legislative determination does not constitute an abuse of the legislative function.

But plaintiffs counter that there still are no standards to insure that other mentioned activities and other groups will have a reasonable opportunity to use the stadium.

Thus put the question is whether the stadium can be a public purpose if used and intended only for use primarily by private profit-making sports organizations. Apparently such a use would not be a public purpose under the Massachusetts Constitution.

On the other hand defendants show us that such use of a stadium is permissible under the constitutions of other states, citing *Bazell v Cincinnati,* 13 Ohio St 2d 63, 70; 233 NE2d 864, 870 (1968); *Martin v Philadelphia,* 420 Pa 14, 17–18; 215 A2d 894, 896 (1966); *Los Angeles v Superior Court,* 51 Cal 2d 423, 436; 333 P2d 745, 752 (1959); *Ginsberg v City and County of Denver,* 164 Col 572; 436 P2d 685 (1968). See also the cases collected in 173 ALR 415 § 1 and supplements; 15 McQuillin, Municipal Corporations, §§ 39.21 (note 30), 39.31.

Defendants also point out that the stadium has had special design features included to provide for many other kinds of activities and public uses and that there is no showing that the stadium will not benefit and be used by the public for other purposes than professional sports.

Whether the stadium could be a public purpose if used *only* for profit by professional sports teams is settled by the analogous *Gaylord* case, *supra.*

There a majority of the Court held that the *exclusive* use of a factory by U.S. Plywood under a lease purchase arrangement with the City of Gaylord issuing revenue bonds under 1963 PA 62;

MCLA 125.1251 *et seq.;* MSA 5.3533(21) *et seq.* was a public purpose.

In that case the bonds were payable exclusively by U.S. Plywood and the city pledged to do nothing but collect the "rent" and pass it on to bondholders. We noted in *Gaylord:*

"The requirement of public purpose has been most rigid when public money or property is involved. [Cites omitted.] The requirement has been less rigid when there was no chance the general taxing power could be reached. [Cite omitted.]" 378 Mich 273, 295, note 8.

B. *"Absolute Necessity"*

Plaintiffs contend that, even if the stadium is a public purpose in the broad sense, § 11 of Act 31 under *Walinske* and *Rude* requires a showing of "absolute necessity."[72] Whatever continuing validity this concept has for governmental users in a revenue bond situation is not before this Court but it is plain that the concept makes no sense when applied to private users of the stadium who must, as we have held, pay sufficient revenues to provide for the retirement of principal and interest on the bonds.

As the trial judge pointed out in his opinion at page 43:

"Now, Section 1 of the Building Authority Act permits any County to establish an authority for the purpose of acquiring a stadium or for the effective use thereof 'for use for any legitimate public purpose of the county.' Previously the Building Act was primarily restated *[sic* —restricted] to buildings for government use. Such broad amendment language squares in no way with the previous stern judicial construction requiring 'absolute necessity'."

---

[72] See plaintiffs' brief, part II, pp 4–7; plaintiffs' supplemental brief, pp 8–9.

The trial judge in this statement sees the rule of "absolute necessity" being too strict in a *Gaylord* case where the user was a private corporation or if in this stadium case the bond structure looked to the alternate users like the Tigers rather than the county as the source of revenue. We are in agreement.

However, the "absolute necessity" rule of *Walinske* and *Rude* related not to a private user but a user by government itself. Here the "absolute necessity" rule may well have continuing validity. Part of the reasoning in *Walinske* was that the revenue supporting the bond issue was a reasonable rental for a normal on-going governmental service. If the equivalent of such rent were not paid to the Building Authority it would have to be paid to someone else. This concept certainly has been useful in this field to date and there is no reason to abandon it here, where because of a distinguishable fact situation it is not squarely in issue.

C. *Proof Of Increased Business Activity*

Plaintiffs argue further that § 8 of the building authority act; MCLA 123.958; MSA 5.301(8) requires competent proof that the stadium will increase business activity and employment and that the record is devoid of such proof.[73]

In support plaintiffs rely on the language of § 8 declaring that subleases to private corporations *"thus to increase business activity and employment"* are a legitimate public purpose. This language, say plaintiffs, is not a legislative determination but rather a "condition" which has not been met by adequate proof. We cannot agree. Reading of the statute without plaintiffs' strained construction shows that this was a legislative conclusion

---

[73] See plaintiffs' brief, part II, pp 9–10.

and not a condition. Even if it were the latter, the record indicates that it is at least arguable that such increased activity will take place. Under such circumstances even a legislative "condition" would be met.

## IX.

## TIGER CONTRACT AND GRANT OF STATE CREDIT: CONST 1963, ART 9, § 6.

The trial judge, the Honorable Blair Moody, Jr., based his first opinion on the perfectly logical reason that since bond counsel claimed the bonds were revenue bonds all the users of the stadium should pay their proportionate share of the cost of liquidating the self-liquidating revenue bonds.[74] He found that the Tigers were a user, or potential user of the stadium, and that their agreement with the county failed to require them to pay their proportionate share to liquidate the bonds. He therefore concluded that since the Tigers weren't carrying their share of the load, the county was carrying the Tigers to the extent of the shortfall. He held the bonds illegal as a violation of Const 1963, art 9, § 18:

"Sec. 18. The credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in the constitution."

Some time later Judge Moody, who had been set an impossible time schedule by this Court in order to accommodate the bond sale schedule, concluded in a supplementary opinion that the stadium bonds are not revenue bonds under Acts 31 and 94

---

[74] See quoted portion of the trial court opinion at footnote 11, *supra*.

and hence are illegal. We have heretofore in Parts III, IV and V confirmed this opinion.

Let us now examine Judge Moody's conclusion that the Tiger contract violates Const 1963, art 9, § 18. We respect his concern but on the record can neither affirm nor disapprove his conclusion.

If the stadium bonds are revenue bonds Const 1963, art 9, § 18 is not pertinent. This Court has several times held neither debt nor credit is involved in a true revenue bond situation. *City of Gaylord v City Clerk,* 378 Mich 273, 293–294 (1966).[75] Consequently the credit of the state or county—state includes its subdivision county, *Attorney General ex rel Barbour v Pingree,* 120 Mich 550, 561 (1899); *Oakland Drain Commissioner v Royal Oak,* 306 Mich 124, 142 (1943)—is not involved in a true revenue bond situation. However, the stadium bonds are not revenue bonds and we shall examine how the Tiger contract affects them as tax bonds presently.

But first we come back to Judge Moody's proper concern. If the stadium bonds were in truth revenue bonds, then any shortfall in the Tigers' meeting their proportionate share of paying off the bonded indebtedness would be or should have been of very grave concern, not directly to the county, who under a revenue bond situation would be only morally involved, but directly and financially to the bondholders. Under a true revenue bond situation, the bondholders could look only to the actual users of the stadium, chief of which obviously were the Tigers, and not to the non-user county, to pay off the bonded indebtedness. If the Tigers weren't going to pay their share, then the bondholders either would lose that much of their investment

---

[75] See also the cases cited above in Part VI, p 293.

or, more likely, wouldn't have bought the bonds in the first place.

This brings us naturally to considering the impact of Const 1963, art 9, § 18 on tax bonds, but we must pause one more moment. If the stadium bonds were revenue bonds and the bondholders had to look to such revenues for their payoff, then the state's watchdog for the credit of the state, the Municipal Finance Commission, would be required by law to inquire whether the revenues from the users including the Tigers would pay off the bonds before approving the bond issue. There was obviously no such finding.

Now let us turn our attention to the stadium bonds as the tax bonds they really are, and examine what impact, if any, Const 1963, art 9, § 18 has on them.

Michigan case law interpreting Const 1963, art 9, § 18 is neither ample nor precise. It is clear the state or its subdivision the county cannot give anything away without consideration. *Detroit Museum of Art v Engel,* 187 Mich 432 (1915) (salary of employee of private museum, no consideration, no public purpose); *Younglas v Flint,* 345 Mich 576 (1956) (transfer of city park to US reserve armory) but see *contra Sommers v Flint,* 355 Mich 655, 663 (1959). See generally 15 McQuillin Municipal Corporations (3rd ed), § 39.30. Note that the constitution as far as the state and county are concerned makes no difference between a public and a private purpose in this regard. When the state acquires or transfers something of value in return for value the state does not offend Const 1963, art 9, § 18. *Walinske v Detroit-Wayne Joint Building Authority,* 325 Mich 562, 583 (1949) (lease of building); *Jackson Broadcasting Television Corp v State Board of Agriculture,* 360 Mich 481, 498 (1960)

(time-sharing on rental basis of studio); *Hays v Kalamazoo,* 316 Mich 443 (1947) (Michigan Municipal League membership).

Now the nub of the problem in all probability is the value received by the state in return for the value transferred. So our inquiry goes to what is the value and who determines it. While the cases definitely describing all the earmarks of the value to be received appear yet to be written, it is probably because any citizen would immediately prescribe full value, and this Court is not going to argue with so logical, reasonable and just a standard.

Research has revealed only one case where this Court spoke on who shall determine the full value to be received by the government in connection with Const 1963, art 9, § 18. It assumed that a state contribution by the Legislature to a joint state-local highway project was a fair value and not a violation of the constitution. In *State Highway Commissioner v Detroit City Controller,* 331 Mich 337, 357 (1951), we said:

"However, the legislature has recognized that limited access highways will benefit the State as a whole and has provided for an apportionment of the cost. This is not a lending of credit within the meaning of article 10, § 12."

Defendants have referred us to *White v Grand Rapids,* 260 Mich 267, 275 (1932), and other cases, where neither Const 1963, art 9, § 18 nor art 7, § 26 were discussed, for the rule that "under the circumstances it is immaterial whether the County made a good bargain or a bad one * * * ."

This Court will assume that the officers of the Legislative and Executive Branches will do their duty and exercise a proper judgment. The courts

will respect that judgment unless there has been a clear abuse of discretion. Obviously, if the state or county were to make a valuable grant for next to no consideration, the courts would be forced to regard that not as an exercise of discretion, but an abuse of discretion.[76]

Since the stadium bonds have already been held invalid by this Court for a number of reasons, it would serve no purpose to remand the case back to the trial court to review whether there was indeed a violation of Const 1963, art 9, § 18 under the rules we have enunciated or the observations we are about to make. In any event in the case of a tax bond, an invalid Tiger lease, while embarrassing to the county, would not invalidate the stadium bonds.

This Court must point out that with the stadium bonds in the posture of valid tax bonds the value to be delivered by the Tiger contract has to be

---

[76] As plaintiffs point out in their supplemental brief, p 14, defendants overlooked a very important sentence contained in *White v Grand Rapids,* 260 Mich 267, 275 (1932):

" '[T]he discretion vested in city officials is not subject to review by the courts. *If they transcend their power, the courts may interfere.* But if, acting within the scope of their power, they make mistakes, it is not the business of a court to amend or correct their errors.' " (Emphasis added.)

See also *Veldman v Grand Rapids,* 275 Mich 100, 111–112 (1936):

"The power and authority is vested in the commission to govern as its discretion dictates so long as its action is not contrary to law or opposed to sound public policy. * * * It is not the business of courts to act as city regulators and, unless the authority of the representatives of the citizens of Grand Rapids has been illegally exercised, their action cannot be interfered with merely because it may not seem to other persons to have been as wise as it ought to have been."

And see *Kent County Theatre Corp v Grand Rapids,* 14 Mich App 362, 366 (1968) where the Court of Appeals, including now Justice T. G. KAVANAGH, reviewed the denial of a theatre license by a city agency. The decision of the city agency was reversed and the Court said:

"A court may properly substitute its own judgment for that of a licensing authority where the act of the licensing authority is found to be arbitrary or unreasonable. *Veldman v Grand Rapids, supra.*"

judged by a different standard from a revenue
bond case. In a revenue bond situation, the Tigers
as users would have to pay their proportionate
share to liquidate the bonded indebtedness, be-
cause in a real sense they are the obligors. In a
valid tax bond situation, the Tigers aren't bond
obligors at all. The county is.[77]

The county in the case of the stadium bonds as
valid tax bonds would presumably have gone to
the people for authority to issue the bonds for the
purpose only incidentally of providing the public a
first-class place to view sporting and other events
but particularly to revitalize downtown Detroit
and bring prosperity to the citizens of the commu-
nity. The citizens in voting approval of the bond
issue presumably would have been persuaded by
the County Fathers that the Tigers and others
would by their fair payments for stadium use pay
for the largest percentage of the cost of erecting
the stadium but that in order to achieve the
benefits of revitalizing downtown Detroit and
bringing renewed prosperity to the community and
its citizens a minimum of property taxation was a
contingent possibility and a good bargain at that.

Since under these circumstances everyone would
have recognized from the beginning that this was
a multi-purpose project the citizens would recog-
nize it would be unfair to require the Tigers to pay
more for their stadium use than the stadium was
fairly worth to them to play ball in. However, the
citizens would expect the Tigers to pay every cent
it was worth to play in such a fine stadium that
would attract such large crowds. The citizens
would be content to pay whatever little that was
necessary to make up the difference in retiring the

---

[77] This, of course, would make it a different ball game.

bonds that would build the stadium that would do so much for them and the City of Detroit and Wayne County.

Our standard of value then for the Tiger contract would not be a proportionate share of the bonded indebtedness. The County Fathers might have to build a monument beyond the highest requirements of a ball club's playing field to revitalize Detroit and it would be unfair and unrealistic to try to require the Tigers to carry the load of the general citizenry having such a monument. On the other hand, the County Fathers with great sagacity and prudence might design and build a stadium to revitalize Detroit which would supply a playing field on which the Tigers could win the pennant and draw huge crowds and pay a fair value in relation to the worth of the stadium to them which would nonetheless bring profitable revenues to the county to liquidate the bonds. In short in a valid tax bond situation, the Tiger contract must be judged not as paying its proportionate share of liquidating the bonded indebtedness for whatever kind of stadium but as paying a fair market value for the use of the practical facilities they needed according to the going rate under similar circumstances elsewhere in the country and with a view to the peculiar circumstances in connection with the Tigers and the local stadium which would be fair to consider.

To summarize:

1. Judge Moody's holding the stadium bonds invalid under Mich Const 1963, art 9, § 6 evidenced a proper concern but until reflection beyond the impossible time frame dictated by the bond sale schedule permitted him to analyze that the stadium bonds were not the advertised revenue bonds but invalid tax bonds, the impact of Mich Const 1963, art 9, § 6 could not be wholly clear.

2. A Tiger contract not paying its full share under a revenue bond situation would either short-change the bond buyers or make the bonds unsaleable. This would deflate the credibility of the county if not its credit. It should also have triggered the Municipal Finance Commission into disapproving the bonds in the first place. Under a revenue bond situation, there is no Const 1963, art 9, § 6 question.

3. Under a valid tax bond situation an alleged inadequate Tiger contract would be judged not by whether it was supplying its proportionate share of retirement of bonded indebtedness, which might be either too much or too little to ask according to whether the stadium was overpriced or a bargain for baseball playing purposes but by whether the Tiger contract was returning full value to the county for the value to the Tigers of the stadium facilities leased to them. The Tiger contract might violate Const 1963, art 9, § 6, but this would not invalidate the stadium bonds.

4. The Const 1963, art 9, § 18 proscription against state or county grant of credit is not offended by a fair exchange of value for value. Under normal circumstances the Legislative or Executive Branch is the judge of what is fair value in matters in which it is concerned, as the Tiger contract here, being answerable to the people for its good or poor judgment. Their judgment, however, is subject to judicial review for abuse of judgment.

## X.

## THE QUESTION OF NOTICE TO TAXPAYERS AND THE RIGHT OF REFERENDUM.

Because of the necessary great haste with which

these appeals were briefed and argued, this Court made an independent framing of issues on appeal that were not adequately raised in the trial court. As was said in the *Gaylord* case by Justice SOURIS:

"[T]his Court cannot succumb to the tactical strategems of litigants which artifically restrict the Court's performance of its duty when constitutional issues of public importance are involved." *Gaylord,* 343.

One of the issues framed by the Court and argued by counsel in oral argument and supplemental briefs is as follows:

"What is the legal impact of the fact that 'notice' to the public spoke of 'revenue bonds' and 'notice' to the bond buyers referred to the same bonds as bonds secured by the general obligation of the County?"

There is no absolute constitutional right to a vote on revenue bonds[78] but under § 33 of Act 94; MCLA 141.133; MSA 5.2763 a vote must be held if, within 30 days of the publication of a "Notice of Intent to Issue Bonds," a petition is filed signed by 10% of the electors of the borrower.

Before discussion of any legal questions raised by the content of the Notice of Intent to Issue Bonds, we shall set out facts showing who was told the real, unlimited-tax-obligation nature of these bonds and *when* they were told and who was lulled to sleep by being told the stadium would be built by revenue bonds, meaning no cost to the taxpayer. The importance of this cannot be minimized since the taxpayers' right to a referendum under § 33 of Act 94 accrues upon the publication of the Notice of Intent and expires 30 days thereafter.

The purpose of this presentation is to make clear what information a reasonable elector had

[78] *Gaylord,* p 304.

available from an official source to act upon *at the time his right to seek a referendum accrued.*

A. *Comparison of Official Bond Descriptions to Taxpayers and Bond Buyers*

What the facts below will show is that the taxpayer was never made aware in any official way—that his taxes in unlimited amounts might pay the *minimum* $371,000,000 bill for the stadium. The key language describing the real nature of these bonds is one short paragraph that was neatly excised from notices to taxpayers but prominently displayed in notices to bondholders. For shorthand reference we shall call this paragraph the "Tax Paragraph" and we will refer to it as such in this discussion. The Tax Paragraph with its important language follows:

"By the terms of the Lease the County of Wayne has agreed to pay annually as the Fixed Rental for the said Stadium such amount as is necessary to pay the principal of and interest on these bonds and additional bonds of equal standing and *the obligation to pay said rental is a general obligation of the said County of Wayne which is authorized and obligated by law to levy an ad valorem tax on all taxable property* within the said county, *without limitation as to rate or amount,* to provide the funds necessary to pay said annual rental in anticipation of which these bonds have been issued." (Emphasis added.)

The following discussion will show how in each notice to the taxpayers the eye-opening and wallet-jolting message of the Tax Paragraph was curiously absent. At the same time the message of this Tax Paragraph was conspicuously present and brought home over and over again in notices to bondholders. We shall begin by looking at what was said in the articles of incorporation of the Wayne County Stadium Authority.

1). ARTICLES OF INCORPORATION (Public Notice)

These articles were adopted on August 20, 1970 and were published in the Detroit Free Press on November 5, 1970 as notice to, and for the benefit of the public.[79]

The only section of the articles dealing with the possibility of issuing bonds makes no mention whatsoever of the fact that Wayne County and the Authority were laying plans to issue unlimited tax bonds. In fact, the articles suggest plainly that any bonds would be paid by the actual users of the Stadium:

"For the purpose of acquiring, improving * * * (etc.) the Authority may issue self-liquidating revenue bonds in accordance with and subject to the provisions of Act 94 * * * and Act 31: provided, *that such bonds shall be payable solely from the revenue of such properties,* which revenues shall be deemed to *include payments made under any lease or other contract for the use of such properties:* and provided further, that no such bonds shall be issued unless the properties whose revenues are pledged have been leased by the Authority for a period extending beyond the last maturity of the bonds." (Emphasis added.)[80]

The average taxpayer, or for that matter even the average judge or lawyer, would have no idea that the language above is a verbatim quote—

[79] The articles were adopted on August 20, 1970, by the Wayne County Board of Commissioners pursuant to the authority and procedure prescribed in §§ 1 and 4 of Act 31; MCLA 123.951, 123.954; MSA 5.301(1), 5.301(4). The members of the Board of Commissioners for the Authority are elected pursuant to MCLA 123.955a; MSA 5.301(5a). The articles were filed with the Wayne County Clerk and with the Secretary of State pursuant to § 6 of Act 31; MCLA 123.956; MSA 5.301(6). Under this provision the validity of the incorporation is conclusively presumed 60 days after the filing with the County Clerk and the subsequent filing with the Secretary of State by the County Clerk.

[80] The articles of incorporation, art IV, § 5; Trial Exhibit 10.

almost—from § 11 of Act 31. What the average taxpayer or judge or lawyer would not recognize is that the conveniently omitted part of § 11 is the only part that might lead a taxpayer to fear for his pocketbook. Here is what the articles of incorporation might look like if they included the omitted part of § 11 of Act 31 (omitted parts in CAPS):

"For the purpose of acquiring, improving * * * *(etc.)* the Authority may issue self-liquidating revenue bonds in accordance with and subject to the provisions of Act 94 * * * and Act 31: provided, that such bonds shall be payable solely from the revenue of such properties, which revenues shall be deemed to include payments made under any lease or other contract for the use of such property: *WHERE * * * BONDS ARE PAYABLE FROM REVENUES DERIVED FROM PAYMENTS * * * PURSUANT TO ANY LEASE OR OTHER CONTRACT OBLIGATIONS, THE BONDS SHALL BE DEEMED TO BE ISSUED IN ANTICIPATION OF CONTRACT OBLIGATIONS * * * WITHIN THE MEANING OF SECTION 6 OF ARTICLE 9 OF THE CONSTITUTION* and provided further, that no such bonds shall be issued unless the property whose revenues are pledged has been leased by the Authority for a period extending beyond the last maturity of the bonds." (Emphasis added.)

Now there appears a little more puzzling situation! Assuming that a studious taxpayer might immediately reach for his handy copy of the constitution, he could turn to § 6 of article 9. Our reasonable taxpayer may not know—just as the legal profession doesn't know—precisely what this section of the constitution means, but there is little question that anyone looking at it would get some idea that it has something to do with unlimited taxes paying for bonds. Looking in Const 1963, art 9, § 6 for words dealing with "contract obligations," the taxpayer would find the following:

"The foregoing limitations [limits on ad valorem taxes] shall not apply to taxes imposed for the payment of * * * *contract obligations* in anticipation of *which bonds are issued, which taxes may be imposed without* limitation as to rate or amount * * * ." (Emphasis added.)

Had the articles of incorporation included the language above, then a very studious taxpayer (or lawyer) might have gotten some idea that unlimited taxes could be involved and might have started asking questions so that this project could be put into perspective before it got too far along.

If the reader will recall, the Tax Paragraph first quoted above mentioned that the county was "authorized and obligated" to tax without limitation as to rate or amount. We point out that conveniently absent from the articles' words, capitalized above, are the words that do the "authorizing and obligating" in the Tax Paragraph. That missing language is what is supposed to make the Tax Paragraph legal. That absent language has been the linchpin of bond counsel's arguments on appeal.[81]

## 2). LEASE BETWEEN COUNTY AND AUTHORITY (Privately circulated)

The Lease between the county and the Authority was approved on September 23, 1971, and to this day has never been published for benefit of taxpayers. As the Michigan Education Association noted in their brief *amicus curiae* (p 8):

"Until trial of this cause, no citizen could readily comprehend the magnitude of this project, and the burdens which will now be placed on the public to

---

[81] We do not decide here whether the absence of this paragraph from the articles of incorporation renders the issuance of the stadium bonds "ultra vires" in view of the numerous other reasons why these bonds are illegal.

finance the same. To this day such minor details as the
actual cost of the Stadium, the rental payments re-
quired of the County, and the operational revenue,
remain a mystery."

Although the Lease was filed with the county
clerk, there was no way a citizen could know it
was on file there. It was a different story with
respect to bond buyers and underwriters, however,
for they were given not only succinct summaries of
the parts of the Lease describing the county's tax
obligation but they were also hand-delivered
neatly bound copies of the Lease and all other
important documents. What in the Lease would be
of such material interest to bond buyers that it
should be summarized in the "Prospectus" and the
bond buyers also given bound copies of the Lease?
Following are pertinent quotations of some of the
more interesting provisions of the Lease as quoted
and summarized in the Prospectus given to bond
buyers:

"The Fixed Rental shall be deemed to be a general
obligation of the county and the other expenses to be
essential operating expenses of the county." Prospectus,
p 11; Lease, § 4(d) (trial exhibit 10; trial exhibit 2a, p 9).

Another interesting provision is § 8 of the Lease
which tells the reader that the stadium must be
built and paid for by the county no matter how
much it costs and if the county does not choose to
pay for it in cash the Authority *must* issue addi-
tional bonds and increase the county's tax-sup-
ported rent obligation. See Prospectus, pp 12–13;
Lease, § 8; bond ordinance §§ 1101–1102 (trial ex-
hibit 10; trial exhibit 2a, pp 13–14; trial exhibit 2c,
pp 31–32).

The Prospectus and Lease get right down to

particulars and make clear that the county has to
pay for these bonds no matter what happens:

> "So long as any of the Bonds remain outstanding,
> unless their payment has been provided for, the *obliga-*
> *tion of the County to pay the Fixed Rental shall be*
> *absolute and unconditional* and shall not be abated,
> reduced, abrogated, waived, diminished or otherwise
> modified in any manner or to any extent whatsoever,
> *regardless of any rights of setoff,* recoupment or coun-
> terclaim that the County might otherwise have against
> the Authority or any other party or parties and *regard-*
> *less of any contingency, act of God, event or cause*
> *whatsoever,* notwithstanding any circumstances or oc-
> currence that may arise or take place before, during or
> after the acquisition of the Stadium, *including, but*
> *without limiting the absolute and unconditional obliga-*
> *tion of the County* described above: (a) *destruction of*
> *the stadium * * * * ; (b) *the taking * * * of * * * the*
> * * * *Stadium * * * by * * * eminent domain* or other-
> wise; (c) *any assignment * * * subleasing or other*
> *similar transaction * * * ; (d) *the expiration of the*
> *term of the Lease;* (e) *any failure of the Authority to*
> *perform * * * any agreement or covenant* * * * ; (f) the
> *failure to complete * * * the Stadium,* whether due to
> the fault or negligence of the Authority or any other
> cause or reason; (g) *any acts or circumstances that my*
> *constitute an eviction * * * ."* Prospectus, p 11; Lease,
> § 13 (emphasis added). (Trial exhibit 10; trial exhibit 2a,
> pp 18–20.)

From here on things begin to be more compli-
cated so let us summarize what has happened so
far:

a) The articles of incorporation were published for
the benefit of the public and in the minimum form
required by the statute. A key section of a statute was
quoted almost verbatim in the articles, but left out any
hint of power for unlimited taxes.

b) Then, relying upon the part of the statute left out
of the articles, the county made a Lease with the

authority to create unlimited tax bonds. The Lease has
never been published but has been given to bondbuyers.

### 3). NOTICE OF SALE (bondbuyer notice)

Four days after the approval of the Lease the
Authority held a meeting on September 27, 1971.
At this meeting an "Official Notice of Sale" pre-
pared by bond counsel was reviewed by the Au-
thority and approved for later publication in a
limited circulation paper known as the Daily Bond
Buyer. The notice of sale was ultimately published
on March 30, 1972, over five months after taxpay-
ers' rights of referendum had expired.

Significantly, the Authority and bond counsel
thought the readers of the notice of sale in the
Daily Bond Buyer (months hence) should have the
information in the Tax Paragraph, but that the
taxpayers of Wayne County should not have any
official published description of the real nature of
these bonds as contained in that private para-
graph.

So far we have seen:

a) That in the Articles of Incorporation § 11 of
Act 31 was quoted almost verbatim but the lan-
guage left out is the language which is supposed to
authorize the county to make a Lease which cre-
ates general obligation bonds supported by unlim-
ited taxes.

b) Then we saw that the county approved a
Lease that is supposed to create this general obli-
gation.

c) On the same day with the help of the drafting
skills of bond counsel, the Authority prepared the
official notice to bond buyers including the Tax
Paragraph to make sure—as required by Federal
law—that bond buyers would not be misled about
what the County promises to do, but never pub-

lished this until five months after tax payers' rights of referendum had expired.

Read again the words of the Tax Paragraph, so helpfully edited out of public notices, and see how well it describes the Lease:

*"By the terms of the Lease* the County of Wayne has agreed to pay annually as the Fixed Rental for the said Stadium such amount as is necessary to pay the principal of and interest on these bonds and additional bonds of equal standing and *the obligation to pay said rental is a general obligation of the said County of Wayne which is authorized and obligated by law to levy ad valorem tax on all taxable property within the said county, without limitation as to rate or amount,* to provide the funds necessary to pay said annual rental in anticipation of which these bonds have been issued." (Emphasis added.)

## 4). TAXPAYERS' NOTICE OF VOTING RIGHTS ("Notice of Intent")

As far as taxpayers are concerned this is the only important document because it triggers a 30-day right of referendum. Once the notice appears the taxpayer, after reading the notice, can decide whether he objects to the project. If he does object he has the right to collect signatures and bring the matter to a full vote.

This "Notice of Intent", also drafted by bond counsel, was considered and approved by the Authority at the very same meeting the Tax Paragraph was approved. The Notice of Intent was published in the Detroit Free Press on September 29, 1971. Recall that at this date the Tax Paragraph, the Lease and any other documents suggesting "tax bonds" were still resting safely in the files of the Authority.

To this point the only documents prepared *and published* for taxpayers were the articles of incor-

poration. They suggest *no* tax. On September 23, the Lease was approved containing the tax bond structure. It was not and has not been published. On September 27, both the "Notice of Sale" for bond buyers and the "Notice of Intent" for the public were reviewed and approved. The "Notice of Sale" contains the Tax Paragraph. "The Notice of Intent" contains no Tax Paragraph or other suggestion of taxes. The "Notice of Sale" was filed away for later publication to bondbuyers and the Notice of Intent was approved for immediate publication to the people.

Here is what the taxpayers were told about these bonds and all they ever officially learned until it was too late:

"PLEASE TAKE NOTICE that the Commission of the Wayne County Stadium Authority *intends to issue and sell Revenue Bonds* of the Authority, *pursuant to Act 94, Public Acts of Michigan, 1933,* as amended, and *Act 31,* Public Acts of Michigan, 1948 (First Extra Session), as amended, in an amount not to exceed One Hundred Twenty-Six Million ($126,000,000.00) Dollars, for the purpose of paying the cost of acquiring, constructing, furnishing and equipping a new stadium in downtown Detroit together with a separate parking facility therefore and appurtenant properties and facilities necessary or convenient for the effective use of the stadium and parking facility and acquiring the site for the separate parking facility all for the use of the County of Wayne.

*"Said bonds shall be payable from rental to be paid by the County of Wayne to the Authority.*

"THIS NOTICE is given pursuant to the requirements of Section 33, of Act 94, Public Acts of Michigan, 1933, as amended."[82]

This notice tells the taxpayer four things:

1) The Authority intends to issue "revenue bonds" under Act 94 and Act 31;

---

[82] See proof of publication, trial exhibit 10.

2) for building a $126,000,000 stadium for Wayne County;

3) the bonds will be paid by rentals to be paid by the County to the Authority;

4) § 33 of Act 94 requires the notice to be published.

1. What is a "revenue bond"? If he didn't already know, a studious taxpayer could find from the city library how to look up the acts and the laws construing them and he would be comforted by the words found over and again in cases such as *Gaylord:*

"[S]elf-liquidating bonds * * * *do not obligate the general* taxing power." *Gaylord, supra,* 290.

2. How much will the stadium cost? There was no official public statement that the real cost of the stadium would be $371,000,000. This information was in the Lease, but the notice above makes no reference to that Lease.

3. How will these bonds be paid? The studious taxpayer already knows that a general tax will not be levied. What does this neatly equivocal paragraph tell him? Bonds will be paid from "rentals" that the County of Wayne will pay to the Authority. The stadium is for baseball and football games, conventions, *etc.,* so it must mean that the football teams, baseball teams and the like will pay rentals to the county and these rentals will be "paid by the County of Wayne to the Authority."

But we now know that what was really meant was that the bonds shall be payable from "rentals to be paid by the County of Wayne to the Authority" under a Lease in which the County of Wayne pledges to tax without limitation as to rate or amount and under which any payments from baseball teams, football teams and the like are irrele-

vant and the county must tax even if the stadium is empty.

4. Why was the notice given? The notice states that it was given because § 33 of Act 94 requires it. There is not a single word in the notice suggesting that the taxpayers have a right to seek a vote on these bonds. Nothing in the notice says that the whole purpose and reason this notice is required is to trigger a right of referendum.

This Notice of Intent contained the only official description of these bonds to taxpayers. The legal purpose of the Notice is to provide information so a taxpayer can decide whether to seek a vote. Upon reading this "Notice of Intent" are there any words which by any reasonable stretch of the imagination suggest an unlimited tax obligation of potentially $371,000,000? Is there anything suggesting a right to vote? In short, can a reasonable taxpayer upon reading this notice make any informed judgment about whether he should start organizing his friends and neighbors for a petition drive to prevent the imposition of potentially enormous additional tax burdens?

5). THE BOND FORM (Published wording of the Bonds)

We would now end this discussion of the selective description of these bonds except bond counsel tells us that a "Bond Ordinance" was published on October 1, 1971, two days after the publication of "Notice of Intent" and during the period of taxpayers' rights of referendum. He says this describes the bonds to them. He is wrong.

First, if it describes the bonds so well the question arises of why it wasn't published with the "Notice of Intent" since the Bond Ordinance was also considered and approved at the same meeting

as the Notice of Intent and "Official Notice of Sale," on September 27, 1971. Why separate the two in publications two days apart? Second, we note that the Bond Ordinance is a meaningless document without the unpublished Lease because they incorporate provisions of each other. The body of the Bond Ordinance makes no mention whatsoever of unlimited tax obligations. But all of this is not so important because the key description of the bonds is in the "Bond Form" at the end of the bond ordinance.

In the Bond Form is the following paragraph which we shall call the *"Revenue Paragraph":* It reads as follows:

*"Each Bond is a self-liquidating revenue Bond, is not a general obligation of said Authority or of said County, and does not constitute an indebtedness of said Authority or of said County, within any constitutional provision or statutory limitation.* The principal of and interest (except capitalized interest) on the Bonds of this series are payable solely from the Fixed Rental to be paid by said County under the terms of said Lease, and the payment of both the principal of and interest on said Bonds, and on any additional Bonds of equal standing which may be issued pursuant to their terms of said Ordinance, is secured by a statutory first lien on such Fixed Rental." (Emphasis added.)

This is what was published on October 1st, 1971. There is no mention of the unlimited tax obligation and the Tax Paragraph is not in this public Bond Ordinance #1. There is another bond ordinance, however, Bond Ordinance #2.

Four months after taxpayers' referendum rights expired, the Authority held a meeting and amended the Bond Ordinance and published Bond Ordinance #2. The description of the bonds in Bond Ordinance #2 is word-for-word the same (almost) as the description of the bonds in Bond

Ordinance #1. The Revenue Paragraph was left exactly the same and the paragraph following it (the words of which are not important here) was also exactly the same. But in this Bond Ordinance #2 the Authority was able to push these two paragraphs just far enough apart to insert the Tax Paragraph. So finally, 4 months after rights of referendum expired, the real unlimited tax nature of these bonds was placed in an official notice published on March 4, 1972 in the Detroit News.

This is the way the taxpayers were dealt with. Now we will consider whether this selective dealing, as reprehensible as it might be, is a case where the law can only say it is regretable but legal, or whether there is some principle of law which would hold that the taxpayers were legally shortchanged by these disclosure practices.

B. *Is The Notice of Intent Legal?*

In oral argument and supplemental briefs plaintiffs argue that constitutional due process was denied to taxpayers by misleading notices. Their position is well summarized by the Michigan Education Association in their brief *amicus curiae,* pp 7–8:

"The MEA does not oppose the construction of a riverfront stadium in Detroit. It does oppose the procedures utilized herein, however, and in particular points to the lack of notice to its members and the general public. Although "notice" was given to the general public and MEA members of the pendency of a "revenue" bond issue, *said notice was inherently deceptive and misleading.* The guarantee of due process seems somewhat less than adequate when we now realize that a good share of the revenues required to fund this project will, in all likelihood, be generated by ad valorem taxes levied against the taxpayers of Wayne County.

\*   \*   \*

"We protest the lack of notice given, and the form of the same. *The notice itself is violative of the due process clauses of both Michigan and Federal Constitutions.*" (Emphasis added.)

Defendants have not tried to argue that the taxpayers' notices were models of full and candid disclosure. Defendants' counsel chose, wisely, not to meet head-on the charge that the notices were misleading and a denial of due process. Instead they make an argument in the nature of confession and avoidance. It goes like this:

(a) The requirement of notice is purely statutory since the Michigan Constitution permits, but does not *require* that any "Notice" be given or any referendum held to issue these bonds, *City of Gaylord v Gaylord City Clerk,* 378 Mich 273, 304 (1966).

(b) Since a notice is not required by the constitution then, even though Act 94 requires Notice of Intent, it is sufficient in law to include in the Notice only what Act 94 specifically requires and no more, *Gaylord, Id.*

(c) The only thing specifically required by Act 94 to be included in the Notice is the "amount of the issue," so this notice more than satisfies the requirements.

(d) The Municipal Finance Commission approved this Notice and has approved many others like it as adequate and sufficient compliance with constitutional and statutory requirements.

Undressed of legal finery and phrased starkly, but nonetheless accurately in legal contemplation, the position of the parties is as follows. Plaintiffs say on behalf of the taxpayers:

"The 'Notice' was so deceptive and misleading that it is not really 'notice' of the truth at all. We were deprived of our chance to vote."

Bond Counsel answers on behalf of the government:

"There's no constitutional requirement for notice. We have complied with the statute. If we didn't tell you the bonds were tax bonds before the referendum rights expired we didn't have to and it's your tough luck."

Arguments like that of defendants have long been uniformly rejected by the courts. The argument usually crops up in cases where a citizen complains that the government or someone acting pursuant to government blessing and regulation has dealt unfairly with the citizen respecting such things as his driver's license, his government job, or some other government-citizen legal relationship.

We recently had occasion to consider this "take-it-or-leave-it" argument in *Viculin v Department of Civil Service,* 386 Mich 375, 386–388 (1971).

One of the claims of defendant Civil Service Commission was that since Donald Viculin had no constitutional right to his job he had no right to review of his dismissal under Const 1963, art 6, § 28 which guarantees review of administrative determination affecting "private rights or licenses". In answer, a unanimous Court adopted the principle stated in *Cafeteria & Restaurant Workers Union v McElroy,* 367 US 886, 894; 81 S Ct 1743; 6 L Ed 2d 1230 (1961):

" 'This question cannot be answered by easy assertion that, because she had no constitutional right to be there in the first place, she was not deprived of liberty or property by the superintendent's action. *"One may not have a constitutional right to go to Baghdad, but the Government may not prohibit one from going there unless by means consonant with due process of law."* ' " *Viculin,* 387. (Emphasis added.)

See also *Goldberg v Kelly,* 397 US 254, 262; 90 S

Ct 1011; 25 L Ed 2d 287 (1970); *Fuentes v Shevin,* 407 US 67; 92 S Ct 1983, 32 L Ed 2d 556 (1972).

In *Wilkins v Ann Arbor City Clerk,* 385 Mich 670, 678, (1971) we noted the rule of *Kramer v Union Free School District,* 395 US 621; 89 S Ct 1886; 23 L Ed 2d 583 (1969). There the Court said that even though there is no Federal constitutional right to vote in certain school elections, once the right is given, lines cannot be drawn inconsistent with equal protection. *Id,* 629. The same rule applies to voting on revenue bond issues, *Cipriano v City of Houma,* 395 US 701; 89 S Ct 1897; 23 L Ed 2d 647 (1969); *Phoenix v Kolodziejski,* 399 US 204; 90 S Ct 1990; 26 L Ed 2d 523 (1970).

The principles of the cases from *Goldberg, Wilkins,* to *Phoenix* and *Viculin* is simply that a citizen, merely because he has no constitutional right to something, cannot be forced to take that something burdened with whatever classification and unfair procedures the Legislature attaches. Once a right is given, be it a job, the right to vote, a telephone, the right to hold property, the right to bid on government contracts or whatever, that right cannot be restricted by means not consonant with due process. See *Viculin,* 387–388.

While it is true that many of the voting cases have dealt with claimed denials of equal protection, it must be remembered that every denial of equal protection is *a fortiori,* a denial of due process. See the analysis of Mr. Justice Stone, concurring in *Hague v CIO,* 307 US 496, 518 ff; 59 S Ct 954; 83 L Ed 2d 1423, (1938). How then can it be said that the state may *not* grant a "privilege" in violation of equal protection but that it somehow can grant a "privilege" and burden it with

procedures violative of due process? The plain answer is that it cannot.

The state here has granted a right to petition for a vote on revenue bond issues. The right to petition is triggered by a notice required by § 33 of Act 94. Does the notice given comport with due process?

In *Ridenour v Bay County,* 366 Mich 225 (1962) we had before us the power of a board of public works to determine special assessments against property in a drain district. The statute, 1957 PA 185; MCLA 123.754; MSA 5.570(24) provided that before "confirming" a special assessment roll there would be hearings preceded by publication of notice twice before the hearing. After the hearings and "confirmation" the assessments were final unless attacked in court within 30 days.

Notice was published under the statute and, in addition, was sent by first class mail to all persons who, according to the special assessment roll, owned property in the special assessment district. The "confirmation" occurred on February 16th and was not attacked within the 30 days provided by statute. Suit in equity was started a month later by plaintiffs. The county filed a cross bill under the Public Securities Validation Act, 1959 PA 161, § 3; MCLA 691.483; MSA 3.994(3). The Securities Validation Act provided for notice to the public published in a newspaper for three consecutive weeks. We point this latter statute out to make clear that there were two separate "notice" provisions before us in *Ridenour;* both held invalid.

One was the notice provision of the Public Securities Validation Act, last mentioned, 1959 PA 161, § 7; MCLA 691.487; MSA 3.994(7). The notice there was designed to perfect the ruling of the circuit

court determining the validity of bonds secured by special assessments against all objections. We held that the statute violated the Fourteenth amendment of the Federal Constitution and art 2, § 16 of the Michigan Constitution of 1908 for failing to provide adequate notice for known parties. *Ridenour,* 242–243.

We *also* held invalid the notice provision of 1957 PA 185, § 24, *supra,* regarding the hearing by the board of public works. The significance of this is that we applied the requirements of due process for securing personal jurisdiction in a court of law to non-adversary hearings before a board that would, in practical effect, determine the rate of tax on benefited properties—even though provision was made for a later contest in court.

In our decision we relied on the principles of *Mullane v Central Hanover Trust Co,* 339 US 306; 70 S Ct 652; 94 L Ed 865 (1950):

" *'But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.'* " *Ridenour,* 241. (Emphasis added.)

In *Mullane,* the Court held that personal notice to known beneficiaries of a common trust fund must be provided. Respecting the fine print in the published notices the Court said:

"Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper * * * ." *Mullane,* 315.

The Court also found the notice defective for failure to state its purpose:

"The chance of actual notice is further reduced when

as here the notice required does not even name those whose attention it is supposed to attract * * * ." *Mullane,* 315.

In *Ridenour,* the taxpayer had a right to object at a "hearing". The hearing would cut off rights to object to special assessments subject to 30 days' opportunity for contest in court. The "notice" served to inform them of the hearing at which they could object. Here, the taxpayers have a right to object by petition within 30 days, which cuts off the right to object further. *Here,* however, the notice does not serve merely to inform taxpayers of the pendency of some other independently created proceeding at which they may object. Here the *notice itself* creates the right to object and petition and the notice also determines the cutting off of the right.

The notice here is defective in both its method of reaching taxpayers and its substance.

1) The notice is defective in its method of reaching taxpayers because the right to petition cannot be created and cut off by fine print in the back of a newspaper. As was said in *Mullane:*

"Publication may theoretically be available for all the world to see but *it is too much in our day to suppose that each or any individual beneficiary does or could examine all that is published to see if something may be tucked away in it that affects his property interests.* We have before indicated in reference to notice by publication that, *'Great caution should be used not to let fiction deny the fair play that can be secured only by a pretty close adhesion to fact.'* " *Mullane,* 320. (Emphasis added.)

We do not hold that due process requires personal notification of every taxpayer, nor do we hold that there must be any mailed notice or

*personal* notice to everyone. *Mullane* holds only
that the method of notice chosen must give reason-
able assurance of actually giving notice in light of
other available means:

"The statutory notice to known beneficiaries is inade-
quate, *not because it in fact fails to reach everyone,* but
because *under the circumstances it is not reasonably
calculated to reach those who could easily be informed
by other means at hand." Mullane,* 319. (Emphasis
added.)

The kind of notice required depends on the
circumstances of the case and the availability of
other means in both a theoretical and economic
sense. Here, for example, there is involved not
merely a true revenue bond where there is no
chance of taxation, but rather bonds secured by
the general, unlimited taxing power of the county.
The bonded project involves the expenditure of
substantial sums of money. It is not unreasonable
under the circumstances to consider other availa-
ble means of notice such as full page advertise-
ments; television; radio; or combination of any of
the above. The method may vary but the question
always to be asked of itself by the government is
whether it has chosen a method it would choose if
it were really desirous of actually informing the
greatest number of electors of what their rights
are.

2) The notice here is also defective in substance
because it fails to inform the reader of its purpose
and because it is misleading.

The purpose of the notice is to create and deter-
mine a method of objecting to a bond issue by
petitioning for a vote. That purpose is not served
by a simple statement that the notice is given
because it is required to be given. It is no answer

here to say that these notices "conform to accepted practice in building authority projects." Customary process is not necessarily due process.

To comport with due process any notice respecting petition rights on bonds supported by any pledge of tax power must state to whom the notice is issued and for what purpose: (a) it must tell, in this case, the electors and taxpayers of Wayne County that it is issued for their benefit; (b) it must contain enough information so that it can be told from its face in plain and understandable language that the notice concerns some particular right or obligation respecting the subject matter of the notice; (c) the notice must explain the nature of the right (or obligation) and what is required to exercise it and the consequence of not exercising it; (d) regarding the subject matter of the notice there must be enough information so that a meaningfully informed decision respecting the right can reasonably be made from information supplied in plain language on the face of the notice.

Defendants' counsel say, however, that people complained in the past when too much information was printed. We do not require and would not tolerate a *magnum opus* as misleading in its complexity as this "Notice" is in is brevity. Counsel knows as well as the Court that it takes as few words in plain English to tell taxpayers about potential burdens as it does to mislead them in compact legal phrases of art.

Where public officials are acting under a constitutional and statutory duty to give notice to the public of what the government proposes, and especially where it concerns rights of electors respecting important undertakings of government such as the issuance of bonds secured by taxing powers, then the government and its public officials, in the

exercise of the duty of informing, occupy a position of trust and a fiduciary standard should be applied to them. *Cf, Barkey v Nick,* 11 Mich App 381, 385 (1968).

In giving notice to taxpayers regarding public securities, to comport with due process the notice must be phrased with the general legal sophistication of its beneficiaries in mind. As phrased it must not make any misleading or untrue statement; or fail to explain, or omit any fact which would be important to the taxpayer or elector in deciding to exercise his right. In short, the notice may not be misleading under all the circumstances.

In addition, proper notice cannot reasonably be accomplished until after the terms of the issue have been approved by the Municipal Finance Commission because the terms of the issue about which the notice speaks are not determined until then. The Municipal Finance Commission has an obligation to insure that the notices as well as the bonds themselves comply with the law.

The similarity between this standard and the standards under SEC Rule 10b-5, 17 CFR 240.10b-5 is more than accidental. While much less in the way of detail may be required here, the principle is the same. Misleading statements in connection with the issuance of public securities, *even to one who is neither a "purchaser" nor a "seller"* but who has a right to try to prevent the securities from being issued, are within the condemnation of Rule 10b-5 (3) which prohibits "any person, directly or indirectly"

"3) to engage in *any* act * * * which operates or *would* operate as a fraud or deceit upon *any person,* in connection with the purchase or sale of any security." (Emphasis added.)

It is contrary to the public policy of this state to permit the officials of our public corporations issuing bonds to act in ways which, under other circumstances, would be actionable if officials of private corporations issued bonds by securing shareholder approval through misleading notices.[83]

The "Notice" here is more than simply against public policy as being contrary to the spirit of Rule 10b-5. Act 94 creates a right to the notice and opportunity for petition. The notice must comport with due process. The notice is misleading. *Misleading process is not due process.* The bonds are invalid since there has been no valid notice given under § 33 of Act 94.[84]

---

[83] See *Securities and Exchange Commission v Texas Gulf Sulphur Co,* 401 F2d 833 (CA 2, 1968); *cert den,* 394 US 976; 89 S Ct 1454; 22 L Ed 2d 756; on remand 312 F Supp 77 (1970). A lawyer preparing descriptions is as subject to the rules as others, *Securities and Exchange Commission v Frank,* 388 F2d 486 (CA 2, 1968). "Fraud" under rule 10b-5 includes even so-called "innocent" non-disclosure which can amount to deception. See, *e.g., Myzel v Fields,* 386 F2d 718 (CA 8, 1967); *cert den,* 88 S Ct 1043; 390 US 951; 19 L Ed 2d 1143 (1968). See the cases cited under 15 USCA § 78j.

[84] Defendants argue that defects in published forms of notices can be cured by general newspaper coverage. They rely on *City Commission of Jackson v Hirschman,* 253 Mich 596, 600 (1931) and *Michigan Public Service Co v Cheboygan,* 324 Mich 309, 339–349 (1949). *Hirschman* involved a claim of irregularities in the conduct of a charter election required to be held. There are no facts in the opinion regarding these irregularities and the case is at best dicta for the rule defendants find in it. Reliance upon the *Cheboygan* case is misplaced. That case did not say that a misleading notice could be "cured" by newspaper articles because the Court found that the form of the notice was "comprehensive and *not misleading*" (p 336, emphasis added). *Bay County v Hand,* 257 Mich 262, 268 (1932) also does not support defendants' position. In *Hand,* the electors had full notice of the regular spring election. Certain questions to be submitted at that election were not published for the full time required by statute. The Court found the notice of the general election was sufficient and did not find any misleading statements.

We cannot approve of any construction of previous law that would allow the government to mislead the people in required notices concerning the elective franchise or the right to petition so long as the misleading is cured by statements in unofficial news reports or by the public rumor mill. The duty of full and straightforward disclosure cannot be delegated to the grapevine.

We do not consider here whether the 10%-in-30 days referendum requirement as applied to Wayne County is an arbitrary and unreasonable condition placed on the right to petition. We note there are now over 1.3 million electors in Wayne County so the 10% requirement amounts to one person getting one signature every 20 seconds, 24 hours a day for 30 days.

By way of comparison, all that is required for statewide legislative referendum is 5% of the total *vote cast* for Governor in the *last election* within *90 days* after the close of a session (Const 1963, art 2, § 9). If that standard were applied to this local transaction the figures would be as follows. There were approximately 780,000 votes in Wayne County for Governor at the last election. Five per cent of that is 39,000 signatures in 90 days or 13,000 signatures in 30 days. Act 94 required *10%* of the *registered electors,* as of the *time of the petition drive* within *30 days.* In September of 1971 there were approximately 1,200,000 registered electors in Wayne County. Ten per cent of that is 120,000 signatures compared to 13,000 applying the standards of statewide referendum to this local transaction, or about 10% vs 1.1%. In addition, of course, the act to go to referendum might have been passed in the first part of the session which would allow legislative petitions much more time.

Here, however, there has been no allegation that anyone tried and was unable to secure the signatures. On the other hand, there is no allegation that anyone knew they had a right to secure signatures. Nevertheless, we save our consideration of this for a future case in which the issue is raised.

## XI.

## OTHER ISSUES.

A. *Failure to Pre-set Rates & Prohibition of Free Services Under Act 94*

Questions raised by Plaintiffs relating to the failure to pre-set rates under Act 94, § 21; MCLA 141.212; MSA 5.2751 and the prohibition of free services under Act 94, § 18; MCLA 141.118; MSA 5.2748 are disposed of by our holdings above.

B. *Impact of Alleged Professional Impropriety on Legality of Bonds*

The question of possible professional impropriety by attorneys connected with this case was raised before this Court. The matter was brought before us not to raise a disciplinary question but rather as one reason to invalidate the stadium bonds. This Court has held these bonds invalid for direct intrinsic legal reasons so that it would be unnecessary surplusage to now consider the legal impact of such a collateral extrinsic issue on the validity of the bonds. Nonetheless, an open charge of professional misfeasance has been made and the makers of the charge should, in fairness and justice, take appropriate action forthwith.

## XII.

## CONCLUSIONS.

In summary we reach these principal conclusions:

1. The acquisition, operation and subleasing of a stadium for the use of professional sports organizations may be a legitimate public purpose. It would appear possible to do so under a legally structured

revenue bond issue under Acts 31 and 94, alone or in combination, under appropriate circumstances as well as by new legislation.

2. Although the stadium bonds relate to a legitimate public purpose under the Michigan Constitution, the bonds in this case were structured to be general tax bonds, secured by the full faith and credit of the county to tax without limit, rather than the revenue bonds authorized by Acts 31 and 94, which must be secured exclusively by the revenues derived from the operation of the public improvement. The bonds are therefore illegal because they do not comply with the requirements of Acts 31 and 94. Under § 7 (2) of Act 94, the only exception to a pure revenue bond is if more than 25% of financing comes from a Federal or state "grant" and the stadium project does not qualify under this exception.

3. Under the rule of the *Michigan Turnpike* case when the incorporating authority pledges its general tax power to pay the rental obligation to the Authority, the "alter ego" doctrine comes into play and the county and the Authority are considered as the same entity. Since the county and Authority are therefore considered as the same entity, the county's pledge of unlimited tax power runs directly to the bondholder. Such a pledge is not permitted under Act 94 so the bonds are illegal.

4. Even if § 11 of Act 31 were exactly precise and specific in evidencing a legislative intent to include the unlimited tax authorizations and immunities from statutory and constitutional tax rate limitations that defendants claim, Act 94 does not provide for these exceptions. In order to incorporate Act 94 into Act 31 and at the same time amend Act 94, the Legislature must have complied with the reenactment and republication requirements of Const 1963, art 4, § 25. Specifically, that

part of § 11 of Act 31, which for convenience in this opinion we have labeled § 11[d], reads as follows:

"Where and to the extent that the bonds are payable from revenues derived from payments to be made pursuant to any lease or other contract obligations, the bonds shall be deemed to be issued in anticipation of contract obligations and such obligations shall be deemed to be contract obligations in anticipation of which bonds are issued, within the meaning of section 6 of article 9 of the constitution."

This part of § 11 of Act 31 quoted above is null and of no effect because the sections of Act 94 to be amended were not reenacted and republished as required by Const 1963, art 4, § 25.

5. If § 11 of Act 31 intends, as defendants claim, to permit taxation without limitation to pay fixed rentals, then § 11[d] quoted above exceeds the scope of the title to Act 31 in violation of Const 1963, art 4, § 24 and also imposes a tax without distinctly stating it in violation of Const 1963, art 4, § 32.

6. Section 13 of Act 94 requires that any bonds issued under Act 94 may not be indebtedness under any constitutional or statutory provision. These bonds state on their face that they do not constitute an indebtedness within any statutory or constitutional provision. The bonds do create an indebtedness within Const 1963, art 7, § 11, however, because the county has created a present unconditional obligation to pay the total debt service secured by their pledge to tax without limit. In addition, the county has created indebtedness on the bonds in two other ways: 1) the county has directly agreed to give bondholders the power to enforce the Lease Contract, one covenant of which is the pledge of unlimited tax support, and 2) the

county's pledge of general taxing power to support the rent places the county in the shoes of the Authority under the rule of *Michigan Turnpike* so their obligations to the Authority are also their obligations to the bondholders. The bonds are therefore illegal because they do create an indebtedness within the meaning of Const 1963, art 7, § 11 contrary to the statement on their face and the requirements of § 13 of Act 94. The approval of the Municipal Finance Commission required under § 27 of Act 94 is without legal effect since it was premised upon these bonds not being debt.[85]

---

[85] In addition to the premise stated in the approved Form of the Bond that these bonds would not create indebtedness of the County, the Attorney General's staff recommended changes in the language of three documents to make sure the bonds would not be "general obligations":

(1) Bond Form changes: In the order of approval of the Municipal Finance Commission, March 28, 1972, p 1, it is ordered that the paragraph in the Form of the Bond delete the reference to the general obligation of the County to tax without limit as to rate or amount to pay the "Fixed Rentals." According to this record the changes have not been made and even if they had been it would be bootless if changes were not also made in the entire bond structure and bond contract which include the Lease which creates the general obligation and power to tax. (See explanation in Part X above.)

(2) Official Notice of Sale: The Official Notice of Sale as finally approved by the Municipal Finance Commission for publication without change says that:

"The County of Wayne is authorized and obligated by law to levy ad valorem taxes on all taxable property, etc. * * * without limitation as to rate or amount to provide funds necessary to pay said Fixed Rental * * * ."

For some reason, the Attorney General's staff thought that this could still be a "revenue" project if the bondbuyers were given the interesting but legally irrelevant information that the County "intended" to pay the Fixed Rental from sources other than taxes even though the County was authorized and obligated to tax without limitation as to rate or amount to pay the Fixed Rental.

(3) Lease: The checklist or "point sheet" used by the Attorney General's staff contains a recommendation that the Lease be amended to delete the language which creates the unlimited tax obligation to pay the Fixed Rental. This Lease, as Defendants continually stress, is the basic document in this bond structure and is the basis for making any statements in the Bond Form and the Notice of Sale. Somehow, this recommendation never made its way to the Municipal Finance Commission. Since by law and by the terms of the Lease and the

7. Under MCLA 46.7 an unchartered county such as Wayne County may not "raise" any more than 1/10th of 1 mill for building purposes without a vote of the people. Under the rule of the *Rude* case, the county has "raised" for building purposes the total amount of its obligations under the Lease because it has pledged unconditionally to pay the sums due under the Lease and this is not "rent" nor is it "reasonable rent" under the rule of *Rude.* Section 8 of Act 31, however, purports to remove this transaction from the operation of MCLA 46.7 when it states:

"Any rental obligation or consideration applicable to the incorporating unit or units under such contract, shall not be considered as indebtedness of the incorporating unit or units within the meaning of any statutory or chartered debt limitation of such incorporating unit or units."

Insofar as this part of § 8 of Act 31 would except the unconditional rental obligation of this unchartered county from the limitations and conditions of MCLA 46.7, it is unconstitutional because there was not compliance with the reenactment and republication requirements of Const 1963, art 4, § 25 which would require amendment or repeal of MCLA 46.7 in order to escape its limitations and voting requirements.

8. Under present Act 31 a "revenue bond" of an unchartered county may not have its taxing power pledged to pay "rental" payments beyond the operating millage allowed under the conditions in the first paragraph of Const 1963, art 9, § 6. No tax bond of any county, however structured, may be

ordinance the Lease is a part of the bond contract, if the Attorney General's staff intended to preserve the revenue nature of the project it would be crucial to delete all power to support the rent obligation by unlimited taxes.

free from constitutional debt limitations. As tax or revenue bonds, these stadium bonds purport to do both and are illegal.

9. Under a revenue bond structure a Tiger contract must bear its proportionate share of liquidating the bonded indebtedness or the stadium bonds can't be approved by the Municipal Finance Commission. (It moreover would probably not be saleable.) Under a proper tax bond situation, the validity of the Tiger contract would not affect the validity of the bonds. However, under Const 1963, art 9, § 18 the state or county may contract for services without an unlawful grant of credit if it receives full and fair value in return. In the first instance, the Legislative or Executive Branch judges what is full and fair value. The courts will respect that judgment unless there has been an abuse of judgment.

10. Although there is no absolute constitutional right to vote on revenue bonds, § 33 of Act 94 requires that a vote be held if a petition is filed by 10% of the electors within 30 days of the publication of a Notice of Intent to Issue Bonds. When the Legislature has provided for notice, the people are entitled to due process in the issuance of the notice. The notice was a denial of due process because it was published in fine print in the classified part of the newspaper and this is not reasonably calculated to actually reach the greatest number of taxpayers. The notice was also a denial of due process because it was inherently deceptive and misleading, and misleading process is not due process. The government and its public officials in exercising a constitutional and statutory duty of informing the public occupy a position of trust with respect to the people and a fiduciary standard should be applied to them.

The issues underlying the Governor's three questions have been fully considered and answered above. Specifically:

1. The stadium bonds relate to a public purpose within the Constitution. Part VIII. However, the county cannot support stadium bonds with its full faith and credit under Acts 31 and 94. Parts II, III and IV.

2. The grant of county credit under Const 1963, art 9, § 18 would not arise under a true revenue bond situation, which the stadium bonds are not. With the existing record and invalidity of the bonds and for several other reasons, this Court did not examine whether art 9, § 18 was violated. The rule is set forth in the summary above and in Part IX.

3. There are adequate standards in Michigan law to issue stadium bonds under Acts 31 and 94. Part VIII.

As long and complicated as this opinion is, it only begins to reflect the number and scope of the problems that have developed in the structure and practice of our municipal finance law since the adoption of the Constitution of 1963. Some of the problems brought pointedly to light by the accident of this stadium bond case could have been avoided, or at least mitigated, had there been a more searching inquiry in the Municipal Finance Commission and in the few and far-between cases that have arisen in the courts in the past.

There is a philosophy that cases should be disposed of by decision on the narrowest possible grounds only. This philosophy is often the part of judicial wisdom and good public policy, especially in an area of finely honed legal distinctions. However, in the apparent chaos and confusion in the

field of municipal finance law unearthed in this case, such a narrow view of our duty would be a retreat from responsibility and a pusillanimous public policy. There is here great need for the most comprehensive and the best directions possible to give guidance to administration and practice. Such directions are imperative to reduce the amount of future litigation necessary to establish a reasonably understandable and practical, if not precise, framework within which those concerned can operate in the future. It is for this reason that we have explored a number of issues, each of which would have been equally dispositive of the case, but all of which involve necessary check points for guidelines for the future.

Despite our consideration of and ruling on a number of important issues in this case, we have not, nor in the nature of things could we have, fashioned a diamond-cut-sharp template to control all practice and administration for all time to come in this labyrinthian welter of legislation, where the Municipal Finance Commission has been unable to serve either the hopes or the purposes of its original incorporators. Consequently, until the Legislature can bring order out of chaos in this field, so vital to state and local finances and to the concerns of the taxpayer, we declare that the equitable doors of this one court of justice are wide open for direct actions by taxpayers for injunctive protection against more levies "without limitation as to rate or amount" whenever they are able to plead and prove a case of confiscation or irreparable injury. *United States Cold Storage Corp v Detroit Board of Assessors,* 349 Mich 81, 89 (1957); *Detroit v Wayne Circuit Judge,* 127 Mich 604, 605 (1901); *Woodman v Auditor General,* 52 Mich 28 (1883); *Marquette H*

& O R Co v Marquette, 35 Mich 504 (1877); *Palmer v Rich,* 12 Mich 414 (1864).

Judgment affirmed. No costs, a public question.

T. M. KAVANAGH, C. J., and T. G. KAVANAGH and SWAINSON, JJ., concurred with WILLIAMS, J.

ADAMS, J., concurred in the result.

BLACK, J. *(concurring specially).*

Exposed by searching questions from the Bench, the blandly deceptive employment by defendants of the equally deceptive building authority act of 1948 (MCLA 123.951 *et seq.;* MSA 5.301[1] *et seq.,* as last amended by 1970 PA 47), along with its referenced auxiliary, The Revenue Bond Act of 1933 (MCLA 141.101 *et seq.;* MSA 5.2731 *et seq.* as last amended by PA 1969, No's 79 and 87), has stirred the Court to unanimous prompt affirmance of the injunctive judgment entered below. Our affirming judgment, reciting "opinion or opinions to follow", was entered June 16 last, 8 days after submission of that which became an appeal by force of the Court's order of May 24, assuming appellate jurisdiction.

The action being thus finally decided, and the defendants since having clamored in the press for "reasons" supporting the decision entered, I have decided to respond immediately with the ensuing separate presentation of an additional ground for affirmance which, in my view, by itself dictates nullification of the "revenue" bonds the defendant Stadium Authority has issued pursuant to its ordi-

nances No's 1 and 2.[1] Such presentation will enter
our record accompanied by certain unilateral gra-
tuities proposing urgently an abrupt termination
of these sly multi-million dollar impositions upon
property taxpayers; impositions such as we find
neatly arranged here pursuant to that reprehensi-
ble underplot known as § 6 of the finance and
taxation article (Const 1963, art 9).

The injunction we have affirmed will of course
arrest permanently any and all levies of property
taxes which the confederate defendants have un-
dertaken to authorize. But that injunction will not
check or inhibit further tricky legislation veneered
by the phrase "within the meaning of § 6 of
article 9 of the constitution." Nothing short of
immediate legislative submission to the people, of
another adjusted-to-date "15-mill amendment",
will restrain the perpetration of more such
amercements of property taxpayers, many of
whom realize they are being steadily fleeced by the

---

[1] The entitlement of both ordinances is the same. The first was
adopted September 27, 1971. The second, amendatory of the first, was
adopted March 2, 1972. That entitlement, published in full cap, is
sufficiently introductive:

"AN ORDINANCE TO PROVIDE FOR THE ACQUIRING AND
CONSTRUCTING BY THE WAYNE COUNTY STADIUM AUTHOR-
ITY OF A STADIUM FOR LEASE TO THE COUNTY OF WAYNE;
TO PROVIDE FOR THE ISSUANCE AND SALE OF BONDS TO
DEFRAY THE COST THEREOF; TO PROVIDE FOR THE RETIRE-
MENT AND SECURITY OF SAID BONDS; AND TO PROVIDE FOR
OTHER MATTERS RELATIVE TO SAID PROJECT AND SAID
BONDS."

Ordinance No 2 as published includes, deep in the fine printed body
thereof, this specific provision for imposition of property taxes:

"By the terms of the Lease the County of Wayne has agreed to pay
annually as the Fixed Rental for the said Stadium such amount as is
necessary to pay the principal of and interest on these Bonds and
additional Bonds of equal standing and the obligation to pay said
annual rental is a general obligation of the said County of Wayne
which is authorized and obligated by law to levy an ad valorem tax
on all taxable property within the said county, without limitation as
to rate or amount, to provide the funds necessary to pay said annual
rental in anticipation of which these Bonds are issued."

shadowy advancement and manipulation of resolu-
tions, contracts, leases, "evidences of indebted-
ness", ordinances, charters, statutes, progressively
cute amendments of statutes and huge "revenue
bond" issues, all keyed behind the scenes to prop-
erty taxation "without limitation as to rate or
amount". Yet, as discovery of bilk usually comes
too late and the rights of bona fide purchasers
intervene, these taxpayers have no remedy or
recourse.

I concede that such uninvited offerings do not of
prim dignity belong in a judicial opinion, and
admit that such as appear presently will have
intruded by license appropriated. Aside from all
this, note is made that my endorsement of the yet
unprepared opinion of the Court will in all proba-
bility be added thereto.

*Butcher v Grosse Ile Twp,* 387 Mich 42 (1972)
fully disrobed § 6 along with all related deceit of
the "Preface" and "Address", which last *Butcher*
considered at 58–60. But we did not then realize
the extent to which that section had already been
employed to exploit such deceit. Now we are faced
by another kind of property tax fraud born of § 6;
fraud attempted by legislation in palpable if not
fraudulent violation of a mandatory, plainly appli-
cable, and long since familiar provision of the
legislative article. This time however, there is a
remedy; one which Judge Moody in circuit pro-
vided promptly and rightfully. And this time, over
and above determination of the formally presented
legal questions with respect to which all here
agree, I experience no difficulty in applying—sua
sponte to this equitable action—the mentioned
constitutional provision. It reads (Const 1963, art
4):

"Sec. 24. No law shall embrace more than one object,
which shall be expressed in its title. * * * "

The quoted provision appeared first in the Constitution of 1850 (art 4, § 20) and again in the Constitution of 1908 (art 5, § 21). When as here the inquiry concerns taxes, it has always been interrelated in meaning and purpose with another section of the legislative article, reading presently (art 4, § 32), "Every law which imposes, continues, or revives a tax shall distinctly state the tax." That was noted explicitly by Justice CAMPBELL, writing for the Court in *Westinghausen v People,* 44 Mich 265–267 (1880):

> "This section,[2] which does not seem to have been discussed at all in the Constitutional Convention, was evidently borrowed from an amendment to the Constitution of 1835, proposed in 1842, and ratified in 1843, which provided in substance that every law creating a State debt should specify the object for which the money was to be appropriated, and be confined to a single object, and all money raised under it should be applied to the specific object stated in the law, and to no other purpose. Sess. Laws 1842, p 157; Sess. Laws 1843, p 231. Its intent is manifest, to prevent the Legislature from being deceived in regard to any measure for levying taxes, and from furnishing money that might by some indirection be used for objects not approved by the Legislature."

The named defendants tell us, dependably as shown by the record:

> "Wayne County Stadium Authority ('the Authority') was incorporated by action of the Board of Commissioners of the County of Wayne ('the County') pursuant to the Building Authority Act, Act 31, Public Acts of Michigan, 1948 (Extra Session) (5.301(1) to 5.301(15)

---

[2] "Every law which imposes, continues, or revives a tax, shall distinctly state the tax, and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such tax or object." (Const 1850, art 14, § 14.)

MSA) ('Act 31'). Under Act 31 the County and the
Authority entered into a lease agreement ('the Lease'),
by the terms of which the Authority agreed to acquire a
domed multi-purpose stadium to be located immediately
to the west of Cobo Hall in the City of Detroit and a
related parking structure and the sites therefor ('the
Stadium') and to lease the Stadium to the County, and
by the further terms of which the County agreed to
lease the Stadium from the Authority and to pay a
rental therefor to the Authority on a semi-annual basis
beginning in 1975, the estimated completion date of the
Stadium, in amounts sufficient to pay principal of and
interest on the Bonds. Although the obligation of the
County to pay the rental to the Authority under the
Lease is absolute and unconditional, it is intended that
the payments of rentals in the amounts of the principal
and interest upon the Bonds will be paid as they
become due from funds other than general funds of the
County, including receipts from: i) use of the Stadium;
ii) an excise tax on charges made for accommodations
by hotels and motels in the County, authorized by Act
No 232, Public Acts of Michigan, 1971, to a maximum
rate of five per cent; and iii) State of Michigan revenues
derived from thoroughbred and harness racing in the
amount of $2,500,000 annually authorized by Act No 5,
Public Acts of Michigan, 1972, to be appropriated to the
County. Any excess derived from these sources will be
used to establish a rent guarantee fund to be used only
for future rental payments required to be paid by the
County if current receipts are insufficient therefor.
*Only if funds available from all these sources including
the rent guarantee fund are insufficient to pay said
rental as it becomes due, and then only to the extent of
any such insufficiency, will the County be required to
expend therefor its general funds including such funds
as may be raised by ad valorem taxes for this purpose.*
(Emphasis by present writer.)

"The Authority and the County entered into an oper-
ating agreement ('the Operating Agreement'), which is
terminable at the option of the County, under which
the Authority agreed to operate and maintain the
Stadium as agent for the County.

"The Authority, pursuant to Act 31 and in accord-ance with Act 94, Public Acts of Michigan, 1933, as amended (5.273 et seq. MSA) ('Act 94'), by ordinance authorized the issuance of Stadium Authority Stadium Bonds in the principal amount of $126,000,000 ('the Bonds') in anticipation of and pledging for their pay-ment the rental payments to be paid by the County to the Authority under the Lease. The proceeds of the Bonds are to be used to pay the cost of acquiring and constructing the Stadium and other costs incidental thereto and to the financing of the Stadium."

However, and except by the delightfully oblique sentence italicized above, the defendants do not mention or acknowledge that the bonds thus is-sued by the Stadium Authority are in actual fact a combination of revenue bonds and general obliga-tion bonds. That necessary conclusion reached, § 24 rears up automatically for test of title and body of the building authority act as that act stood —with its amendments of 1970—when ordinance No 2 was ordained March 2 last.

In the building authority act we must find—if there at all—constitutional as well as interpretive power *of the Stadium Authority* to issue and sell these *dually secured* bonds, distinguishable as they always have been from "self-liquidating revenue bonds"; for the bonds before us if valid are general obligation bonds, dually secured in that they are designed for retirement (a) by variously commit-ted, or "returned", or "granted", or promised "net revenues primarily pledged", and (b), by a specific pledge of the faith and credit of the defendant County *with that pledge backed by obligatory countywide property taxation*—"without limitation as to rate or amount"—*whenever such revenues turn up short.* There is in the building authority act no such power. For that additional reason I have voted to affirm.

*First: The Building Authority Act, Tested by
§ 24 for Authorization of Other than Revenue
Bondage.*

Arrayed below is the 1970-amended (by No 47)
title of the building authority act:

"An act to provide for the incorporation of authorities
to acquire, furnish, equip, own, improve, enlarge, oper-
ate and maintain buildings, automobile parking lots or
structures, recreational facilities, stadiums, and the
necessary site or sites therefor, together with appurte-
nant properties and facilities necessary or convenient
for the effective use thereof, for the use or benefit of
any county or for the use or benefit of any county and
any city or village therein, or for the use or benefit of
any city, village or township or for the use of any
school district and any city, village or township wholly
or partially within the district's boundaries, or for the
use of any intermediate school district and any constitu-
ent school district or any city, village or township,
wholly or partially within the intermediate school dis-
trict's boundaries; to provide for compensation of au-
thority commissioners; to permit transfers of property
to authorities; to authorize the execution of contracts,
leases and subleases pertaining to authority property
and the use thereof; *to provide for the issuance of
revenue bonds by such authorities;* to validate action
taken and bonds issued; and to provide other powers,
rights and duties of authorities and incorporating units,
including those for the disposal of authority property."
(Emphasis by present writer.)

Prior to review of § 24's buttressing authorities
the reader of this title will note that there is no
intimation therein, any more than there has been
in the title of the act since enactment thereof in
1948, of any power to pledge "full faith and cred-
it", or of power to levy property taxes for the
purpose of retiring or securing payment of "reve-
nue bonds" issued and sold thereunder. As always

before, the amended title gives notice only of intent to provide "for the issuance of revenue bonds by such authority [authorities]." It, the title, is in that respect *restrictive* and *preclusive,* within presently quoted *Callaghan v Chipman,* 59 Mich 610 (1886).

In recent *Maki v East Tawas,* 385 Mich 151 (1971), affirming 18 Mich App 109, both Courts redeclared and reapplied the rules set forth in *MacLean v State Board of Control for Vocational Education,* 294 Mich 45 (1940), particularly including regularly cited *Blades v Board of Water Commissioners of Detroit,* 122 Mich 366 (1899). *Blades* is factually and instantly analogous. The title of the statute considered there did not give or intimate that constitutionally required "fair notice" of the *imposition,* by lengthy § 9 of that statute (pp 373–375), of property taxes "to be assessed, levied, and collected the same as other city taxes." The conclusion reached by the Court was summed up by this pointed question (p 378):

"Would the title to this bill, as introduced in the legislature, when read by a taxpayer of Detroit, be notice to him that the system of supporting the water-works was to be changed from that of water-rates to that of taxation?"

The same interrogatory is due here. Would the 1970-amended title quoted above, when read by a taxpayer of Wayne County, be notice to him that the well understood system of retiring revenue bonds was to be changed (if indeed it was thereby changed) to one of revenues derived from the resolved project supported whenever needed by *property taxation, levied at large "without limitation as to rate or amount"?*

For many years now *Vernor v Secretary of*

*State,* 179 Mich 157 (1914) has been regarded as a leading Michigan authority counsel should consult for guidance in testing the sufficiency of the title of legislation brought to scrutiny. The opinion gathers and reviews with care all of the authorities handed down to its time, and presents these answers to what will ever be a recurrent constitutional question (pp 160–161):

"What is the constitutional test? We think it is that a title must embrace the object of the act, and the body of the act must not be inconsistent with the title. The pertinent questions should be: Does the title of the act fairly indicate the purpose of the legislation? Is the title a fair index of the act? Does the title of the act fairly inform the legislators and the public of its purposes, as a whole?"

"In *Brooks v Hydorn,* 76 Mich 273, 278 (42 NW 1122) [1889], Justice Morse, speaking for this court, said:

" 'This purpose of the constitutional direction, which has been disregarded in this act, is that the intent of the bill—its object—shall be clearly shown by its title for the benefit, not only of the members of the legislature who are to vote upon it, but also for the benefit of the State outside of the legislature, who are interested, and have a right to be, in all legislation, whether the same be general or special.' "

Judged by these rules the title of the building authority act has always restricted the issuance of bonds, by any and every authority appointed thereunder, to what are legally identifiable and commonly known as revenue bonds. So did the title of the Revenue Bond Act from the time of its enactment in 1933 to the time of its express amendment, in 1969 (by No 87), to provide "for a pledge by public corporations of their full faith and credit for the payment of the bonds". But here 1970-amended § 11 of the building authority act still restricts, as it has since 1948, the financing

power of the appointed authority to that of issu-
ance of "self-liquidating revenue bonds", such
bonds only, as theretofore and presently autho-
rized by the Revenue Bond Act.

No one could possibly know this better than do
the nationally eminent bond counsel for these
defendants, the respective offices of whom overlook
the financial canyon of Detroit's Griswold Street
where all great bond issues of our public corpora-
tions must pass in review. They surely must recall
vividly, more so than the writer, the emergent
events of early 1933 that gave rise to the need for
exclusive financing of public, projects by issuing
and selling "self-liquidating revenue bonds, paya-
ble solely from the revenues derived from the
operation of such project" (from the title of 1933
PA 94, pp 117–118). The people had just initiated
and adopted the "15 mill amendment" (Const
1908, art 10, § 21) and there was no other way to
finance such projects. Besides, any legislator or
local officer who in those days so much as hinted
at more property taxation was doomed politically.

In sum, the act of 1933 has nailed down in
public as well as professional understanding the
purpose and meaning of "self-liquidating revenue
bonds". That exclusively precise expression defines
what kind of bonds an appointed authority may
issue under § 11 as it reads today. Now let us
examine the critical portion of that section (PA
1970 at 135):

"Sec. 11. For the purpose of acquiring, improving and
enlarging any such building or buildings, automobile
parking lots or structures, recreational facilities, stadi-
ums, and the necessary site or sites therefor, together
with appurtenant properties and facilities necessary or
convenient for the effective use thereof, and furnishing
and equipping the same, *the authority may issue self-
liquidating revenue bonds in accordance with and sub-*

*ject to the provisions of Act No. 94 of the Public Acts of 1933, as amended,* being sections 141.101 to 141.139 of the Compiled Laws of 1948, except that the bonds may be either serial bonds or term bonds or any combination thereof, as shall be determined by the authority. *Such bonds shall be payable solely from the revenues of such property, which revenues shall be deemed to include payments made under any lease or other contract for the use of such property.* Where and to the extent that the bonds are payable from revenues derived from payments to be made pursuant to any lease or other contract obligations, the bonds shall be deemed to be issued in anticipation of contract obligations and such obligations shall be deemed to be contract obligations in anticipation of which bonds are issued, within the meaning of section 6 of article 9 of the constitution. No such bonds shall be issued unless the property whose revenues are pledged has been leased by the authority for a period extending beyond the last maturity of the bonds. For the purpose of section 33 of Act No 94 of the Public Acts of 1933, the limits of the authority shall be deemed to coincide with the limits of the incorporating unit, or in the case of a joint authority organized under section 2, with the limits of the county, or in the case of a joint authority organized under section 2a, with the combined limits of the incorporating units." (Emphasis supplied.)

If anything in this welter of words is construable as empowering an appointed authority to issue bonds other than "self-liquidating revenue bonds", such as bonds secured in whole or in part by property taxation, that construction must fall before the title of the Act as it stands; § 24 being supremely controlling.

Decisive as they are, the foregoing considerations do not touch or apply another and less delicate purpose of § 24; that of *preventing fraud* in the legislative process. Compare the 1969 amendments of the title and body of the Revenue Bond Act (by No 87) with the 1967 (by No 200),

1968 (by No 96) and 1970 (by No 47) amendments of the title and body of the building authority act. Then examine all in array with the statutorily required publication of notice of intent to issue the bonds that are now in question. The specific representation of that notice was declared intent "to issue and sell Revenue Bonds of the Authority, pursuant to Act 94, Public Acts of Michigan, 1933, as amended, and Act 31, Public Acts of Michigan, 1948 (First Extra Session), as amended, * * * ."[3]

In this statutory and documentary record of visibly representational employment of "revenue bonds" and "self-liquidating revenue bonds", there is persuasive evidence of the kind of fraud § 24 was designed to prevent. No one here should shrink from saying so.

Take the Revenue Bond Act. By 1969 PA 87, the title and body of that act were amended radically, so as to authorize for the first time in the 36 year life of the statute a financing choice, available to the "public corporation", between

(a) the issuance and sale of self-liquidating revenue bonds as before or,

(b) the issuance and sale of bonds supported in part by "net revenues primarily pledged to such payment", and in part by property taxation pursuant to new § 7(2) of the act.

It is the *fact* and the *framing* of these 1970 amendments of the building authority act that should concern us now, for it is persuasively if not conclusively inferable that the promoters, the drafters, the introducers and the lobbyers thereof knew all about—if indeed they were not the pushers thereof—the year-before pledge and tax amendments of the Revenue Bond Act. Hence, if it

---

[3] The Court's forthcoming opinion will touch this publication with detail.

was desired that bonds issued and sold by the
Stadium Authority have the same taxational sup-
port as in § 7(2) of the Revenue Bond Act
provided, why—in 1970—was the title of the build-
ing authority act left pertinently intact, thus con-
tinuing the since-1948 representation to legislators
and public that all bonds issued by "such authori-
ties" would be "revenue bonds"? I can only con-
clude that, with the title of the building authority
act proposed for amendment as was the title of the
Revenue Bond Act the year before, the risk of § 24
arrest of the 1970 bill, by alerted legislators, must
have been deemed greater than the more doubtful
and more distant risk of a judgment of invalidity
under § 24, and that the deft draft of these 1970
amendments was designed to conceal a purpose
that circuitously worded § 11 would authorize the
issuance by "such authorities" of "revenue bonds"
*supported by taxation, at large and as needed over
a long period of years;* all "without limitation as to
rate or amount" within the "meaning of section 6
of article 9 of the constitution."

Such is constitutionally banned fraud; the kind
oft cited *Callaghan v Chipman, supra,* has warned
against for 86 years (pp 614–616):

" 'The principal questions in each case will therefore
be whether the act is broader than the title; and, if so,
then whether the other objects in the act are so inti-
mately connected with the one indicated by the title
that the portion of the act relating to them cannot be
rejected, and leave a complete and sensible enactment
which is capable of being executed.' *Chiles v Monroe,* 4
Metc (Ky) 72 [1862]; Cooley, Const Lim 148, 149;
*Weaver v Lapsley,* 43 Ala 224 [1869]; *People v Briggs,*
50 NY 566 [1872]. On the other hand, 'as the Legisla-
ture may make the title to an act as restrictive as they
please, it is obvious that they may sometimes so frame

it as to *preclude* many matters being included in the act which might, with entire propriety, have been embraced in one enactment with the matters indicated by the title, but which must now be excluded because the title has been made unnecessarily restrictive. The courts *cannot* enlarge the scope of the title. They are vested with no dispensing power. The constitution has made the *title* the *index* to the legislative intent as to what shall have operation. It is no answer to say that the title might have been made more comprehensive, if in fact the Legislature have not seen fit to make it so.' Cooley, Const Lim 148, 149; *Ryerson v Utley,* 16 Mich 269 [1868]; *People v O'Brien,* 38 NY 193 [1868].

"The object and purpose of the constitutional provision now under consideration is stated by Mr. Justice COOLEY, in the case of *People v Mahaney,* 13 Mich 481 [1865], as follows: After referring to a practice which had prevailed of bringing together into one bill subjects diverse in their nature, and saying that it was corruptive both to the legislature and the State, he adds:

" 'It was scarcely more so, however, than another practice, also intended to be remedied by the constitutional provision, by which, through dexterous management, claims were inserted in bills of which the titles gave no intimation, and their passage secured through legislative bodies whose members were not generally aware of their intention and effect. * * * The framers of the constitution meant to put an end to legislation of the vicious character referred to, which was little less than a fraud upon the public, and to require that in every case the proposed measure should stand upon its own merits, and that the legislature should be *fairly notified* of its design when required to pass upon it.'

"The same views have been taken of the object and purposes of the provision in other states. [Citing authorities including *People v Com'rs of Highways,* 53 Barb 70 (1869).]

"In the case of 53 Barb. the title of the act was 'An act to *regulate* a road in the town of Palatine, Montgomery county.' The object of the act was to authorize and direct the commissioners of highways of a specified town to reduce a road, then of the width of four rods, to the width of three rods. In that case Judge Potter says:

'Legislative abuses, in disregard of private property, have become the standing reproach of the day. Important encroachments upon public and individual rights, and with bold impunity of consequence, are smuggled through the legislature by acts bearing *most deceitful* or *mysterious* titles, and so *ingeniously* devised as to ward off all suspicion or inquiry, or entirely to *mislead* parties interested as to the object of the act, if, perchance, they should ever read its title. Such considerations as these in relation to this existing evil, so frequently brought to the knowledge of the courts, imperiously call upon us, when the occasion presents itself, to look with a jealous scrutiny, that the constitution, in subordination to which all statutes are subject, shall not be encroached upon, nor its provisions contravened by legislative action.' And the court made short work of the act then being considered. He said: 'The *body* of the bill *expresses* its object; the *title disguises* and *conceals* it. It is a fraud upon the public; it is a fraud upon the constitution. The words to regulate, employed in the title, are deceptive. The subject is not honestly or fairly expressed in the title, but carefully avoided. The act was conceived in fraud, and its title designed in fraud.' " (All emphasis by Court.)

> *Second: An Urgent Remedy for the Deceptive Inclusion in the Finance and Taxation Article of that which is presently headed "Limits on ad valorem taxes".*

I take it that few readers of the *Butcher* case and of our instant opinions will deny a critical need for protection statewide against unrestrained property taxation, especially all such as may be levied "without limitation as to rate or amount". Nor would any such reader be apt to deny a complementary need for restoration of that constitutional provision which for many years carefully limited "taxes assessed against property for all purposes" excepting only as voted otherwise by the electors affected, such as obtained from and after

initiation and adoption of the "15-mill amend-
ment" in 1932. Let me recall the pivotal words of
that amendment, leaving out the two presently
impertinent provisos thereof:

"Section. 21. The total amount of taxes assessed
against property for all purposes in any one year shall
not exceed one and one-half per cent. of the assessed
valuation of said property, except taxes levied for the
payment of interest and principal on obligations hereto-
fore incurred, which sums shall be separately assessed
in all cases: * * * ."[4]

The need mentioned was not fully realized until
the *Butcher* case was submitted and resubmitted
in 1971 and decided March 9 last. Now an un-
checked flood of bond issues, secured in whole or
in part by more. and more property taxation, flows
steadily through an incredibly careless Municipal
Finance Commission and on to a great multitude
of foreclosable property tax liens. The situation is
urgent, and calls for legislative submission this
year of another amendment corresponding with
that of 1932, adjusted only to the "50 percent"
proportion of true cash value which new § 3 of
article 9 imposes. To that the legislative draftsmen
might well add a footnote memo to the Supreme
Court, by which the people could inform the Jus-
tices that the words "total amount of taxes as-
sessed against property for all purposes in any one
year" means exactly what it says and that the
restrictive scope thereof takes in all kinds of sin
taxes, use and abuse taxes, privilege taxes, per-
sonal taxes, special assessments, general assess-
ments, duties, imports and excises, whenever same
are imposed upon and levied against property and

[4] The full quotation appears in the first opinion where the amend-
ment was brought to review; *Pontiac School District v City of Pontiac,*
262 Mich 338 (1933).

become a lien thereon which, if not paid, may be foreclosed with resultant loss of the delinquent taxpayer's property.

Within the past few days a further reason for submission of such a protectively clear amendment has surfaced. With the so-called MEA amendment now initiated and due to go before the people this year, and with the inclusion in that proposed amendment of the same "without limitation as to rate or amount" language which in *Butcher* we considered, the electors are apt rightfully to be both wary and chary of what is being widely represented as "property tax relief" or "property tax reform". In short, the people having been deceived before by § 6 and its submission are less likely to approve an amendment that tastes again of property taxation "without limitation as to rate or amount", at least until they have been precedently assured, as by the 1932 amendment, *that they are to have overall elective control over all property taxation.* That assurance will have to be provided, if I read aright the understandable suspicions of property taxpayers, before they as electors will approve an amendment containing much the same language as appears now in the second paragraph of § 6 of the finance and taxation article.

By way of conclusion it may not be amiss to add a wholesome word about politics. The Legislature today, like this Supreme Court, could stand a bit more of that great desiderate which spells trust and respect of the people who sent us to legislative and judicial duty. So far as the Legislature is concerned I can think of nothing that might so quickly tend to bring for its membership great cheers, from all over the state, than the submitted opportunity of restoration of local elective control over property taxation.

*SUPPLEMENT* (August 30, 1972).

A copy of the Court's opinion, as it stands *(ante 233)*, was delivered to me August 2. That opinion, manifestly the product of assiduous and painstaking endeavor to prevent more like errors of elected and appointed municipal officers, is replete with value of great significance in and for the area of municipal finance and the relation of applied constitutional and statutory provisions to that area. The opinion does, however, include certain commitments which in my respectfully submitted judgment are not requisite to decision and, also, are susceptible to brand of dicta.

Of prudence learned over the years, I am not prepared to endorse the Court's opinion in its entirety. I therefore record that which appears below in the same cautionary mood one finds in Justice Cardozo's introduction of Lecture I, delivered in 1921.[5]

I concur with and endorse the outline and statement of facts appearing in the Court's opinion *(ante 236–244)*; also with Divisions I, II, III *(ante 238–253)*, and with X and "B." of XI *(ante 330–356)*. I agree tentatively but not fully with the remainder of the opinion and, of course, concur with the judgment of the Court, affirming the circuit court's judgment.

T. E. Brennan, J. *(dissenting). The gist of the*

---

[5] "I own that it is a good deal of a mystery to me how judges, of all persons in the world, should put their faith in dicta. A brief experience on the bench was enough to reveal to me all sorts of cracks and crevices and loopholes in my own opinions when picked up a few months after delivery, and reread with due contrition. The persuasion that one's own infallibility is a myth leads by easy stages and with somewhat greater satisfaction to a refusal to ascribe infallibility to others. But dicta are not always ticketed as such, and one does not recognize them always at a glance." (Quoted from the *Selected Writings of Benjamin Nathan Cardozo,* p 116; Fallon Law Book Co., New York, 1947).

*majority opinion is that the stadium bonds are invalid because they are not "true" revenue bonds.*

They are not "true" revenue bonds, say the majority, because they are, in reality, "tax bonds", backed by the full faith and credit of the County of Wayne.

They are "tax bonds", the reasoning goes, because the county has agreed to lease the stadium; has pledged its full faith and credit for the payment of the rent; and the amount of the rent is equal to the obligation on the bonds.

This, of course, was precisely the argument of the plaintiff in *Walinske v Detroit-Wayne Joint Building Authority,* 325 Mich 562, 574–575, (1949):

"Plaintiff contends that a vote of the electorate is required by the Constitution, the State statutes and the charter of the city of Detroit to authorize the proposed construction and issuance of bonds. He claims that the city and county by entering into a lease binding them for a long term of years to pay a rental sufficiently large to pay the operational cost of the contemplated building, the interest on the revenue bonds as it becomes due, and also the principal of the bonds as it becomes due over the period of the lease, and the fact that the lease and the bonds are to be for the same term and when the bonds are retired the authority must convey the building to the city and the county, is in effect a contract to pay the cost of the building. He further claims that the proposed bonds to be issued by the authority are in fact full faith and credit bonds of the city and county and subject to their bond debt limitations. He admits that the bonds are to be issued by the authority, and that the city and county do not pledge their credit to pay the interest and principal directly, but that they do so indirectly by agreeing to pay rent to the authority sufficient to pay such interest and principal over a long period of years. He further claims that this is an illegal method of circumventing the law and constitutional provisions, as the city and

county are attempting to do indirectly what they could not do directly."

If the county's pledge of full faith and credit to pay the rent converts these bonds into "tax bonds", and if that is the controlling fact, then it is difficult to see how any public building can be financed under the building authority act (1948 PA 31) without the same objection.

But, my Brethren reply, there is a difference between a courthouse and a stadium. Of course there is a difference.

But if building authority bonds for a courthouse rented to the county are valid and building authority bonds for a stadium rented to the county are invalid, then the difference between a courthouse and a stadium must be the salient and distinguishing fact, which causes the difference in the bonds.

If the county's agreement to pay rent converts these stadium bonds into tax bonds, and the county's agreement to pay rent does not convert courthouse or jail bonds into tax bonds, then it is obvious that the controlling element is not the *fact* of the payment of rent, but the purpose or reason for which the rent is paid.

Here of course, the majority opinion runs headlong into the plain language of the statute. Stadiums are listed along with other public buildings. Stadiums are specifically declared to be proper public purposes.

Indeed, the conclusion is inescapable that the Legislature in 1970, by PA 47, amended PA 31 of 1948, with the precise transaction before us uppermost in their minds.

"Sec. 8. The authority and any incorporating unit or units shall have power to enter into a contract or

contracts whereby the authority will acquire property contemplated by the terms of this act and lease the same to the incorporating unit or units for a period not to exceed *50* years. The consideration specified in such contract for such use shall be subject to increase by the authority if necessary in order to provide funds to meet its obligations. Any rental obligation or consideration applicable to the incorporating unit or units under such contract, shall not be considered as indebtedness of the incorporating unit or units within the meaning of any statutory or charter debt limitation of such incorporating unit or units. *With the consent of the authority as contained in the contract or otherwise secured, any incorporating unit or units to which the property is leased, may sublease the property or any part thereof to any 1 or more persons, firms or corporations or may contract for the use of the property or any part thereof by any 1 or more persons, firms or corporations, where the sublease or contract benefits and serves a legitimate public purpose of the sublessor. Any sublease or contract may extend for a period not to exceed 50 years and is not a franchise or grant within the meaning of any statutory or charter provision. The acquisition of any stadium with appurtenant properties and facilities by any authority and the contracting for the lease thereof by any incorporating unit or units, for the purpose of providing facilities for sports, recreational and other activities and events, with or without admission charges, and furnishing facilities for use or enjoyment by the public and to induce sports and entertainment organizations, whether amateur or professional, to utilize the facilities for games, contests and other performances and attractions and thus to increase business activity and employment, constitutes a benefit to and a legitimate public purpose of the authority and the incorporating unit or units. Where any stadium with appurtenant properties and facilities is acquired by an authority and leased to any incorporating unit or units, the subleasing thereof to, or the contracting for the use thereof by, any sports, entertainment or similar organization or any owner of a franchise in any professional sports or athletic league or association, in consideration of the agreement of the organization or owner and, if*

*necessary, the league or association to hold, conduct or produce games, contests and other performances and attractions in such stadium, with or without admission charges, constitutes a benefit to and a legitimate public purpose of such incorporating unit or units."* (Emphasis added.) MCLA 123.958; MSA 5.301(8).

Oddly enough, the majority have not found the 1970 amendment a violation of the constitutional prohibition against the loan of state credit. 1963 Const, art 9, § 18.

Quite the contrary, the majority has concluded that the acquisition and operation of a stadium by the county *is* a proper public purpose.

If the county's rent obligation is not the crucial fact, and if the construction of a stadium is not *per se* the crucial fact, what is?

Put another way, if *some stadium* bonds are valid and *some stadium* bonds are invalid, where is the line to be drawn?

Now my Colleagues reply, "there are stadiums and there are stadiums." Of course there is a difference. All stadiums are not alike.

But are they to be distinguished in point of law or on the basis of their size? Their cost? Their location? The shape of the playing field or the sports intended to be played there?

Clearly such considerations are irrelevant.

The majority holds that stadium bonds issued solely under the Revenue Bond Act, without the incorporation of a building authority, or the intervention of a leasehold interest in the incorporating unit, would be valid. In such a case, the private user would pay rent sufficient to meet the entire bonded obligation.

Such bonds, it is suggested, would be "true" revenue bonds.

But the question remains whether any kind of a

stadium can be built under the building authority
act (Act 31).

The question remains whether in the absence of
any sufficient anticipated *profit* from the operation
of the stadium, the county itself can guarantee the
*revenue* which will underlie the issuance of the
bonds.

In short, can the county *itself* get into the
stadium business?

Could the county rent an existing stadium for
the purpose of providing a place for its citizens to
compete in various athletic contests and to attend
such games, or to present and attend various
pageants, celebrations and conventions, or gener-
ally to accommodate the many public functions of
general interest and concern to the citizenry?

In my own view, the answer is obvious. Stadi-
ums and Colosseums are among the most ancient
of municipal structures.

Surely there are many publicly owned stadiums
and athletic arenas already built and operating in
Michigan. State owned colleges and universities
have state-owned stadiums. Public schools have
football fields and baseball fields and gymnasiums.
The State Fair has both indoor and outdoor are-
nas. County fairs have race tracks and grand-
stands. Public parks have athletic fields of every
description and benches, dugouts, seats, chairs,
press boxes, locker rooms, turnstyles, scoreboards,
lights and every conceivable accoutrement. Prisons
have stadiums.

If all the publicly owned grandstands in Michi-
gan were filled to capacity at the same time, there
would be hardly anyone standing up from Monroe
to Manistique.

It may be that there are more pressing demands

upon the county's purse than renting a stadium in downtown Detroit.

But whatever the policy considerations, this is a very late date indeed for this Court to pronounce that the county may not legally and constitutionally undertake to rent one.

The feeling abides that the taxpayers of Wayne County are being used; that their rental payments will go to acquiring a magnificent riverfront stadium which will then be turned over, for an inadequate consideration to the Detroit Baseball Club, Division of John E. Fetzer, Inc.; that this aspect of the transaction is so unconscionable as to prompt the court below, and this Court, to hold the entire bond issue invalid, even though the legal theory of the bond issue is technically unassailable.

Some sections of the proposed sublease to the Detroit Baseball Club are especially disconcerting. It contemplates that 40,000 square feet of office space will be provided to the sublessee, within the stadium facility. It grants a monopoly to the Detroit Baseball Club in the area of professional and "semi-professional" baseball. It permits the Baseball Club to use the stadium for practice sessions whenever it is not otherwise being used, and prohibits the county or the Authority from using the stadium at all except upon seven days notice to the sublessee.

Such arrangements are hardly consistent with the non-discriminatory conduct of a publicly owned and operated facility.

The general corporate offices of the baseball team which plays in the stadium have no more call to be housed in the stadium than the general corporate offices of the meat packing firm which supplies the hot dogs or the broadcasting company which televises the games.

Professional baseball is a lawful occupation, and even at the major league level is not so affected with the public interest as to be classified as a public utility. The county has no more right to issue a baseball franchise in a domed stadium than it has to grant a monopoly to any user of a public facility. Neither can a public facility be "reserved" for a single user without the payment of the same consideration as any other user would be required to pay for the possession of the premises during a comparable period of time.

But these and other considerations which go to the validity of the sublease, are not presently before us.

They should be considered in a proper proceeding to which the Detroit Baseball Club has been made a party.

In my view, the sublease neither adds to nor detracts from the legal posture of the proposed bond issue.

I would reverse and remand.